E-FILED
Saturday, 25 January, 2020  12:38:01 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
### For the
### Central District of Illinois

**JAMAAL APPLEWHITE,**

    **Plaintiff,**

    **v.**

**DEERE & COMPANY, INC., a Delaware Corporation,**

    **Defendant.**

**Case no.: 4:18-cv-04106-SLD-JEH**

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**

TABLE OF CONTENTS

Introduction                                                                                                      3

Undisputed material facts ("UMF")                                                                6

Disputed Material Facts ("DMF")                                                                  7

Disputed Immaterial Facts:                                                                        26

Undisputed Immaterial Facts                                                                        27

Additional Material Facts ("AMF")                                                                27

Argument                                                                                                          42

I.   RETALIATION                                                                                            42

      A.   Plaintiff Establishes a Causal Connection Between His Protected Activities and Deere's
Adverse Actions                                                                                            43

      B.   Plaintiff Presents A Preponderance of Evidence Supporting A Reasonable Conclusion
That The Alleged Basis For His Termination—Excessive Tardiness And Absenteeism—
Was Pretext for Retaliation                                                                          47

          Evidence demonstrates that Deere acknowledged a retaliatory motive for its materially adverse
action.                                                                                                            48

          Deere practiced several actions that would deter reasonable individuals from Utilizing FMLA
leave and reporting violations of the FMLA.                                                49

              *Deere administered an adverse employment action to Mr. Applewhite each
time he took leave or opposed its FMLA interferences, and blocked his
attempts to prevent unexcused absences.*                                                    50

              *In dealings with Mr. Applewhite, Deere departed from its documented policies
and customary procedures, and treated Applewhite less favorably than
similarly situated employees.*                                                                  51

              *Deere included unwarranted and unfavorable comments in Applewhite's work
performance appraisal.*                                                                          53

II.  INTERFERENCE                                                                                          54

      A.   Deere's FMLA Interference Since June 12, 2015 Are Not Time-Barred              55

      B.   The Three-Year Statute of Limitations Applies                                          55

      C.   Plaintiff Was Denied FMLA Benefits to Which He Was Entitled Under The Certifications
Approved on December 2015 and May 2016                                              56

          Deere's recertification request was improper so the original certification, per the FMLA, permitted
Mr. Applewhite to take leave to help his mother any day from December 23, 2015 to December
22, 2016, until his 60 days of entitlement were fully depleted.                          56

          Even if the court determines the basis for Deere's early recertification request was legitimate,
Heidi Ciha did not provide an adequate deadline to complete the recertification, and was
prohibited from denying Mr. Applewhite FMLA leave until after June 8, 2016.      59

          Plaintiff demonstrates Deere violated the FMLA when it secretly authenticated the recertification,
and blocked him from taking leave on May 16, June 2, and June 15 of 2016 (even under the care
described in the recertification).                                                                60

CONCLUSION                                                                                                  62

## INTRODUCTION

In support of its Motion for Summary Judgment, Defendant Deere & Company ("Deere"), who denies Plaintiff's claims of FMLA interference and retaliation, filed its fallacious brief in the course of litigation. To the extent they are even relevant, Defendant's naked assertions in its brief, and its underlying documents, do not support its claims. Rather, the parties agree on the material facts properly supported by the record which establish that Deere interfered with Plaintiff's right to take FMLA leave, and terminated Plaintiff for reasons that violated Plaintiff's rights under the FMLA.

Notwithstanding the undisputed record, in support of its Defense, Defendant: 1. claims Plaintiff exhibited increasing attendance issues before his request for FMLA leave; 2. argues that it granted telework privileges to support Plaintiff's FMLA need; 3. affirms revoking Plaintiff's telework privileges for using them the same weeks of taking leave; 4. bases Plaintiff's termination on his noncompliance to both its work start time (before and after it was established); and 5. reasons that all acts of interference before June 12, 2016 are time-barred. Truth to the matter, had Plaintiff not elected to take leave to take care of his mother, especially intermittently, Defendant would not have established a work environment where Plaintiff would be considered late to work, which it later used as a basis for the termination of his employment. A reasonable jury, based off the undisputed facts, would determine that Defendant's claims are inconsistent, and it is guilty. It is also evident that, as a matter of law, the Defendant's motion for summary judgment should be denied, while granting that of the Plaintiff. Defendant, only after the commencement of litigation, claims that Plaintiff's increasing attendance issues before his request for FMLA in December 2015 contributed to its decision to terminate his employment. However, it is important to note that, during this period, Plaintiff received nothing but exemplary appraisals for his fiscal year 2015 and 2016 work performance. After the Plaintiff requested FMLA leave in December 2015, participated in complaints against Defendant in February and March, and increased leave usage, Defendant revoked his telework privileges and required him to begin work by a specific time. Here, it is important to note that it

is undisputed, the revocation of Applewhite's telework privileges and the requirement for him to begin work by a specific time, resulted from his attempt to take FMLA leave on May 16, and were not conditions similarly situated employees, who had not invoked their rights for intermittent FMLA leave, suffered. One of the similarly situated employees, Steuer, had taken continuous FMLA leave, but Plaintiff's intermittent leave differed in that Defendant's Human Resources staff found it so difficult to manage that they complained about it, and worked amongst themselves to discourage Defendant from using it. The undisputed evidence shows that they preferred that he use FMLA leave continuously. To discourage Plaintiff from participating in FMLA rights afforded to him, Defendant: prematurely requested Plaintiff recertify before his mother's condition was expected to end, disallowed him enough time to complete the recertification, denied his sufficient requests for leave, issued him warnings  for protected absences, revoked his telework privileges, removed him from leadership responsibilities, denied him an annual pay increase, stalked him, refused to answer his questions regarding is FMLA entitlement, treated him differently than similarly situated employees, and more.  In May 2016, only after Defendant constrained Plaintiff to the discriminatory and restrictive work environment and wrongfully denied his FMLA leave requests, it began considering him late to work and reprimanding him for it. The undisputed facts confirm Plaintiff's employment would not have been terminated had his FMLA leaves of absence on May 16, June 2, and June 15 been excused.

Prior to Plaintiff's FMLA leave request, his alleged tardiness and absence to meetings cited by Defendant were excused and not addressed. This is why the record on each of these points shows Mr. Applewhite, prior to taking leave, received exemplary work performance reviews, with no mention of, or discipline for, attendance issues. Furthermore, the practice at Deere was to begin and end meetings late, and this was true for the team to which Plaintiff belonged. Consequently, Defendant referenced Plaintiff's absence and tardiness to meetings as the basis for the termination of his employment, after Plaintiff filed this action, only to protect itself. Immediately after Plaintiff began utilizing FMLA leave, Defendant started to

discourage him from further using it. The record further shows that Defendant's retaliatory actions were willful, and that Defendant was intentional about covering up its discriminatory motives. Such evidence invokes the statues three year statue of limitations. Defendant's motion for summary judgment is therefore not legally viable.

Defendant's claim that it is entitled to its summary judgment on Plaintiff's retaliation claim because there is no causal connection between Plaintiff's termination and his FMLA leave, and Plaintiff presents no evidence that the basis for his termination was pretextual must fail. The law in this jurisdiction is uniform that in wrongful termination actions under federal employment statues, a plaintiff survives summary judgment on his retaliatory discharge claim when he presents evidence: 1. that he engaged in protected activity; 2. he suffered an adverse employment action; and 3. a causal connection exists between the two. Plaintiff does precisely that.

Plaintiff, in this case, presents a preponderance of evidence that he suffered an assortment of related adverse actions when he attempted to take leave or complained about the violation of his rights, and the basis was pretextual. He establishes a causal connection between Defendant's adverse actions and his protected activities by proving that: 1. the temporal proximity between the chain of adverse actions that concluded in the termination of his employment and his participation in protected activities were unusually suggestive of retaliation; 2. Defendant acknowledges a retaliatory motive for its materially adverse action; and 3. Defendant implemented several tactics that would discourage a reasonable individual from utilizing leave and reporting violations of the FMLA.

Defendant terminated Plaintiff's employment in June of 2016, but as soon as Plaintiff returned from his year of personal leave in March 2015, it began interfering with his right, and setting the stage so that Plaintiff's termination of employment appeared to be based on non-retaliatory reasons. Plaintiff's successful fight for his FMLA leave rights prior to 2015, and his continued participation in FMLA rights upon his return provoked Deere's illegal behaviors.

For all of the foregoing reasons, and as further discussed below, the Court should enter summary judgment in favor of Plaintiff, and against Defendant.

## UNDISPUTED MATERIAL FACTS ("UMF")

List by number each fact from Section B of the motion for summary judgment which is conceded to be undisputed and material.

1. Undisputed.

3. *See* additional material facts. Undisputed that Matter was Plaintiff's direct supervisor. Plaintiff objects to Paragraph 3 to the extent that it suggests cost analysis projects was his main or only job responsibility. Mr. Applewhite's primary responsibility was to plan, execute, manage, and close the CART project plan so that the project was completed on time, and within scope and budget. [ECF No. 57–1 Page 13.]

7. Undisputed. *See* additional material facts.

9. *See* additional material facts. Undisputed that Matter, in October 2015, agreed to allow Plaintiff to telework on Monday of each week. However, Defendant objects to the remainder of the allegations in Paragraph 9 as unsupported by the cited evidence and to the extent that it makes legal arguments. The telework arrangement that Matter permitted did not make it possible for Plaintiff to spend each weekend in Chicago. Plaintiff was able to spend each weekend in Chicago before Matter permitted the telework arrangement.

15. Undisputed.

19. Undisputed. *See* additional material facts.

22. Undisputed. *See* additional material facts.

28. Undisputed.

30. Undisputed.

34. Undisputed that Matter shared with Plaintiff on April 19, that beginning the following workweek, his telework privileges were revoked. It is also undisputed that Deere revoked Plaintiff's telework privileges just hours after Knupp complained that he was "...getting

his work time in at off-business hours and not claiming or taking FMLA time." [ECF 63-4 ¶ 29.]

Plaintiff had taken FMLA leave the same week that he teleworked.

      35.     Undisputed.

      42.     Undisputed.

      48.     Undisputed.

      49.     *See* additional material facts. It is undisputed that Plaintiff wrote "[t]ardiness has been an issue for me, but has not impacted my ability to perform." However, Plaintiff clarifies that FMLA-related tardiness was the issue as it impacted how he was perceived by others. For that reason, he requested, in his mid-year review summary comments, titled, "Men Lie. Women lie. Numbers don't", the following from Matter: "I only ask that my evaluations are based off of facts (instead of perception and hearsay). I ask this because I've learned that much of my colleagues feedback and opinions are based off of their **perceptions**..." [ECF 53-7 Page 26.]

      53.     Undisputed. *See* additional material facts.

      54.     Undisputed.

      60.     Undisputed.

      63.     *See* additional material facts. Undisputed that Plaintiff testified that Wolff was not on time for meetings 100 percent of the time. However, Defendant did not cite evidence to support the factual assertion in paragraph 63.

## DISPUTED MATERIAL FACTS ("DMF")

 List by number each fact from Section B of the motion for summary judgment which is conceded to be material but is claimed to be disputed. Each claim of disputed fact must be supported by evidentiary documentation referenced by specific page. Include as exhibits all cited documentary evidence not already submitted by the movant.

      2.     Disputed. *See* additional material facts. Mr. Applewhite took leave only after the Vice President of Supply Management, Ranjit Nair, extended Mr. Applewhite the option to take an unpaid leave of absence with benefits, in lieu of quitting. Still, he discussed with Pamela Brandt options of separating from the company while on leave. (Declaration of Applewhite

"Applewhite" ¶ 2; *Id*. Exhibit "Ex." A.) During the early part of 2014, Mr. Applewhite planned to quit because he was subjected to a hostile and discriminatory work environment that manifested after he successfully fought for his right to go on intermittent FMLA leave to help take care of his parent, and lasted until he went on a personal leave. (*Id*. ¶ 3; *Id*. Ex. B .)

4.  Disputed. Matter supported late work start days, especially when Mr. Applewhite worked extremely late evenings and/or early mornings. (Applewhite ¶ 7; *Id.* Ex. D.) Before Mr. Applewhite began utilizing his FMLA leave, work start times for Matter and the employees that worked for him, directly and indirectly, included working independently and together at any and all twenty-four (24) hours of the day:

- May 12, 2015 from 8:59 PM to 9:20 PM, Mr. Applewhite worked with Matter, and Matter supported Mr. Applewhite's plan to begin work the next day at his discretion. (Applewhite ¶ 7; *Id*. Ex. D at Bates numbers ("Bates") ending 447.)

- Steuer testified that, on occasion, he began work as late as 10 PM. (Exhibit ("Ex.")  B, Deposition of Steuer, 30:23-24, 31:1-4.)

- May 13, 2015 from 12:49 AM to 1:35 AM, Mr. Applewhite worked with Ruchi Choubey, a representative of the business segment located in India (Applewhite ¶ 7; *Id*. Ex. D at bates nos. ending 445-446.)

- August 11, 2015 at 3:30 AM Mr. Applewhite worked with Bipul, a representative of the business segment located in India, to support Bipul during a Region 1 CART meeting that was scheduled for 4 AM that same morning. (Applewhite ¶ 7; *Id.* Ex. D at bates nos. ending 1849, 1855.)

- January 4, 2016 from 11:46 PM to 12:48 AM, Mr. Applewhite worked with Amit Kadukar, a representative of the business segment located in India. (Applewhite ¶ 7; *Id*. Ex. D at bates no. ending 316.)

- January 4, 2016 from 12:50 AM to after 2:30 AM, Mr. Applewhite worked with Atul Jadhav, a representative of the business segment located in India. (Applewhite ¶ 7; *Id*. Ex. D at bates no. ending 312.)

- January 8, 2016, Matter worked around 12 AM. (Applewhite ¶ 7; *Id.* Ex. D at bates nos. ending 663-664, 666.)

- March 9, 2016 at 12:32 AM to 12:43 AM,  Mr. Applewhite worked with Amit Kadukar, a representative of the business segment located in India. (Applewhite ¶ 7; *Id*. Ex. D at bates no. ending 152.)

This occurred because Mr. Applewhite and his colleagues supported Deere segments around the world, which is why approximately 90% of his meetings were held virtually and/or independently.

5.      *See* additional material facts. It is undisputed that close collaboration with Silverstein was required for Plaintiff to be successful leading CART. However, Plaintiff clarifies that close collaboration with all of the project's team members was important, whom were located throughout about three countries and 7 unique cities, spanning about three countries and four states. For that reason the team met virtually. Plaintiff objects to Paragraph 5 to the extent that it suggest that Plaintiff and Sivertsen were required to meet in person for CART meetings when in fact they often led and participated in CART meetings from their own desks. Similarly, one of Steuer's primary responsibilities was leading a software-deployment project that required close collaboration. He testified that he was allowed to telework from home while working for Matter. (Steuer 25: 21-23.) Plaintiff further objects to Paragraph 5 to the extent that it makes legal arguments and assertions not supported by the cited evidence. (Applewhite ¶ 11.)

6.      Disputed. On February 26, 2015, Applewhite shared with Matter his need to support his mother in Chicago. [ECF 63-4 ¶ 14; ECF No. 57-2 Page 61.]

10.      Disputed. Matter allegedly learning of Mr. Applewhite's tardiness is hearsay. Additionally, Mr. Applewhite scheduled meetings on Ms. Siversten's behalf because he was the project manager, and he did not plan to attend all meetings at the start of the meeting, or even at all. (Applewhite ¶ 9.) Defendant offers no evidence to support its claim that Mr. Applewhite's colleagues shared any timeliness concerns with Matter "soon after" he approved a telework

arrangement in October 2015. The first time Matter solicited and received feedback regarding Mr. Applewhite's timeliness was on February 16, 2016, after Mr. Applewhite began utilizing FMLA leave. [ECF No. 53-7 Page 14.]

11.     Disputed. Matter did not share concerns about Mr. Applewhite's attendance with him in November. Matter even ignored the alleged tardiness concerns in February when he updated Mr. Applewhite's formal work performance assessment. (ECF No. 53-7 Pages 21-29; Applewhite ¶ 8.) Matter began disciplining Mr. Applewhite for tardiness-related concerns after Mr. Applewhite attempted to report FMLA leave on May 16, 2016. (*Id*.; ECF No. 56 Page 19.) On May 24, Matter shared negative feedback regarding Mr. Applewhite's attendance in his assessment.

14.     Disputed. *See* Paragraph 12 in the disputed immaterial section.

16.     Disputed. *See* additional facts. Defendant's assertion, "the certification stated Plaintiff's mother would experience daily flare-ups of her medical condition for the next sixty days," contradicts Defendant's response to Plaintiff's motion for summary judgement wherein it clarified that the estimate addressed the next six months. [ECF 63-4 ¶ 19.] The medical certification noted that the sporadic flare-ups were to have an "INDEFINITE" probable duration of condition, not one expected to end in February, 2016. [ECF No. 53-3 Page 67.] Considering the facts that Ms. Applewhite worked the third shift, and Mr. Applewhite worked all hours of the day (*see* disputed fact Paragraph 4), Mr. Applewhite and Ms. Applewhite's healthcare provider recognized a "day," for the purposes of Ms. Applewhite's health condition and the medical certification, to mean a twenty-four (24) hour period, initiated at the onset of Ms. Applewhite's flare ups, ending twenty-four hours later, and not miraculously ending at midnight of the same day. (Declaration of McNamara "McNamara" ¶¶ 3, 6; Applewhite ¶ 12; *Id*. Ex. F.) The certification also demonstrated that McNamara explained Ms. Applewhite required care on an intermittent. [ECF 53-3 Pages 69-71.]

17.     Disputed. *See* additional material. The FMLA supported Mr. Applewhite's FMLA leave needs. Deere making it possible for him to work from the home where he helped take

care of his mother, supported Deere's business needs. (Applewhite ¶ 13; *Id.* Ex. G.) It is undisputed that upon learning that Applewhite was entitled to FMLA protected absences, and might not complete important job tasks as a result of the entitlement, Deere created a telework arrangement that discouraged him from taking FMLA leave. (Applewhite ¶ 13.) Under the arrangement, as his FMLA leave usage increased, his work arrangement became less flexible. [ECF No. 53-3 Page 72.] Thirteen (13) days after Mr. Applewhite's telework privileges were changed, Knupp investigated whether the impacts of the arrangement made it possible to prematurely close Plaintiff's approved FMLA case. On January 21, she emailed Davis, "...if [Mr. Applewhite] has an approved [FMLA] case; yet he doesn't 'use it' — is there a time span where in which if he doesn't report any hours the case is reviewed and closed?" (Ex. D, Defendant Produced Discovery, at Bates No. ending "Bates" 1574.)

18.    Disputed. The FMLA supported Mr. Applewhite's FMLA leave needs. Making it possible to work from where he helped take care of his mother supported Deere's business needs. (Applewhite ¶ 13; *supra* Paragraph 17.)

20.    *See* additional material. It is undisputed that Mr. Applewhite shared, "when I was allowed to telework as much as needed, it helped preserve FMLA hours." [ECF *53-3* 26:11-24.] However, Plaintiff objects to Paragraph 32 as unsupported by the cited evidence and to the extent that it makes legal arguments, and is based on opinion. The telework arrangements allowed by Matter did not make it possible for him to spend each weekend in Chicago. (Applewhite ¶ 28.) Defendant does not dispute that Knupp complained and found it difficult to do her job when Plaintiff took intermittent FMLA leave. (ECF 63 ¶ 29; Exhibit D at Bates 1263, 1264.)

21.    Disputed. *See* additional material. As the project manager, Mr. Applewhite was responsible for planning CART's requirements meetings so that the project team would generate a list of requirements they wanted included in the project on time. [ECF 53-7 Page 23.] Even though he took on the administrative task of setting up a virtual meeting, he was an optional attendee and did not have definitive plans to attend (Applewhite ¶ 9.)  The only

meeting that Mr. Applewhite was required to attend, as documented in Deere's system where it shared work performance expectations, was CART's "Kickoff Meeting." (Id.; ECF No. 53-7 Page 23.) Steuer testified it was his understanding that all project-related expectations of Deere employees were to be documented in their GPM (Ex. B at 29:18-22.) Matter had the opportunity to list his expectation of Mr. Applewhite to attend the requirements meeting in the "Goal/Responsibility" section in the system, but chose not to. [ECF 53-7 Page 24.] Had Matter inquired as to the reason for Plaintiff's arrival time, he would have learned that Mr. Applewhite was unaware that his presence was expected, and due to helping his mother earlier that morning, was unable to go to sleep until approximately 4 AM. (Applewhite ¶ 11.) It was not until 2:09 PM, over five hours after the CART meeting concluded on February 8, that Matter shared with Plaintiff that Plaintiff's presence at the CART meeting was "very important" and that he expected Plaintiff to "be part of these meetings[.]" (Applewhite ¶ 9.)

24.     Disputed. *See* additional material. Mr. Applewhite arrived at an appropriate time to all relevant meetings. Up until February 8, 2016, Mr. Applewhite was an optional participant of the "detailed requirements meeting." He never received an unexcused tardy or warning for joining the detailed requirements meetings after the start time. (Applewhite ¶¶ 10-11.)

25.     Disputed. Plaintiff disputes Paragraph 25 to the extent that Defendant suggests that Matter previously shared his concerns regarding Plaintiff's attendance. (*Id*.) On February 23, Plaintiff shared with Matter that his later starts and absences were due to either his FMLA leave, technical difficulties, a previous running over, or working extremely late the previous workday. He even summarized the related verbal dialogue in email. Plaintiff noted, "[u]nfortunately, my personal situation has me up very late often...fortunately, I get to spend more time w/1on1 CMCA meetings[.]" "I'd like you to know that I woke up late to 5am and 6am meetings in the past because I was up later the night before either: 1. Meeting with someone at JD TCI at an hour where no one at SWOB was up working (e.g.,, 10pm, 12am, 2.am .. 4am, etc.), or 2. Helping my family." (Deere 1351-1353.) Matter, even after Plaintiff mentioned that he sometimes woke up late to early morning meetings because his personal situation helping

family, did not inquire further to check whether the tardiness was FMLA protected. (Applewhite ¶ 14.)

26.     Disputed. Matter met with Mr. Applewhite to discuss timeliness, but it was expressed as a concern, not a warning. (Ex. D at Bates 1352, 1353.) Additionally, prior meetings at uncommon working hours and FMLA leave were previously acknowledged as valid justification for not attending meetings between 5 AM and 8 AM. (Ex. E at Bates 447; Ex. D at Bates 1360, 1516.)

27.     Disputed. *See* additional material. Matter notified Plaintiff that he would need to reevaluate Plaintiff's telework privileges if it appeared the telework option was the cause of his absences or tardiness. (Ex. D at Bates 1352.) Matter never shared that it appeared that the telework option was the cause of his absences or tardiness. Instead, Deere based its decision to terminate Plaintiff's telework privileges on his FMLA leave utilization. [ECF 53 Page 15 ¶¶ 33-34.] Plaintiff objects to the fact alleged in Paragraph 27 in that it references incomplete/ selective transcripts of testimony that does not properly contextualize the question asked or the answer given.

29.     Disputed. *See* additional material facts. Matter did not allow Mr. Applewhite to telework continuously, at his discretion after February 19. During the week of February 22, Matter required Mr. Applewhite to work at the SWOB office Thursday and Friday. [ECF No. 53-3 Page 78.] On March 6, Plaintiff shared, with Knupp, his concerns that Matter leveraged telework options to get deeper details about his leave that Plaintiff was not comfortable sharing. [ECF No. 57-2 Page 34.] Knupp testified that she remembered the complaint from Mr. Applewhite, and attempted to address it herself, instead of reporting it. (Ex. A, Knupp's Deposition, 11:5-24, 12:1-6,14-24; 13:1-2; 15: 10-24; 16: 7-13; ECF No. 57-2 Page 34; ECF 63-4 ¶ 28.)

31.     Disputed. It is undisputed that Plaintiff's needs were unpredictable. However, the remaining assertion made in Paragraph 31 are disputed. Defendant did not cite admissible evidence to support them. Defendant's mother's psychotherapist testified that health

certification that she completed in December explained that Ms. Applewhite needed care for "[s]upport and facilitating medical treatments; provide [patient] with assistance in dealing with chronic anxiety and depression...support and transport." (McNamara Declaration ("McNamara") at Bates 278.)

32.     Disputed. Plaintiff shared that he affirmatively would telework and take FMLA leave on the days in question, but that it was his *plan*. [ECF 53-3 Page 87.]

33.     Disputed. See additional facts. It is undisputed that 30 days after January 8, 2016, Plaintiff's telework arrangement was to revert back to two days per week. [ECF 53-3 Page 74.] However, it is disputed that he began a pattern of using telework Monday and Tuesday, and then claiming FMLA Wednesday through Friday each week. Defendant did not cite evidence to support the factual assertion in paragraph 33. For example, contrary to Defendants assertions in Paragraph 33, Mr. Applewhite did not utilize FMLA leave took FMLA leave, instead of teleworking, on Tuesday, April 12. (*Id* Page 75.)

37.     *See* additional material facts below. It is undisputed that on April 21, after six o'clock in the evening, Deere Disability Services emailed Mr. Applewhite FMLA paperwork that contained an invalid FMLA eligibility notice, which stated he was only eligible for eight (8) hours of FMLA leave. [ECF No. 53-3 Pages 89-90.] Plaintiff disputes the factual assertions in Paragraph 37 as they are premised on legal argument and Defendant's opinion. The eligibility notice included the note, "[i]n order to determine whether your absence qualifies as FMLA leave, you must return all information...within 15 days of receipt of this letter or first day of missed work, whichever is most recent." [ECF No. 53-3 Page 90.] The correct eligibility notice to complement Defendant's certification was sent to Mr. Applewhite on May 17, 2016. Instead of 8 hours, Plaintiff was eligible for over 400 hours of FMLA leave.  [ECF No. 57-1 Page 66.]

38.     Disputed. *See* additional material facts. On April 29, 2016, Davis sent an email, which clarified the purpose of the recertification form. (Ex. D at Bates 360.) She believed Plaintiff was only "approved for FMLA leave to care for a family member during 'flareups,'" and did not warrant FMLA protection for a leave of absence in which Plaintiff inquired about for the

purpose of eliminating further backlash from Davis' supervisor[1] (*Id*.) However, Defendant does not dispute that Plaintiff was approved for FMLA to take care for his mother for additional reasons that would warrant the offered leave. [ECF 63 Page 28 ¶ 68.] Consequently, Davis' statement to Plaintiff that "...your family member's provider *can* complete" the recertification if needed, proves that recertification was only need if Plaintiff had taken leave continuously from April 29 to June 3. (Emphasis added) (Ex. D at Bates 360.)  Plaintiff was not on notice that the completion of the recertification forms were required for Plaintiff's original certification to remain active until Plaintiff met with Ciha a few days later on May 3, 2016.  (Applewhite ¶ 15.) During the meeting, Ciha also explained that Applewhite would have to recertify every thirty days going forward. (*Id*.) Ciha summarized the discussion between Mr. Applewhite and Deere via email: "[t]here is also an outstanding request for Dr certification that has been sent to Jamaal (by Amber Davis), and he has until this Friday, May 6th to provide this in order to continue his FMLA benefit. Jamaal expressed concern over completing that task by this Friday [(May 6th)]...without that recertification, his current approved leave expires this Friday." [ECF 53-3 Page 95.] On May 4, Mr. Applewhite shared that despite his diligent efforts, due to extenuating circumstances, Ms. Applewhite's healthcare provider, McNamara, was unwilling to complete the required recertification forms until after she had a chance to re-diagnose Ms. Applewhite during their appointment that was scheduled for May 13. (McNamara ¶ 4; Ex. D at Bates 1123.) On May 5, Deere did not share that it would allow an extension to the recertification deadline, it only shared that it "…wo[uld]n't be able to extend the date for the paperwork past May 10th..." (Ex. D at Bates 342.) On the same day, Ciha admitted that Deere wanted to change Applewhite's leave from intermittent to continuous. She emailed, "...Disability services requested the recertification, because the pattern of [FMLA] usage indicates we may need to look at something other than intermittent." [ECF 57-1 at Page 68.] On May 17, Mr. Applewhite submitted the recertification to Deere (Ex. D at Bates 1061.)

---

[1] During the afternoon of April 29, Plaintiff contacted Davis for help, asking "[w]hy is Kevin calling and emailing me threats on actions that will be taken? Is it better if I tell you that I won't be in until June 3rd?" (Ex. D at Bates 360.)

39.     Disputed, partially. *See* additional material facts.  Plaintiff is unable to present facts, specifically transcripts of Matter's deposition, which are essential to justify Mr. Applewhite's opposition that Matter testified, during Matter's deposition, that he "…instituted a flexible start time for Plaintiff, in lieu of remote work..." The new work start time was not established in place of the telework arrangement, which was eliminated about one month prior. [ECF No. 53-3 Page 88.] An email exchange on May 6, 2016 shows that Deere would not permit Mr. Applewhite to claim the May 16 FMLA leave of absence as a protected leave.[2] [ECF No. 17-18 ¶¶ 45-51; Ex. D at Bates 1121; ECF No. 57-2 Pages 25-30, 44-51.] Matter created the discriminatory work start time on May 17, in retaliation to Mr. Applewhite's attempt to use intermittent FMLA leave on May 16. [ECF 57-2 Page 19.]  On May 17, Matter summarized the discussion that he and Mr. Applewhite had regarding the leave, and he emailed it to Mr. Applewhite, carbon copying Knupp and Ciha.  (*Id*.) In part, the summary stated,

> *In our meeting I conveyed the seriousness of the situation from Monday, 16 May. That fact that you came in late to work, especially as you did not arrive until near 1:20pm, and without sufficient prior notification is not acceptable and is considered an unexcused absence / tardy…You did not provide me with notification until 9:05am. I want you to know I have reported this to HR to understand how I need to address this situation. I want you to understand that unexcused tardiness or absence will be addressed with appropriate disciplinary measures…Going forward, I expect you to start your day in the office between 6am - 8am…going forward I expect at least 48 hours' notice for any request for vacation, and for you to also realize the work still needs to get done…It seems something often times comes up which appears to affect your ability to get to the office on time or at all, and to get your work done...you seem to often have difficulty getting to work because you are traveling in from Chicago…If you continue to be tardy, have unexcused absences, do not follow the work agreements we have set in terms of your working hours in the office, or our agreements for requesting vacation, etc, there will be progressive disciplinary consequences, up to and including termination.*

(*Id*.)

40.     Disputed. Defendant does not submit evidence for the factual assertion in paragraph 40, and it is not supported by the record. *See* L.R. 7.1(D)(1)(b). Mr. Applewhite

---

[2] Friday, May 6, Deere, after confirming with the Dan Allen, the Human Resources Global Director, Ciha emailed Applewhite, "[y]ou will need to report to work on Monday and beyond, until/unless your FML case is re- opened/re-approved...If you do not report to work, this time will be considered an unexcused absence, and as multiple occurrences take place, appropriate discipline will be issued."

shared that he would be absent for "personal reasons" when notifying Matter of his need for FMLA leave. (Ex. D at Bates 1648.) When Mr. Applewhite used verbiage like "family matter" and "personal reasons" in his notifications to take FMLA leave, his supervisor understood and accepted that he was referring to assisting his mother. (Ex. D at Bates 1648.) Nevertheless, even after Plaintiff shared that an "urgent personal/family matter came up last min" on May 16, Matter refused to allow Mr. Applewhite to utilize FMLA leave (Applewhite ¶ 7.) As a result of Plaintiff's  attempt to take FMLA on May 16, Deere created new rules - required that Plaintiff make vacation requests 48 hours in advance and started work no later than 8AM.  Plaintiff further objects to Paragraph 40 as legal argument and opinion.

41.     Disputed. *See* additional material. It is undisputed Plaintiff warned Applewhite for arriving to the SWOB in the afternoon. However, the remaining assertion in Paragraph 41 is not supported by the cited evidence. Defendant suggests that it previously shared with Plaintiff that he had to begin work at a specific time, but offers no supporting evidence. May 17, 2016 was the first time Matter shared with Plaintiff that he would have a set start time window to begin work. (Applewhite ¶ 7.) Plaintiff further objects to Paragraph 41 as legal argument and opinion.

42.     Disputed. Plaintiff does not have access to the transcript of his deposition, which is needed to support his opposition of the fact asserted.

43.     Disputed. *See* additional material facts.  Plaintiff is unable to present facts essential to his opposition that he "…again arrived thirty minutes late to the SWOB, at 8:30 a.m., and without providing any prior communication or explanation to Matter." Plaintiff did not state he had elected to telework, and evidence cited by Defendant does not support its claim. Plaintiff wrote that he, "…started working as early as 7:06am (see attached snapshot of sent emails), and finished at ~430p." (Applewhite ¶ 16; Matter Decl. Exhibit E.)

44.     Disputed. *See additional material*. Deere set the recertification deadline to May

6.[3] [ECF 53-3 Page 95.] Ms. Applewhite's healthcare provider was willing to complete the new

health certification after Ms. Applewhite met with her on May 13, but not before then.

(McNamara ¶ 4.) On May 4, Mr. Applewhite notified Deere of McNamara's unwillingness to

complete the health certification by May 6, and asked if it would be extending the due date.[4]

[ECF No. 57-2 Page 26.] In response to Mr. Applewhite's unsuccessful attempt to have the

certification completed on time, Deere his denied Applewhite's extension request, and

explained to him, "[y]ou will need to report to work on Monday and beyond, until/unless your

FML case is re-opened/re-approved based on Dr certification being submitted. If you do not

report to work, this time will be considered an unexcused absence, and as multiple

occurrences take place, appropriate discipline will be issued." [ECF No. 57-2 Page 25-26.]

After May 6, with exception to attending Ms. Applewhite's doctor's appointment on May 13,

Deere wouldn't allow Mr. Applewhite to take unpaid, non-FMLA time off to help take care of his

mother. Ciha even admitted that she confirmed it with her superior, Dan Allen: "we are not in a

position to offer you further unpaid, non-FMLA time off. " (Ex. D at Bates 1121.) Plaintiff did not

request intermittent FMLA leave for two times per week, and Defendant offers no evidence to

support such a claim. He requested intermittent leave for as much time required to help take

care of his mother, until approximately January 1, 2017, using Deere's *Employee Request for*

*Family & Medical Leave (FMLA)* form. [ECF No. 57-1 Pages 58.] In fact, on May 13, McNamara

issued a sufficient recertification, which explained the frequency of Ms. Applewhite's flare-ups

was "TBD," with an estimated 3-day duration of related incapacity per episode. (*Id.* Page 62.)

McNamara's estimates for the frequency and duration of Ms. Applewhite's flare-ups were

approximate, not absolute predictions. (McNamara ¶ 5.) Knupp testified that she understood

---

[3] In her summary of the FMLA discussion held with Mr. Applewhite on May 3, she wrote, "there is also an outstanding request for Dr certification that has been sent to Jamaal (by Amber Davis), and he has until this Friday, May 6th to provide this in order to continue his FMLA benefit. Jamaal expressed concern over completing that task by this Friday...without that recertification, his current approved leave expires this Friday."

[4] May 4, Mr. Applewhite in an email, titled "FMLA Recertification - Not Possible Until May 13th," emailed Curran, Matter, and Ciha, "[m]y mom was unable to get a doctor's appointment to have the paperwork filled out until May 13th. The doctor's not willing to give a new diagnoses until then. Will you be extending your due date until after the doctor's appointment."

the duration and frequency of Ms. Applewhite's flare-ups to be estimates.[5] (Ex. A at 75: 15-24; 76: 1-10.) On May 17, Mr. Applewhite managed to have Deere, after almost one month, acknowledge that he actually had 401.5 of FMLA leave hours remaining, which he did not 100% deplete by June 2. (ECF No. 57-1 Pages 66-67.) On the same day, not on May 20, he submitted the recertification documents. (*Id.* Pages 57-63.) Deere shared that it needed more information on what "TBD" for frequency meant. (*Id.* Page 64.) May 20, Deere shared with Applewhite that his recertification was approved. June 7 was the first day that Deere shared with Mr. Applewhite that it approved his FMLA leave request using the updated certification form that McNamara faxed directly to it. [ECF No. 57-2 Pages 4, 6-7.] It was only until then that Deere explained to Applewhite that McNamara updated the estimated frequency of flare-ups from "TBD" to two (2) times per week, and faxed the updated form directly to it. [ECF No. 57-2 Page 7.]

45.    Disputed. *See* additional material. Plaintiff did not make an FMLA leave request for a specific or an absolute number of occurrences per week. [ECF No. 57-1 Pages 58.] Deere approved the medical certification that they received from McNamara, and did not ask for a second opinion. Plaintiff is unable to present essentials facts, specifically transcripts of his deposition, which are essential to justify his opposition that he testified, during his deposition, that read the recertification paperwork on May 16. Plaintiff objects to the extent that Defendant seems to suggest that the Plaintiff testified that the first time Plaintiff read the recertification paperwork was on May 16, 2016. Defendant mischaracterized the evidence cited, which does not support any assertion of when Plaintiff initially read the rectification paperwork. Applewhite ¶ 17.) Plaintiff additionally objects to Defendant's cited footnote as legal argument.

46.    Disputed. *See* additional material facts. It is undisputed that Plaintiff met in-person with Matter for his mid-year review. However, he arrived on time. (Applewhite ¶ 18.)

---

[5] Knupp testified, "[s]o the days off that were outlined for you were based off of what they estimated it would probably take for you to care for your mother."

47. Disputed. *See* additional material facts below. It is undisputed that Matter noted times that Plaintiff had been tardy and absent. However, Plaintiff disputes that the absenteeism was unexcused. Defendant cites no evidence for the assertions in Paragraph 47. Plaintiff further objects to Defendant's alleged fact, as it is hearsay. Matter, in the mid-year review, noted Plaintiff's instances of FMLA-excused tardiness and absences identified by Sivertsen. [ECF 53-7 ¶¶ 15, 22.] In an email solicited from Matter, Sivertsen shared a note detailing these FMLA-excused timeliness concerns:

- 02/10 - Meeting scheduled @ 7AM with CART group for requirements. Jamaal cancelled meeting @ 3:06 AM.

- I scheduled meeting to discuss CART project plan with Jamaal and Mark @ 8AM and Jamaal sent out email to me @ 3:06am stating "he would try to make meeting but was off on FMLA".

- Also on this same day Jamaal had set up meeting to discuss some CART issues with me @ 12:30 pm. He didn't cancel nor show up for this meeting as well. At 1:30pm he IM'd me sorry that he missed meeting and was going to reschedule.

[ECF No. 53-7 Pages 15-16.] Mr. Applewhite took FMLA leave on February 10. (Ex. D at Bates 1444 to 1445.)

50. Disputed. *See* additional material. Matter admitted that at approximately 6:20 AM on May 31, Mr. Applewhite notified him that he would be absent, beginning later that morning to address an FMLA-related situation. He also admitted that Mr. Applewhite "...rather than use FMLA he used vacation." [ECF No. 57-2 Page 14; Ex. D at Bates 955, 956.] Within ten minutes, Matter relayed Mr. Applewhite's FMLA leave plans to Deere's Human Resources Department, Knupp and Ciha. (*Id*.) The next day, June 1, early morning, Mr. Applewhite shared his need to remain on leave. (Ex. D Bates at 958.) Later that evening, Ciha shared with Jeffrey Chisholm that Mr. Applewhite shared with Matter that he planned to return from leave the next day, late afternoon. (Ex. D Bates at 952.) The next day, on June 2 at approximately 1:30 PM, Mr. Applewhite, as planned in advance with Deere, returned from leave and reported to Deere

Disability Services and Matter that he utilized FMLA leave that started May 31, and ended June 2. [ECF No. 57-2 Page 12.] A total of 22.5 FMLA leave hours were deducted. [ECF No. 57-2 Pages 2-3.]

51.    Disputed. *See* additional material. Mr. Applewhite reported to both Deere Disability Services and Matter that on Wednesday, June 2, he had taken FMLA leave. Matter then forwarded Mr. Applewhite's notification to Ciha and Knupp. (ECF 57-2 Pages 11, 14; Ex. D at Bates 266, 909, 950.) Still, Deere treated his warning against his return from intermittent FMLA leave as "...important documentation if things [did] not improve and [it] *continue[d]* down the progressive process and issue[d] any discipline, EPI and/or termination" (emphasis added). (Ex. D at Bates 967.) Deere considered Mr. Applewhite's June 2 tardy unexcused because he had used two days of FMLA leave that same week [ECF No. 53-7 ¶ 24; *Id*. Pages 18-19.] On June 1, Matter noted a talking point, which he reviewed with Knupp and shared with Ciha, for his June 2 warning meeting with Mr. Applewhite, titled "Discussion" that read "[d]o not offer any answers to [Mr. Applewhite's] questions..." (Ex. D at Bates 953.)

52.    Disputed. *See* additional material. On June 6, 2016, Knupp mentioned nothing about Plaintiff's dependability at the meeting. Knupp did, however, echo Matter's earlier, new, unique, and discriminatory restrictions that he shared during the June 2 meeting that he held with Mr. Applewhite: "[i]f you are absent or tardy, you will be required to provide a doctor's excuse...when scheduling vacation, obtain prior approval from your manager…at least 48 hours in advance…" [ECF No. 53-8 Page 6; ECF No. 56 ¶ 77; ECF No. 57-2 Page 1-2.] Mr. Applewhite refused to sign the warning, but hand wrote "May 16" in the top right corner of the first page of the warning to take note that one of the tardy dates identified by Knupp as part of the reason for the warning. (ECF No. 53-8 Pages 6-7; Applewhite ¶ 21.) In the meeting, Deere never shared an exact or even approximate number of days that it used to define "excessive" absenteeism or tardiness. (*Id*., ECF No. 57-1 Page 95.) Even later, during her deposition for this action, in 2019, Knupp refused to provide an objective definition of "excessive." She testified that she defined "excessive" tardiness as "[c]onsistent repeated patterns after multiple

coaching sessions and the employee understanding very clearly that this is when we expect you to be in the office by, and they repeatedly failed to comply." (Knupp 63: 24, 64: 1-5; Applewhite ¶ 21.) Deere, in response to Mr. Applewhite's interrogatory, after terminating his employment, defined "excessive" tardiness and absenteeism as "a number of unexcused hours/days absent and/or tardy that demonstrates a lack of dependability and creates issues with Deere team members and stakeholders." (Ex. C at Answer to Interrogatory ("Int.") No. 11.) Deere shared that no employees that reported to Matter during the relevant time period exhibited excessive tardiness/absenteeism warranting discipline, but could not share any specifics on the frequency. (Ex. C at Int. No. 13.) Knupp refused to share the number of hours or days that Mr. Applewhite had been absent or tardy. (Applewhite ¶ 21.)

55.     Disputed. *See* additional material. It is undisputed that the warning noted, "[w]e ask that you sign this letter to acknowledge your understanding of the expectations." However, the warning was not clear. Consequently, Mr. Applewhite objected to signing it, and Knupp wrote "employee refuse to sign" in place of his signature. (ECF No. 53-8 Pages 6-7; Applewhite ¶ 21.) During the June 6 formal warning, Knupp, again, intentionally refused Mr. Applewhite opportunities to address concerns regarding absenteeism and tardiness by ignoring his questions about why she was not honoring is claim that his FMLA leave-related travel on May 16 and June 2 was supposed to be protected under the FMLA.[6] (ECF No. 56 ¶¶ 45, 81-85; ECF No. 57-1 Page 95; ECF No. 57-2 Pages 4, 5, 8-10, 27-30, 95; Applewhite ¶ 21.) After failing to get any of the HR staff that were apart of the meeting to address his in-person contentions, Mr. Applewhite complemented his in-person protest with a follow-up email to Knupp and Matter that stated, "I was tardy, however, it was due to travel time from my approved FMLA. This is a violation of my right." Knupp refused to answer his question and did not address his complaints that his FMLA rights were being violated. [ECF No. 57-1 Page 95; Applewhite ¶ 21]. In the same email chain, Knupp refused to directly and sufficiently answer

---

[6] May 3, Applewhite met with several Deere staff where Ciha shared that he was expected to understand that "...time as intermittent should be the amount required to tend to the FMIA situation. For example -if the need is a Dr appt, based on the time of the appt, Jamaal should take the needed time for the appt (and travel since the need is in Chicago) but before and/ or after that time, he should expect to be in the office or request vac."

Mr. Applewhite's questions about excessive absenteeism and tardiness. To these questions, she simply responded "the company has outlined it's attendance and performance expectations in this previous communications with you." (*Id*.) Later that evening, in a desperate effort to get someone from Deere to answer questions about the FMLA rights to which he believed he was entitled, Mr. Applewhite scheduled a meeting between the manager of Disability Services, Kevin Curran, and Jeffrey Chisholm. [ECF No. 57-2 Page 10.] However, continuing to make it difficult for Mr. Applewhite to cure his alleged deficiencies, they both declined the invitation to discuss Applewhite's concerns, and refused to attend the meeting. (*Id*. Pages 8-9; Ex. C at Int. No. 4).

56.  Disputed. On June 15 at 11:11 AM, Plaintiff asked Ciha, Matter and Knupp "[w]hat time do you have me clocked in today?" He added that "[he] would like to accurately report [his recorded arrival time] to Disability Services." [ECF No. 57-1 Page 91.] Instead of responding with the time that Mr. Applewhite clocked in, Knupp responded over six (6) hours later, and asked him to meet her in a conference room. (*Id*.)

57.  Disputed. *See* additional material facts. It is undisputed that the department to which Applewhite belonged had the option to him into Deere's Employee Performance Improvement (EPI) process. During her deposition, Knupp explained why Deere chose to circumvent its disciplinary policy. She testified that they decided to terminate Plaintiff's employment without putting him into the EPI because "[t]he performance was being managed through conversations that you were having with your manager on an on going basis, verbal, and written." Per Deere's 'Disciplinary Procedure-Salaried Employees it should have used the EPI before terminating his employment. (Ex. D at Bates 1924, 1925; Applewhite ¶ 22; Knupp at 71:2-24, 72:1-4.) The written warning stated, "[w]e understand, respect and support your rights to take FMLA time for which you have been approved. The concerns referenced here are outside of that approved certified time off." Deere's actions were not consistent with this warning because they did not understand, respect or support Mr. Applewhite's FMLA leave rights - it fired him for attempting to utilize approximately fifteen minutes of his FMLA leave on

June 15. Ciha claimed that Deere "...told [Mr. Applewhite] what was not working" in regards to FMLA absences, but this was not true - Deere intentionally refused to answer Plaintiff's questions meant to clarify his leave rights under the FMLA, *supra* ¶ 55)

      58.     Disputed. Plaintiff testified that Deere claimed that his employment was terminated for arriving to work after 8 AM and arriving late or not at all on other days, but it is important to note the distinction that Plaintiff argues that he was terminated in violation of the FMLA. The evidence cited by Defendant does not support the assertion made in Paragraph 58. [ECF No 53-3 Pages 54-56.]

      59.     Disputed. The assertion made in Paragraph 59 contradicts the testimonies of two other witnesses.  Knupp testified that she, along with Heidi Ciha and Dan Allen, were the ultimate decision-makers for Plaintiff's termination. (Applewhite ¶ 22; Knupp 10:15-22.) Matter testified that he, Knupp, and Ciha were decision-makers for Plaintiff's termination (Applewhite ¶ 26.)

      61.     Disputed. Plaintiff received knowledge of of McKasson's attendance from Sivertsen and Matter. (Applewhite ¶ 23.) Plaintiff further objects as Defendant mischaracterizes the cited transcripts.

      62.     Disputed. Mr. Applewhite, without being asked, reported to Matter that Steuer and others that reported to Matter were regularly late to team meetings. (Applewhite ¶ 27.) Matter regularly, in error, considered Mr. Applewhite late to meetings when Matter did not see Mr. Applewhite active on instant messenger during the time Mr. Applewhite had a meeting scheduled on Mr. Applewhite's calendar. (*Id*.) Matter solicited feedback about Mr. Applewhite's timeliness - he admitted that he "asked Christine Sivertsen...if [Plaintiff] had timely attended scheduled meetings." [ECF No. 53-7 P 14.] Steuer testified that he had began work as late as 11 PM, arrived tardy and even completely missed a few work meetings during relevant periods, while working under Matter. (ECF No. 53-6 Page 8:13-17; Ex. B at 14: 20-22, 16: 1-24, 17: 1, 38:13-17.) Matter received unsolicited feedback about timeliness about his other team

members, and was personally aware that his team, including himself, often began meetings after the scheduled start times:

- March 14, 2016, Matter and Bipul entered, the first meeting of the day, approximately ten (10) minutes late. (Ex. E at Bates 174.)

- August 28, 2016, Steuer arrived in a meeting about twenty-two (22) minutes late. (Ex. E at Bates 358.)

    64.    Disputed. In responding to the question how many meetings *with Mark* he completely missed, Steuer testified that he "…c[ould] think of one off the top of [his] head where [he] completely missed, but there could have been another." (Emphasis added.) [ECF No. 53-6 Page 8.] Steuer had been late to meetings, for example, one with Mr. Applewhite. (Ex. E at Bates 358.)

    65.    Disputed. Undisputed that Steuer utilized FMLA leave for six or eight weeks as result of emergency back surgery, was not disciplined by Matter during that period, was not disciplined by anyone with the Human Resources group that he reported to at that point, and was not disciplined immediately after returning from leave. However, Plaintiff objects to the remainder of Paragraph 65 because Defendant cites no evidence for the remaining assertions, and is not supported by the recorded. *See* Local Rules 7.1(D)(1)(b); Plaintiff objects to the point that Defendant appears to liken Steuer's FMLA utilization to that of Plaintiff's, however, Steuer's FMLA leave was continuous whereas Plaintiff's leave was intermittent. (Steuer 31:10-20; ECF 63-4 Pages 6-8 at ¶¶ 18, 22.)

    66.    Disputed. It is undisputed that Ciha declared she authorized terminations of employment of salaried employees for attendance issues similar to Plaintiff's issues. However, Plaintiff objects to Paragraph 66 because Defendant cites no evidence for the remaining assertions, which contradict the statement of fact in paragraph 51 wherein Defendant states that Plaintiff incurred an unexcused tardy because he had already used two weekly occurrences of FMLA leave. (ECF 53 ¶ 51; ECF 53-7 ¶ 24.) Defendant further objects to Paragraph 66 as legal argument. Plaintiff is unable to access parts of Ciha's transcripts of the

deposition referenced, which are essential to his opposition that she "…terminated Deere salaried employees for attendance issues similar to Plaintiff…"

**DISPUTED IMMATERIAL FACTS:**

List by number each fact from Section B of the motion for summary judgment which is claimed to be both immaterial and disputed. State the reason the fact is immaterial. Support the claim that the fact is disputed with evidentiary documentation referenced by specific page. Include as exhibits all cited documentary evidence not already submitted by the movant

8.      *See* additional material facts. Disputed because the assertion is not supported by the cited evidence, which was mischaracterized, and immaterial because Plaintiff's privilege to telework before he requested FMLA leave is irrelevant. Plaintiff is unable to present evidence to support his opposition that the telework requests cited in Paragraph 8 occurred during the relevant time period.


12.      Disputed immaterial. *See* additional material facts. Mr. Applewhite received no discipline or any inclination that Mr. Matter took issue with the alleged infractions.

- November 6, Mr. Applewhite did not share with Matter that he completely missed a meeting, and does not admit that he sent Matter a text claiming so. Mr. Applewhite is unable to present evidence to support his opposition that he texted Matter that "he completely missed a meeting because he overslept." Nevertheless, it is noteworthy that the alleged snapshot of a text messaged sent from Mr. Applewhite to Matter does not state anything about missing a meeting. [ECF No. 53-6 No. 53-7 Page 9.]
- November 20, disputed because Plaintiff mischaracterizes the text message cited in Paragraph 12.
- November 23, meeting regarding Sampling Approach was a project that did not involve Mr. Applewhite, and did not appear in the Global Performance Management system as part of his job responsibilities. [ECF No. 53-7 Pages 21-29.]

- December 11, after Applewhite did not attend a meeting, Matter reached out to him, only sharing "[w]e missed you in the meeting today, I hope all is well." Applewhite shared with Matter, "[m]y meeting with Rosie went almost one hour over until about 5pm. Consequently I worked about 11 hours. The last two work days have been long so I was exhausted and overslept." (Exhibit D at Bates 1914.)

- December 17, Mr. Applewhite took a vacation as requested even though it should have been considered a sick day as he reported that he was experiencing an unmanageable about of stress.  (Ex. D at Bates 1913, 1988.)

23.     Disputed immaterial. January 27, Mr. Applewhite reported technical difficulties. February 1, Mr. Applewhite reported being sick. (Matter Decl. Ex. G) Immaterial because plaintiff was not a required attendee to the CART requirements meetings until sometime after February. (Applewhite ¶ 9.)

36.     Disputed immaterial. Whether Plaintiff teleworked without permission is immaterial as his telework usage was never cited as a factor in the decision to terminate his employment. It is disputed that he teleworked on April 22, let alone teleworked without permission. His telework privileges were not terminated until April 25.  [ECF 53-3 Page 88.] Matter admits that Mr. Applewhite planned to take FMLA leave on April 22. (Ex. D at Bates 1210) Furthermore, within all of the communication that occurred between Mr. Applewhite and Deere on or after April 22nd, there was no indication that Mr. Applewhite's alleged teleworking on April was not permitted or even occurred. (Ex. D at Bates 1099, 1130, 1136, 1170.)

**UNDISPUTED IMMATERIAL FACTS**

13.     Undisputed immaterial. Immaterial as this day was taken as a vacation, but should have been considered a sick day as Plaintiff was experiencing an unmanageable amount of stress.  (Ex. D at Bates 1913, 1988.)

**ADDITIONAL MATERIAL FACTS ("AMF")**

2.      Plaintiff was qualified for and took intermittent FMLA leave prior to beginning his personal leave in March 2014. (Applewhite ¶ 3.)

2a.     Within months of returning from his personal leave, during the second quarter of 2015, Mr. Applewhite shared with Matter his concerns of being retaliated and discriminated against. Approximately seven months later, on January 21, 2016, Matter reported Mr. Applewhite's concerns, sharing that his delay in reporting the complaint was an error on his part. (*Id*. ¶ 4.)

2b.     February 16, 2016, a compliance case investigation, led by Milton Shaw, Deere's Human Resources Operations Manager, ensued, and then closed.  (Id. ¶ 5; *Id*. Ex. C.)

2c.     Ciha testified that Carol Mottet shared with her that Mr. Applewhite was involved in a compliance case. (*Id.*¶ 6.)

3.      On December 7, 2015, Matter rated Mr. Applewhite's work performance as "successful performance." [ECF No. 57–1 Page 51.]

3a.     October 28, 2015, Matter rated Mr. Applewhite's fiscal year 2016 work performance as being on target for 100% of his five job specific competencies: creating trust, executing consistently, driving for sustainable results, analyzing rigorously, and making sound decisions. (*Id*. Pages 1-2.) The fiscal year 2016 encompassed the period of October 2015 to October 2016.

3b.     As part of his appraisal comments, Matter acknowledged that the CART project, due to Mr. Applewhite's efforts, was on schedule, and that Mr. Applewhite "worked to keep the team focused and not add too much additional content." (*Id*. Page 13.)

3c.      Mr. Applewhite completed over five times more should cost analyses than his predecessors. [ECF No. 57-2 Pages 35-38.]

3d.     Knupp testified that Mr. Applewhite's termination was due to, in part, feedback from other Deere employees, and how he treated Matter, herself and other HR staff. (Knupp 41: 1-7; 42: 20-24; 43: 1-3.)

3e.     As of May 24, 2016, midway through the year, Matter admitted that Mr. Applewhite completed eleven (11) should cost analyses. (ECF No. 53-7 Page 22.)

3f.     Mr. Applewhite's immediate predecessor completed zero (0) should cost analyses. [ECF No. 57-2 Page 36.]

3g.     The initial competency ratings that were included in the FY16 mid-year review were created between October and December of 2015. (Applewhite ¶ 29, ECF 57-1 Page 10.)

3h.     Steuer testified that he preferred to complete project type work over should costs. (Ex. B at 29:3-7.)

5.     On July 17, 2015, Mr. Applewhite summarized his last four (4) weeks of work to illustrate the fact that approximately 90% of his work on CART and his other responsibilities was successfully completed independently and/or virtually. [ECF No. 57-2 Pages 57-60[7]; ECF No. 56 Page 10 ¶ 9.]

6.     Plaintiff asked Matter for permission to work remotely from Chicago, where he could help support his mother.

7.     Matter did not make a final decision of Plaintiff's work arrangement request by June as the promised timeframe. (Deere 1867-1869.) Consequently, on July 17, Mr. Applewhite submitted a telework proposal to Matter, which included data that supported the fact that Mr. Applewhite's work was completed approximately 90%  independently and/or virtually. [ECF No. 57-2 Pages 57-60.]

8.     May 2015, Matter formally praised Mr. Applewhite's work performance by documenting it in Deere's global performance management system ("GPM"). (Applewhite ¶ 29; *Id.* Ex. G.) The feedback was wholly positive and optimistic, and included the following compliments:

*Jamaal, I was glad to have you Join the team this year;*

---

[7] July 17, 2015 at 6:04 PM, Mr. Applewhite sent Matter an email that, in part, stated "[t]he snapshots below are actual summaries of my last four weeks. You will notice that only **10 hours** out of the last **18 days** *could be* completed with face to face interactions." (Emphasis in original.)

- *I am excited to see you leverage your engineering, cost management, and metrics & reporting knowledge to help CMCA continue to increase the value we bring to the organization. I appreciate your passion to find cost reduction...;*

- *I do believe you make an effort to create trust; act in a manner consistent with Deere values (being honest and open)...;*

- *All other sub-teams were behind schedule when you joined, and you quickly rnet with each sub-team lead to insure they began making progress to insure we hit our target...; and*

- *You have been actively engaged With the leads to assist them in getting back on schedule...*

(*Id.*)

10.     The expectation of Applewhite to attend every single CART meeting was not stated, nor documented in Mr. Applewhite's annual goals. According, to the Project Management Book of Knowledge, a project manager's job is to make sure objectives are met on time, within scope, and at cost.

12.     Tardiness to meetings, and starting and ending meetings late were common practice within Matter's team and Deere as a whole. (Ex. D at Bates 1890.) In early December 2015, while completing Mr. Applewhite's formal work performance appraisal, Matter mentioned nothing about tardiness or absenteeism, and offered nothing but praise and gratitude for Mr. Applewhite's outstanding performance. (Applewhite ¶ 11; *Id.* Ex. G.) Below are some of the comments that he shared:

- *Jamaal, I was glad to have you join my team in March, and have enjoyed working with you.*

- *I do believe you make an effort to create trust; act in a manner consistent with Deere values [being honest and open]...;*

- *When you joined the team, this project was generally behind schedule, so your challenge was to manage the overall project while working with tile sub-team leads to get them on track with hitting. the project due dates. You were able to get the sub-teams and overall project back on track and could have deployed on time if IT would not have had the blackout time, Very good effort;*

- *I do believe our teams relationships have improved because of the 2 events you and Ruchi identified, planned and conducted;*

- *The Master CAT Scorecard report was a big success, thank you for supporting Dave Johnson and Joe Erdman In ·getting this report completed and published In the...I realize it took some push from both you and me;*

- *Your goal was 150 component part should costs and you completed 170, thank you for not only meeting but exceeding your goal; and*

- *You stepping into the CART project mid-year, with many tasks being behind schedule, and working with the team to get on schedule is a good example.*

(*Id*.)

16.    Mr. Applewhite requested leave to start approximately January 11, 2016, not December 23, 2015. [ECF No. 53-3 Page 67.]

16a.    Davis explained to Knupp that Plaintiff's FMLA case would remain active from December 2015 through January 2017. (Ex. D at Bates 1574.)

16b.    She also explained to Knupp that Mr. Applewhite, in order to protect his FMLA-related absences, had until 3 business days after returning from leave to report his time. (*Id*.)

16c.     Davis also shared with Mr. Applewhite that his reporting responsibility "to report [his] FMLA time to Disability Services by e-mail...within three business days of returning from leave." [ECF No. 57-2 Page 40.]

16d.    The certification approved by Deere explained, "patient needs psychological care." [ECF 53-3 Page 70.]

16e.    The certification approved by Deere explained Mr. Applewhite would "supervise [his mother] during her episodes, make sure she is taking her medicine, and physically be in her presence to address panic attacks and self-inflicting injuries." [ECF 53-3 Page 68.]

16f.    The certification was sufficient to authorize Applewhite intermittent leave to take care of his mother. Consequently, it was *approved* on December 23, 2016.

17.    Mr. Applewhite completed an analysis to highlight Matter's disparate treatment between himself and his predecessors. [ECF No. 57-2 Pages 35-38.]

17a.     The analysis showed that Mr. Applewhite's predecessors were expected to complete less than 50 should cost analyses, compared to the approximately 200 should cost analyses that Mr. Applewhite was expected to complete. (*Id*. Page 37.)

18.     The more FMLA utilized, the less flexible the work arrangement. (Pl. Dep. Ex. 16.)

19.     After an exhausting negotiations, Plaintiff shared, "[b]y the grace of God, you helped me reach a balance where Deere's business needs and my personal needs could be met at a level that would be considered, in GPM lingo, 'successful' at the least." (Pl. Dep. Ex. 16.)

20.     Later the same day that Knupp complained, she emailed the HR manager, her supervisor, Ciha, sharing that she and Rathburn "feel Jamaal no longer deserves a flex work schedule." [ECF No. 57-2 Pages 32-33.]

20b.     That same day Knupp updated Ciha on what she learned about the FMLA rights to which Applewhite was entitled. She emailed, "...[Curran] told me that Jamaal does not have to give us any proof or reasoning when he asks to take FMLA-we as a company go off of their 'word' since it's an unpaid benefit/approved FMLA case. Seems so frustrating!" (*Id*; ECF No. 55 ¶ 30.)

20c.     Seven (7) days later, Matter terminated Applewhite's telework arrangement privileges. (Id. Page 22.) Knupp later lied, testifying that the way Mr. Applewhite used his leave had no impact on her frustration. (Ex. A at 18:17-24, 19:1-24, 20:3-24, 21:1-11.)

21.     During the 2016, several weeks after Mr. Applewhite shared his concerns of retaliation and discrimination with Matter, Matter shared with Mr. Applewhite that he finally felt compelled to formally submit a compliance complaint regarding the matter. (Applewhite ¶ 4.)

22.     In addition to soliciting negative feedback from my colleagues, Deere retaliated by creating unwarranted compliance complaints, which, after being closed unfounded, resulted in adverse consequences to Mr. Applewhite. During the first quarter of 2016, Mr. Applewhite was investigated by a Deere investigator and Carol Mottet in support of a compliance

compliant. As a result of the investigation, the case was closed unfounded, but Mr. Applewhite was removed from his leadership recruiting role. (Applewhite ¶ 6.)

24.     On February 16, 2016, a compliance case investigation, led by Milton Shaw, Deere's Human Resources Operations Manager, ensued. (Applewhite ¶ 5.)

24a.     February 19, Mr. Applewhite reported his retaliation and discrimination concerns during a meeting with Milton Shaw. (Applewhite ¶ 5; Ex. E at Bates 1796, 1797.)

27.     April 18 at 6:44 PM, Clara shared frustration with Plaintiff not being in the office because of a combination of telework privilege and FMLA leave, and asked for "guidance on some recent activity with [Plaintiff]'s FMLA." (Ex. D at Bates 1263,1264; ECF 56 Page 13 ¶ 29.)

27a.     April 18 at 6:54 PM, Knupp shared with Ciha that she and Doug felt that Plaintiff no longer deserved a flex work schedule. [ECF 57-2 Pages 32-33; ECF 56 Page 13 ¶¶ 30-31.]

27b.     April 19, Deere informed Plaintiff that beginning the following workweek, his telework privileges were revoked. [ECF 53 Page 15 ¶ 34.]

29.     March 1, 2016, Matter provided Mr. Applewhite with his last performance evaluation. He rated Mr. Applewhite's Business and People Performance as "successful performance." Although Deere shared with Mr. Applewhite that his "…base pay increase [was] determined by: Business and People Performance ratings…" it offered him no merit increase. [ECF No. 56 ¶¶ 25-26; ECF No. 57-1 Page 53; ECF No. 57-2 Pages 16, 34, 75.]

29a.     Deere's Code of Business conduct requires employees who learn about a potential violation or illegal act to " immediately, and without investigating, report it to...The John Deere Compliance Hotline...The John Deere Compliance Hotline is operated by an independent company." [ECF Ex. D at Bates 1933.]

33.     Knupp's concern was that Mr. Applewhite teleworked on days that he needed to be outside of Moline, in Chicago. Knupp's other concern was that Mr. Applewhite did not work onsite in Moline on April 13, 14, 15, 20, and 21, when he was on FMLA leave. She used his FMLA leave usage as a negative factor. (Ex. D at Bates 1263.) Furthermore, Mr. Applewhite wanted to be in Moline, where he lived since April 2015, when required to work onsite. Knupp

even acknowledged that Matter believed this to be true. (Ex. D at Bates 1367, Ex. E at Bates 1109–1112, 1118-1119.)

33a.    On April 21, just one day after Mr. Applewhite reported using leave on April 20, Matter explained to Applewhite that "[a]ny vacation requests will need to be approved by me and I will respond to your requests within 2 business days." (Ex. D at Bates 1171-1174.)

37.    All days from May 18 up to, and including June 1, were within fifteen (15) days of May 17.

37a.    April 25 Mr. Applewhite's first day of FMLA leave since Deere sent the FMLA paperwork with understated eligibility entitlement hours on April 21. (Ex. D at Bates 362, 364, 1117, 1203.)

37b.    All days from April 26 up to, and including May 11, were within 15 days of April 25.

37c.    The "most recent" date between May 11 and June 1 is June 1.

37d.    Ciha required Mr. Applewhite to submit the recertification paperwork by May 6.

37e.    The deadline for Mr. Applewhite to complete Defendant's health recertification request was June 1, 2016.

37f.    On May 6, Ciha confirmed, with the exception of allowing Mr. Applewhite to accompany his mother to her May 13 doctor's appointment, Deere refused to categorize any absences occurring after May 6 as absences protected by the FMLA, until his FMLA recertification materials were approved. [ ECF No. 57-2 Page 25.]

37g.    Mr. Applewhite's first day of FMLA-eligible missed work since he received the corrected eligibility notice was May 18.

37h.    All days from May 19 to June 2, were within 15 days of May 17.

37i.    The "most recent" date between June 1 and June 2 is June 2.

37j.    Deere's Disability Services required Mr. Applewhite to submit the recertification paperwork by June 2.

37k.    May 17 at 10:46 PM, Mr. Applewhite submitted all recertification materials required for the approval of his recertification. [ECF No. 57-1 Pages 57-63.]

37l.    During the relevant period, Deere's policy on family and medical leave of absence explained, "[a]n employee may request FMLA leave on an intermittent or reduced work hour schedule...If the request is...to provide medically necessary care to a member of the employee's immediate family...., Company consent will not be required." (Emphasis in original.) (Ex. D at Bates 247, 248.)

38.    Upon learning that Deere was remaining firm on its recertification submission deadline, Mr. Applewhite scheduled a home care provider to help take care of his mother, in his absence, on May 9, 10, and 11. (Applewhite ¶ 15.)

38a.    May 23, 2016 was the first instance that Mr. Applewhite had taken FMLA leave since Deere expired his originally approved leave on May 6. Matter accepted Applewhite's plan to take leave, and blind carbon copied Knupp on his acceptance notification. (Ex. D at Bates 281-282, 996.)

39.    Sivertsen shared with Plaintiff that McKasson was allowed to telework while working under Matter as the CART project lead. (Applewhite ¶ 23.)

39a.    Steuer testified that he, as a salaried employee, was unaware of having a start or stop work time while working under Matter or any other Deere employees. (Ex. B at 17: 8-24; 18: 1-7.)

39b.    Mr. Applewhite hired support to assist his mother during periods that Deere prohibited him from utilizing FMLA. (Applewhite ¶ 15.)

41.    Previously, no one that reported to Matter during the relevant time period had a required start time. His direct reports were able to start work at any of the twenty-four hours of the day, including as late as 10 PM. (*Id*. ¶ 7; Ex. B at 30: 23-24, 31: 1-4; ECF No. 56 ¶¶ 65-66; ECF No. 57-2 Pages 18-20.)

41a.    Steuer testified that he, as a salaried employee, was unaware of having a start or stop work time while working under Matter or any other Deere employees. (Ex. B at 17: 8-24; 18: 1-7.)

43.    Other similarly situated employees that had not invoked their rights for intermittent FMLA leave were not subjected to a strict start time and were allowed to telework. (*Id.;*Applewhite ¶ 23.)

44.    On May 13, 2016, McNamara issued Applewhite's recertification. [McNamara ¶ 4; 57-1 at Pages 60-62.]

44a.    The recertification provided the date of onset, expected duration, and medical facts of Ms. Applewhite's condition (*Id.*; McNamara at Bates 277.)

44b.    On the recertification, McNamara estimated Ms. Applewhite would require care on an intermittent basis from July 5, 2015 to July 1, 2017, and explained, "[t]he support of her son is critical to her day to day living, as well as her mental status." [ECF 53-9 Pages 9-10.]

44c.    The recertification issued on May 13, stated the frequency of Applewhite's mother's flare-ups was "TBD," with an estimated three (3) days of related incapacity per episode. (*Id.*; ECF 63-4 Page 21 ¶ 68.)

44d.    Amber explained, Applewhite was approved for FMLA protected absences, beginning the day "...your provider approved you." [ECF 57-2 Page 44.]

45.    On May 24, Deere, without receiving permission from Applewhite, contacted McNamara to question her about the recertification for Ms. Applewhite. (McNamara ¶ 7; Ex. D at Bates 987; Applewhite ¶ 12.)

45a.    Deere did not contact McNamara to confirm that Mr. Applewhite's FMLA intermittent leaves of absence were consistent with Ms. Applewhite's need for care. It also did not contact her to clarify the flare-up estimates that she provided. (McNamara declaration ¶ 7.)

46.    Matter never shared with Plaintiff that he took issue with the time Plaintiff arrived to his 2016 fiscal year mid-year review. (Applewhite ¶ 18.)

47.     On May 12, Claya Knupp instructed Mark Matter to include, in Plaintiff's fiscal year 2016 work performance appraisal, negative FMLA-related feedback, disguised as something unrelated to Mr. Applewhite's FMLA leave. [ECF No. 57-2 Pages 23.]

47a.     Matter emailed Knupp feedback that he allegedly received from Mr. Applewhite's colleagues:

> *Jamaal has told the CART team several times that he is on FMLA due to some issues, but is also continuing to work. However, his issues seem to be negatively impacting his overall work performance. I would prefer he dedicate himself full time to his FMLA needs and return once he is able to be committed to work full time.*

(*Id*.)

47b.     Knupp immediately replied and instructed Matter to change the feedback so that it contained "[n]o reference to FMLA at all...show[ing] that Jamaal was **disengaged** and not committed." (Emphasis added.) (*Id*.)

47c.     Twelve days later, Matter completed Applewhite's mid-year work performance appraisal, and, per Knupp's recommendation, paraphrased the feedback he had received above to replace all references to Mr. Applewhite's FMLA leave with remarks about his lack of engagement:

> *[Y]ou have been tardy to many meetings and have had unexcused absences and tardiness to work…These have been observed by…individuals who were meeting with…You need to make every effort to be in the office on time...I have summarized the feedback I have received…Jamaal is **not always engaged**...*

(Emphasis added.) [ECF No. 53-7 Page 28.]

47d.     On June 6, Knupp continued to suggest that Mr. Applewhite's FMLA-related absences negatively impacted his level of engagement - in her Written Warning to Mr. Applewhite she wrote: "...it is important that you maintain availability and **engagement**." (Emphasis added.) [ECF No. 53-8 Page 6.]

47e.     Matter thanked Knupp for her guidance on his mid-year comments for Applewhite's goals and summary. (Ex. D at Bates 997.)

47f.     On June 7, explained that part of the reason he was not going to approve some of Applewhite's vacation requests was "based on the status of your goals...," and "[v]acation needs to be used throughout the year." He also referenced the written warning issued on June 6 as reason for not approving some of Applewhite's vacation requests. (Ex. D at Bates 856.)

47g.     Steuer testified that Matter's policy regarding paid time off was that "[y]ou were always allowed to take time off as long as you had your work covered. It was dependent on you as that person to make sure that you had what you needed covered." (Ex. B at Bates 22:20-22, 23:1-5.)

49.     Tardiness related to Plaintiff's FMLA was an issue as it impacted how he was perceived by others. For that reason, he requested, in his mid-year review summary comments, titled, "Men Lie. Women lie. Numbers don't", the following from Matter:

> I only ask that my evaluations are based off of facts (instead of perception and hearsay). I ask this because I've learned that much of my colleagues feedback and opinions are based off of their  **perceptions**...

(Id. 26.)

50.     Senior Human Resources officer, global director, Dan Allen's was even aware for Mr. Applewhite's plan to utilize FMLA leave on June 2, yet no Deere personnel offered Mr. Applewhite an option to re-certify, or attempted to contact Ms. Applewhite's healthcare provider to confirm that Mr. Applewhite's FMLA leave utilization was consistent with Ms. Applewhite's needed support. (Ex. D at Bates 952.)

50a.     Instead, on June 1, Deere planned surveillance on Mr. Applewhite. staked him. (Applewhite ¶ 19; Ex. D at Bates 952.)

51g.     The suggested talking point came from Deere's Human Resources department, and she requested that Matter "[s]hare [Mr. Applewhite's] response with Claya" after Matter's June 2 meeting with Mr. Applewhite. (Id.)

51h.    June 2, was Mr. Applewhite's first day reporting to work after he had taken FMLA leave that began on May 31, which Deere agreed he was entitled. (Ex. D at Bates 266.)

51i.    On June 2, Matter scheduled the June 2 meeting with Mr. Applewhite after the May 31 FMLA leave began, and before Mr. Applewhite returned to work from the same leave.

51j.    One June 2, less than two (2) hours after Mr. Applewhite first returned to work from the approved FMLA leave that he began on May 31, Matter held the meeting to address Deere's issues with Mr. Applewhite's timeliness on June 2 and May 17. [ECF No. 53-7 Pages 18-19.]

51k.    During the meeting, Matter shared with Mr. Applewhite that as a result of the timing of his return, June 2 was treated as an "unexcused tardy." Matter still welcomed him to work as late into the evening as needed to get his work completed.[8] Matter took notes that Applewhite, in response to the warning, responded, "I believe per the doctors information that I am fine to use FMLA." (Applewhite ¶ 20; Ex. D at Bates 931-932, 953.)

51l.     Mr. Applewhite completed a full day's work even though he began his shift in the afternoon. (Applewhite ¶ 20.)

51m.    On occasion, Steuer began work as late as 10 PM. (Steuer 30: 23-24, 31: 1-4.)

51n.    Matter's talking points for the meeting were provided by Ciha and Knupp, which included the note, "[d]o not offer answers to his questions." (Ex. D at Bates it all 949, 953.)

51o.    During the meeting, Matter shared his concerns with Mr. Applewhite taking an extended lunch, and informed him that he would be following up with Deere's HR department for disciplinary actions.[9] (*Id*.)

51p.    On June 3, Matter reiterated, via email, what he shared in the discussion meeting, that even though Mr. Applewhite made up work hours that he spent on an extended

---

[8]Matter shares with Mr. Applewhite, "...[y]ou can work as long as you need to catch up on your work this evening as you are an exempt employee but it does not make up for your unexcused tardy."

[9] During the "Discussion" meeting, Matter tells Mr. Applewhite "...leaving for several hours in the middle of the day without any communication to me, your manager, is not acceptable and I will need to work with HR to determine next steps."

lunch, it "...still [did] not excuse the fact that [he was] out of the office..." [ECF No. 53-7 Pages 18-19.]

      51q.    Steuer testified that he was unaware of Matter's policies regarding taking breaks during the middle of the day, extended lunches, and unpaid time off because no conversation of the like "was ever shared with [him]." (Ex. B at 21: 5-24, 22: 1-11.)

      51r.    In regards to his understanding of time off policies while working for Matter, Steuer explained, "[y]ou were always allowed to take time off just as long as you had your work covered. It was dependent on you as that person to make sure that you had what you needed covered." (Ex. B at  23: 1-4.)

      51s.    Knupp testified that she was not aware of any policy, documented by Deere, that addressed exempt employees who had lunches that lasted more than thirty (30) minutes. (Ex. A at 56: 21-24.)

      52g.    Steuer testified that team meetings with Matter regularly started and ended late for several reasons, including, the previous meeting running over, and technical difficulties with the VC run and instant message system softwares. (Ex. B at 11: 24, 12: 1-24, 13: 1-24)

      52h.    Steuer testified that he could not recall the exact number of meetings that he had been late to, but admitted that he had been late to several meetings, and could not limit the number . (Ex. B at 14: 20-22, 16: 1-24, 17: 1;18: 1-7.)

      52i.    Steuer testified that Matter never reprimanded him for being late to a meeting. (Ex. B at 17: 2-4.)

      52j.    Knupp testified that it was Deere's policy to allow employees paid, sick time off for five (5) or more consecutive days, and the only requirement to activate this benefit was to "[n]otify your manager, let your manager know that you're out of the office." (Ex. A at  54: 19-23.)

      52k.    She also testified that Deere only required employees that had been absent, out of the office after six (6) days in a row to work with the Disability Services department on short-term disability. (Ex. A at 54: 6-14, ECF No. 22 ¶ 79.)

53.     The warning created new work restrictions for Plaintiff of which similarly situated employees were not subjected like requiring a doctor's note after taking one sick day off work. [ECF. No. 56 ¶¶ 78-80; Ex. A at 54: 3-23; ECF No. 57-2 Page 1.]

53a.    Mr. Applewhite used less than (5) sick days in 2015 and 2016. (Ex. D at 1988-89.)

55f.    June 7, Curran shared that the most recent medical recertification, which was faxed directly to his department by Ms. Applewhite's healthcare provider, estimated Ms. Applewhite's flare-ups to occur 2 times per week. [ECF No. 57-2 Pages 4-7.]

55g.    Knupp testified that she was not surprised that the supervisor of Disability Services department declined the meeting Mr. Applewhite scheduled to discuss his concerns regarding retaliation and interference because "[t]ypically, the employee works with their manager and HR..." (Ex. A at 37: 12-24, 38: 1-3, 38: 15, 38: 19-20.)

55h.    Knupp admitted that she could not recommend a person that should have been included in the meeting that. (Ex. A at 39: 15-17.).

55i.    Knupp shared that she would have advised Mr. Applewhite to include Davis, Curran's subordinate, to the meeting that Curran declined, and only would have expected Curran to be involved only if questions need to be escalated. (Ex. A at 39:22-24, 40:1-2.)

57a.    Knupp testified that she was one of the decision makers in the termination of Mr. Applewhite's employment. (Ex. A at 10:15-22.)

57b.    As a result of Mr. Applewhite's employment being terminated by Deere and Ms. Applewhite's continued need for care (Ex. E at Bates 1113 to 1115), even after seeking comparable employment and acquiring additional skills and education (Ex. E at Bates 1123 to 1127, 1146-1150), he has yet to land a similar job with comparable pay, and depleted his retirement benefits to cover his living expenses. (Applewhite ¶ 30.)

57c.    The employee options that he was offered were limited due to his continued need of FMLA leave to help his mother with her serious health condition that

continued years after Deere terminated his employment. (Ex. E at Bates 1113 to 1115; Applewhite ¶ 30.)

57d.    During the relevant period, Deere's policy regarding the disciplinary procedure for its salaried employees working in the USA stated, "[i]n cased related to performance or behavior, the employee should first...be counseled as to how to correct [areas of shortcomings], and be given a reasonable time to do so...Where one exists, a formal improvement program (i.e., the Employee Performance Improvement (EPI) process) should be used. (Ex. D at Bates 1924.)

57e.    During the relevant period, Deere's policy regarding the disciplinary procedure for its salaried employees working in the USA stated, "[d]iscussions with an employee regarding shortcomings of performance or behavior should be held on a timely basis, that is, as soon after an incident occurs or comes to the supervisor's attention, or during the periodic performance appraisal." (Ex. D at Bates 1924.)

63.    Matter testified that Wolff was late to meetings as well. (Applewhite ¶ 11.)

## ARGUMENT

I.   RETALIATION

An employee can prove retaliation circumstantially, using a variant of the McDonnell-Douglas method of proof. Specifically, a plaintiff must show that: (1) he exercised rights afforded by the Act; (2) he suffered an adverse employment action; and (3) there was a causal connection between his exercising of rights and the adverse employment action. *See Darby v. Bratch*, 287 F.3d at 679 (8th Cir. 2002). Here, it is undisputed that the first and second prongs are met. Deere disputes only that there is a causal connection between Mr. Applewhite's exercise of his rights of the FMLA and the termination of his employment.

After defendant articulates a nondiscriminatory reason for an adverse employment action, the Plaintiff must show the Defendant's justification is pretext, unworthy of credence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000). To do so, a plaintiff can produce evidence that the reason for taking the adverse action: (1) had no basis in fact; (2) did

not actually motivate the employer's action; or (3) was insufficient to motivate the employer's action. *E.E.O.C. v. Ford Motor Co.,* 752 F.3d 634, 649 (6th Cir. 2014). Here, the record shows, under each option, that Deere's stated reason for Mr. Applewhite's termination was pretext for retaliation. Deere claims Plaintiff was terminated because of excessive tardiness and absenteeism. Contrarily, Mr. Applewhite proves that his use of intermittent FMLA leave, and complaints about violations of his rights was the actual motivation for Defendant's decision.

      A.     Plaintiff Establishes a Causal Connection Between His Protected Activities and Deere's Adverse Actions

Deere attempts to negate any casual nexus between Plaintiff's termination and his use of FMLA leave by overcomplicating Plaintiff's requirements for establishing *prima facie*. It focuses on two areas of controversy in support: 1. Plaintiff's alleged attendance issues; and 2. the six-month time period between when it fired him and when Mr. Applewhite first requested his FMLA leave of absence. It is important to note that the burden of establishing a *prima facie* case is not onerous but one easily met, as the burden of proof at this stage is minimal. *See EEOC v. Avery Dennison Corp.,* 104 F. 3d 858 (6th Cir. 1997). The Court of Appeals highlights the fact that "the EEOC argued that to prove a *prima facie* claim, it was sufficient for a plaintiff simply to proffer evidence sufficient to raise an inference that the protected activity was the likely reason for the adverse action." *See* also *Dixon v. Gonzales*, 481 F3d 324 (6th Cir. 2007);

In regards to Plaintiff's alleged attendance issues, Defendant claims that Plaintiff admits to being responsible for the issues related to his attendance prior to requesting leave. However, Plaintiff did not claim responsibility for the issues, and never admitted that he had *unexcused* tardiness issues. Furthermore, Plaintiff argues that the progressive discipline that led to his termination was independent of his attendance at meetings, and provoked only by his absences that were considered unexcused after Deere denied his FMLA requests. Prior to Mr. Applewhite formally requesting FMLA leave in December 2015, Deere offered no inclination that Mr. Applewhite's attendance was a problem. It only shared glowing remarks for his work performance, and reflected its astonishment of his immediate and positive impacts in his

appraisals. On May 16, after Mr. Applewhite attempted to use FMLA leave, it denied his request. The following day, Matter created discriminatory work requirements for Mr. Applewhite - for the the first time ever he, unlike similarly situated employees, was required to begin work at a set time and had to give Matter a 48-hour advanced notice for vacation requests, *infra*. Plaintiff cites *Lamer* for the proposition that "where an employer treats an employee differently after he asserts his rights than before he had done so, a retaliatory motive may be inferred." *See Lamer v. Metaldyne Co. LLC,* 240 F. App'x 22, 32 (6th Cir. 2007). On June 2, Deere issued him a written warning for being tardy to work on May 16 and June 2, which were two days that he notified Deere of his intent to take leave.

Secondly, as it relates to the six month period between Plaintiff's first FMLA leave request, Defendant, in error, calculated temporal proximity by counting the days from the date that Mr. Applewhite formally submitted his original FMLA leave request paperwork to the date Deere terminated his employment, and arrived at its tangential six month period. In the case *MacKenzie v. Caplan Industries, Inc.*, (Dist. Court, ED Pennsylvania 2019), Defendant moved to dismiss Plaintiff's claim of FMLA violation, alleging Plaintiff failed to sufficiently plead causation between his termination and FMLA leave because the seventeen weeks between Plaintiff's request for FMLA leave and his termination were not "unusually suggestive" of a casual connection. Contrarily, the Court noted:

> *A plaintiff may establish a causal connection between protected activity and an adverse action either through (a) "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action," or (b) "a pattern of antagonism coupled with timing to establish a casual link."* Budhun [v. Reading Hosp. & Med. Ctr.], *765 F.3d at 258 (quoting Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)).*

The Court analyzed temporal proximity beginning on the last day of Plaintiff's initial twelve weeks of leave. Consequently, Defendant's motion was denied. Similarly, in the current case, Deere's attempt to negate the obvious causal nexus between Plaintiff's protected activities should be rejected. Plaintiff establishes causal connection using both options.

On June 15, 2016, Deere departed from its disciplinary policy - it expedited the termination of Mr. Applewhite's employment without putting him into its Employee Performance Improvement (EPI) program, *supra* DMF ¶ 57. Uncoincidentally, Plaintiff had just twice opposed Deere's FMLA violations: firstly, nine (9) days prior he complained to several Deere managers that his FMLA rights were being violated[10]; secondly, hours before he was fired, against Deere's orders, he reported taking approximately fifteen (15) minutes of leave earlier that day. It is also important to note that this expeditious termination occurred less than one (1) month after Mr. Applewhite's recertification was approved, *supra* DMF ¶ 55. Firing Mr. Applewhite was just Deere's most egregious and obvious retaliatory action, and the last step in its retaliatory progressive discipline, which consisted of two earlier, unwarranted steps. Together, the three steps served as the *final* link in Deere's chain of spiteful actions;

- On May 17, after Applewhite's recertification was issued on May 13, Deere executed the first step in its progressive discipline of Mr. Applewhite, a verbal/informal, first warning to him. It was for an unexcused absence that occurred on May 16 - Deere denied his request for FMLA leave to cover the absence.

- On June 6, Deere initiated its second step of its progressive discipline for Mr. Applewhite - issued him a formal, written warning for unexcused absences on May 16 and June 2. Deere denied his request for FMLA leave to cover both absences.

- As mentioned above, Deere concluded its progressive discipline by firing Mr. Applewhite on June 15, 2016 just hours after he notified Deere of his intent to take leave for that same morning.

Each of the three (3) steps that made up Deere's progressive discipline transpired less than four (4) days after protected activity. Such a short time period between protected activities and adverse employment actions, indubitably, fall within the Third Circuit's 2-month time-frame for unusually suggestive temporal proximity. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d at 760 (3rd Cir. 2004).

---

[10] ECF No. 57-1 Page 95; Applewhite ¶ 21

Deere's chain of antagonizing actions, which instigated its progressive discipline and consisted of about eleven (11) impermissible events, also fall within the Courts timeframe for unusually suggestive timing:

- December 23, Mr. Applewhite was approved for FMLA leave, and less than three (3) weeks later:
  - on January 8, Matter required Mr. Applewhite to spend significantly more time on less desirable work than similarly situated employees (Ex. D at Bates 1606, 1609-1612; supra AMF 3h); and
  - weeks later, Deere created a so-called anonymous complaint that resulted in an internal investigation of Mr. Applewhite that concluded in him being removed from a leadership recruiting role.
- February 19, Mr. Applewhite participated, via Deere's internal investigation, in a complaint against Deere for retaliation and discrimination against himself.
  - Nine (9) days later, on March 1, for the first time ever (*supra* AMF ¶ 29), Deere issued Mr. Applewhite an annual merit award that was a 0% pay increase.
- March 6, Mr. Applewhite complained to Knupp that his supervisor was interfering with his FMLA rights.
- April 18, Knupp admitted the employee's protections under the FMLA frustrated her. [*supra* AMF ¶ 20, 20b, 20c; ECF 63-4 ¶¶ 29,31.] After being advised of Plaintiff's FMLA rights, she decided with Rathburn that Mr. Applewhite's telework arrangements should be revoked. Consequently, Deere:
  - three (3) days later, on April 21, grossly understated the number of leave hours for which he was eligible;
  - on April 22, (now) required all vacation requests be pre-approved; and
  - on April 25, revoked Mr. Applewhite's telework privileges.
- May 4, after Mr. Applewhite notified Deere of his intent to complete its recertification, it:
  - two (2) days later, on May 6, voided his approved FMLA certification;

- on May 12,  Knupp and Matter conspired to disguise negative comments about Applewhite's use of leave as non-FMLA, job-related deficiencies;

- on May 16, upheld its FMLA prohibition, by denying Mr. Applewhite the option to take FMLA leave that same morning; and

- on May 17, Deere began to take issue with him working late shifts, and required him to begin work by 8 AM going forward; and

- started to scrutinize Mr. Applewhite's attendance more than that of similarly situated employees by actually planning and conducting surveillance on him, inside and outside the SWOB office.

- May 13, after McNamara issued Applewhite's recertification for intermittent FMLA leave, Deere:

  - on May 17, initiated its progressive discipline that concluded in the termination of Mr. Applewhite's employment on June 15.

  - Seven (7) days later, on May 24, Plaintiff's supervisor shared a negative performance appraisal for Mr. Applewhite.


B. Plaintiff Presents A Preponderance of Evidence Supporting A Reasonable Conclusion That The Alleged Basis For His Termination—Excessive Tardiness And Absenteeism—Was Pretext for Retaliation

Defendant claims that it is inconceivable and inconsistent for it to approve and enhance Plaintiff's FMLA leave requests, only to retaliate against him months later for exercising the same rights. However, the undisputed evidence, highlights Deere's bold and reckless indifference to the federally protected rights of Plaintiff. *Infra*, Plaintiff, through referencing an abundance of undisputed incidents, further demonstrates that Defendant's basis for firing him was pretextual, and uncovers Defendant's retaliatory motives. He highlights Deere's: animosity toward the burden that resulted from his use of *intermittent* FMLA leave; antagonizing decision-makers; and strategy to perpetuate unprotected leaves of absence.

<u>Evidence Demonstrates That Deere Acknowledged a Retaliatory Motive for its Materially
Adverse Action.</u>

Deere camouflages its retaliatory behaviors as support of Applewhite's leave.
Applewhite uncovers its most deceiving act, an assertion that its complex and unreliable
telework arrangement was as an "enhancement" to Applewhite's FMLA rights. Although
Plaintiff, at first glance, believed the telework offer to be made in good faith, the evidence
illustrates that Deere used it as pretext for recertification and firing him. Less than two weeks
after Applewhite began teleworking from where he helped take care of his mother, in lieu of
taking leave, Knupp investigated the option to close his FMLA on the basis that he reduced his
FMLA use, *supra* DMF ¶ 17. Similarly, Deere now argues that an increase in FMLA use,
connected to its truncated telework privileges, justifies its recertification request, which, it
argues, legitimizes some its FMLA interference behaviors that occurred after May 6, 2016.

It is undisputed that Deere's HR representatives had negative emotions, and took issue
with managing Plaintiff's intermittent leave. Knupp, on April 18, after being advised of Plaintiff's
FMLA rights, shared her frustration, and decided with Rathburn that Mr. Applewhite's telework
privileges should end because some of the days he utilized leave coincided with days he was
expected to work from the office. [ECF No. 56 Page 13 ¶¶ 29-30.] As part of the same email
exchange, she admitted, via email, her aggravation to her manager. Deere, determined to
dissuade Mr. Applewhite from invoking his rights under the FMLA, brazenly:

- attempted to invalidate his original certification;

- misstated the number of FMLA leave hours in which he was entitled *see* 29 C.F.R. §
  825.205(b)(1), *see* also 29 C.F.R. § 825.305(d); *see also Arban v. West Publ'g Corp.,* 345
  F.3d 390 (6th Cir. 2003);

- required, before legally allowed, him to complete a recertification, and offered him fewer
  days to complete it than legally required. 29 CFR § 825.308(b); *see also* 29 CFR §
  825.203; and

refused to report Applewhite's concerns that he was a victim of FMLA retaliation, *supra*
DMF ¶ 29, AMF¶ 2a.

Knupp, during her deposition, painted herself as never one to get frustrated, and
testified that Mr. Applewhite's FMLA leave rights did not frustrate her.[11] The evidence shows
that she was clearly being deceitful as, on April 18, she literally complained to her colleagues
about how difficult it was to manage Applewhite's leave, and admitted being frustrated by his
FMLA rights, *supra* AMF 20, 20b, 20c. Under her advisement, Plaintiff's telework privileges
were officially revoked on April 25, 2016. (*Id.*) Then, On May 12, less than one month after, she
advised Plaintiff's supervisor to disguise negative comments about his leave as non-FMLA
related deficiencies.[12] [ECF No. 56 ¶¶ 55-58; ECF No. 57-2 Page 23; ECF No. 57-1 Pages 1-9.]
Matter complied with Knupp's recommendation, terminated his telework arrangements,
incorporated the disguised FMLA comments as part of his work performance appraisal, and
offered Mr. Applewhite a 0% base pay increase that was surprisingly inconsistent with Matter's
appraisal of his work performance and Deere's guidelines, *supra* AMF ¶ 29. *See also* 29 C.F.R.
§ 825.220(c), 29 C.F.R. § 825.205(a)(1) ("...employers cannot use the taking of FMLA leave as a
negative factor in employment actions, such as hiring, promotions or disciplinary actions...").

Deere Practiced Several Actions That Would Deter Reasonable Individuals From Utilizing FMLA
Leave and Reporting Violations of the FMLA.

In an effort to discourage Mr. Applewhite from taking intermittent FMLA leave and
reporting FMLA violations, it required he recertify every 30 days, beginning May 6, 2016, *supra*
DMF ¶ 38. Furthermore, it disciplined him for taking leave, made it impossible for him to cure
deficiencies, treated him worse than similarly situated employees, departed from its own
policies, and shared unwarranted and inconsistent unfavorable comments in his work
performance appraisals.

---

[11]Knupp testified, "I mean, I'm not normally a frustrated type of person. I don't get frustrated. So that's not a word that I would use to describe how I felt." (Ex. A at 19: 2-24; 20: 17-24.)

[12] Knupp commanded, "[n]o reference to FMLA at all...[p]araphrase the feedback below to show that Jamaal was disengaged and not committed..." [ECF No. 57-2 Page 23.]

*Deere administered an adverse employment action to Mr. Applewhite each time he took leave or opposed its FMLA interferences, and blocked his attempts to prevent unexcused absences.*

Nearly every month since Applewhite began taking leave in January 2016, he suffered adverse employment actions after participating in FMLA protected activities.In January, right after Applewhite took his first leave of absence, Deere removed him from his leadership position on its recruiting team for the National Society of Black Engineers. In February, Applewhite continued to take leave, intermittently. In March, after Applewhite, undeniably out performed his predecessors (Ex. D at Bates 1610,1611), his supervisor rated him as having a "successful performance" and being on track with expectations. Yet, somehow Deere denied him a merit increase for the first time in his ten-year career, and without any justification. In April, after Knupp admitted to the nuisance related to Applewhite's intermittent leave, Deere revoked his telework privileges. In May, it voided his FMLA leave, denied his recertification, and disciplined him for an unexcused absence for a day he requested FMLA leave, *supra* DMF ¶ 39. As part of the discipline, it required him to begin work by 8 AM, else suffer disciplinary action. Approximately two weeks later, in June, Deere organized surveillance on Applewhite, put him on notice that he was being closely watched. It even had a security vehicle trail him, after work, on his way home, *supra* AMF ¶ 50a.

Deere discovered no incriminating evidence from its surveillance of Applewhite. Nevertheless, around the same time period, it denied his request to take FMLA leave for his absences on May 16 and June 2, and issued him a written warning, considering them unexcused, despite his sufficient recertification. Matter's discussion with Applewhite, and his talking points in preparation for the formal warning, exemplify that Deere was intentionally ambiguous and non-cooperative when Applewhite posed questions about his FMLA rights. In preparation for Applewhite's discipline, Matter blatantly noted, "[d]o not offer any answers to [Applewhite's] questions...," supra DMF ¶ 51. Consequently, Applewhite immediately protested the admonishments and attempted to rectify Deere's interference by initiating discussions with various human resources personnel. Deere's unit human resources department personnel directed him to contact its Disability Services Department for his FMLA questions. However,

even Deere's Disability Services department refused to meet with him to address his concern

that he was not being allowed to take leave three times per week like the recertification

explained was needed for care, *supra* DMF ¶¶ 44,55 and AMF ¶¶ 55f-55i. Such a failure to

identify deficiencies in Applewhite's medical certification, to provide an opportunity to cure

deficiencies, and answer FMLA-related questions violates the FMLA. The FMLA explains,

"[e]mployers are...expected to responsively answer questions from employees concerning their

rights and responsibilities under the FMLA." See 29 C.F.R. 825.300(c)(5). About two weeks after

Deere ignored Applewhite's protest,  on June 15, the day he returned from approved leave, it

fired him in retaliation, but alleged the reason was because he exceeded the estimated need

for care by fifteen minutes. *See Hansen V. Fincantieri Marine Group, Llc,* Dist. Court, ED

Wisconsin 2013, where the court determined "Hansen's absences were not so far in excess of

the estimated frequency and duration" to warrant adverse employment action. *See* Hansler v.

Lehigh Valley Hosp. Network, 2015 WL 4925819, at *6-7 (3d Cir. 2015); *see also* Sims v.

Alameda-Contra Costa Transit Dist., 2 F.Supp.2d 1253 (N.D.Cal. 1998). Sims' absences

exceeded the frequency of absences predicted in his certification. Since Alameda did not allow

him to cure the deficiency before firing him, the Court ruled it could not deny him FMLA leave

based on the perceived insufficiency.

*In dealings with Mr. Applewhite, Deere departed from its documented policies and customary
procedures, and treated Applewhite less favorably than similarly situated employees.*

Deere's Code of Business Conduct policy requires managers and Human Resources

staff to, "immediately, and without investigating," report potential illegal acts. [ECF 63-4 ¶ 28.]

However, Knupp and Matter, in three separate incidents, admitted that they did not properly

report Applewhite's concerns of FMLA retaliation when he shared it with them. Knupp, twice

investigated the concern herself, and concluded no foul play [*supra* DMF ¶ 29, AMF ¶ 29a;

ECF 63-4 ¶ 67.] Matter reported it, but waited about seven months later, *supra* AMF ¶ 2a.

Deere's disparate treatment of similarly situated employees demonstrates Applewhite

was a victim of retaliation. Matt Steuer, Olga McKasson, and Nick Wolff were three employees

that were similarly situated to Mr. Applewhite. All four employees worked as full-time, salaried, exempt employees, in the same department, with the same titles and/or job responsibilities, and reported directly to Matter. Steuer and Applewhite, both reported to Matter during Applewhite's leave, and were project leaders for the development and maintenance of software programs. Wolff and McKasson's held Applewhite's role before he was hire. The notable differences amongst the four employees was that Applewhite was the only one that: 1. invoked his rights to take FMLA leave, intermittently; and 2. opposed Deere for violating FMLA rights.

Completing project type work was known to be more desirable than analyzing the cost of parts, *supra* AMF ¶ 3h. Still, Matter made the analysis of parts a job responsibility for every CART project leader. Applewhite, even though he was required to, and completed, significantly more analyses than both of his predecessors combined, was the only similarly situated person that received negative evaluation comments for his should cost performance, *supra* ¶ 17. Adding salt to the wound, Matter based his denial of Applewhite's vacation requests on Applewhite cost analysis performance. Steuer testified that Matter's direct reports could take vacation at their leisure. Matter testified that Applewhite was the only that reported to him, which he denied a request to take vacation. Similarly, after June 2, Applewhite was required to provide a doctor's note after taking one sick day off from work, and Knupp testified that Deere's policy was to only require a note after five sick days, *supra* AMF ¶¶ 52j, 53, 53a.

Ciha testified that Deere's FMLA policy permitted Applewhite to take intermittent FMLA leave without Deere's consent. (Applewhite ¶ 15.) However, it is undisputed that Deere departed from its policy when she shared that the basis of Deere's recertification request was rooted in the belief that Mr. Applewhite's leave should be changed from intermittent to continuous. [ECF 63 Page 6 ¶ 37.] On top of that, "[t]he FMLA was not intended to impose onerous procedural burdens on employees who need medical leaves of absence," but, for recertification, Deere demanded Applewhite prove that Ms. Applewhite was actually his mother. *See Manuel v. Westlake Polymers Corp., 66 F.3d 758, 763 (5th Cir.1995).* Even Knupp testified

that she had never witnessed Deere require an employee to re-certify before their current FMLA approval expired. (Ex. A at 51: 8-18.)

On May 17, Matter issued Applewhite a warning for taking an extended lunch and arriving to work after 1 PM on May 16. He also denied Applewhite's attempt to take FMLA leave. [ECF 57-2 Pages 18-20; *supra* DMF ¶ 42.] Like the similarly situated employees, Applewhite was never previously disciplined for beginning work in the afternoon because Matter's policy allowed employees to work at anytime of the day, *supra* DMF ¶ 41, AMF ¶¶ 41, 41a, 43. Similarly, extended lunches were not prohibited, but Applewhite was disciplined (Applewhite ¶¶ 20,25). After May 17, on Applewhite (and none of the similarly situated employees), was required to start work at a specific time. This proves the warning was actually pretext for discrimination. Applewhite's attendance, in all aspects, was scrutinized more closely than that of similarly situated  employees. Consequently, Mr. Applewhite was the only employee that directly reported to Matter who was even allegedly disciplined for missing meetings or arriving to them after they started. The undisputed record is clear that Deere based its decision to revoke his telework privileges on the fact that a portion of his FMLA leave coincided with days he was expected to work from the office, *supra* UMF ¶ 34. Again, Applewhite was the the only similarly situated employee that had his telework privileges revoked. (Applewhite ¶¶ 23, 24.)

*Deere included unwarranted and unfavorable comments in Applewhite's work performance appraisal.*

Before Mr. Applewhite requested FMLA leave in December 2015, Matter had given him better, meritorious work performance appraisals. (*Supra* AMF ¶ 8; ECF 63-4 ¶ 7.)  After February 2016, when Plaintiff participated in a complaint against Deere for discrimination and retaliation (*Supra* AMF ¶¶ 2-2c), and after March 2016, when Plaintiff complained to Knupp about his manager's retaliation, Defendant made sure negative comments in Applewhite's work performance appraisal, which reduced his likelihood of receiving future bonuses, raises, and promotions.  (*Supra* AMF ¶ 47, ECF No. 56 ¶¶ 57-60; ECF No. 57-1 Pages 1-9.) Such a drastic

change in Defendant's view and treatment of Plaintiff over such a short period of time and in such close temporal proximity to Plaintiff's protected activities further gives rise to an inference of retaliation. *See Lamer v. Jvletaldyne Co. LLC*, 240 F. App'x 22, 30 (6th Cir. 2007). "Where an employer treats an employee differently after he [engages in protected conduct] than before he had done so, a retaliatory motive may be inferred."

## II.  INTERFERENCE

Per the FMLA, specifically 29 C.F.R. § 825.220(b), "[a]ny violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act. In order to be successful in an interference claim, Plaintiff only needs to prove that Defendant violated the FMLA or its regulations in one way. However, Plaintiff incorporates the arguments in the proceeding retaliation section with this interference count, and proves that Defendant actually committed over ten (10) violations, which prejudiced him. Some of the highlighted violations demonstrate that the Defendant was willful in its actions, which makes the three-year statute of limitations applicable.

Defendant attempts to paint a picture that they were more supportive, than required by law, of Plaintiff's attempts to exercise his rights under the FMLA. It argues, "[i]t is inconceivable that Deere, *at first instance* it learned of Plaintiff's FMLA needs, support and enhanced Plaintiff's FMLA leave...only to retaliate later for exercising the same FMLA rights." However, it is undisputed that in February 2015, Mr. Applewhite notified Matter, his supervisor, of his need to help his mother, who lived in Chicago. Matter, nor any other Deere representatives, at that time, shared with Mr. Applewhite his FMLA eligibility notice. [ECF 63-4 ¶ 14.] In *Morkoetter*, an employee who was not even eligible for FMLA leave nonetheless gave notice to his employer of his "need to take FMLA in the future," and the court held that the employee sufficiently alleged he engaged in protected activity. *See Morkoetter v. Sonoco Prods. Co.,* 936 F. Supp. 2d 995,1001 (N.D.Ind. 2013). On the contrary, Deere was required to share with Mr. Applewhite, his "...eligibility to take FMLA leave within five business days..." of when Mr. Applewhite

requested FMLA leave, but it did not. *See* 29 C.F.R. § 825.300(b). Furthermore, Deere claims to have "enhanced" Plaintiff's leave by decreasing his need to take leave by allowing him to work from home more often. However, soon after Plaintiff accepted its telework arrangement, Deere conspired options to terminate his approved leave under a "use it or lose it" strategy, *supra* DMF ¶ 17.

Deere, in support of its claim that it fired Applewhite for non-discriminatory reasons, argues its warning for excessive tardiness and absenteeism, were motivated by Applewhite's tardiness to meetings before he began to take leave, over five months prior. However, this is inconsistent with the undisputed evidence, and noncompliant with its disciplinary policy that states "[d]iscussions with an employee regarding shortcomings of performance or behavior should be held on a timely basis, that is, as soon after an incident occurs," *supra* ¶ 57e.

A.     Deere's FMLA Interference Since June 12, 2015 Are Not Time-Barred

Deere's actions of interference that occurred on June 15, 2016 and three years prior are not time-barred because Plaintiff proves that the three-year statute of limitation applies, *infra*. Even if somehow the Court determines that the three-year statute of limitations does not apply, none of Deere's acts of interference that are connected to Plaintiff's termination of employment are time-barred because Plaintiff's termination of employment was only the "...*last* event constituting the alleged violation for which the action is brought," which occurred within the FMLA's two-year statue of limitation, on June 15. (Emphasis added.) *See* 29 U.S.C. § 2617(c). The progressive discipline used to fire Plaintiff consisted of events that took place before June 12 (i.e., revocation of telework privileges on April 25, issuance of verbal warning for tardiness on May 16, implementation of a work start time on May 17, and delivery of written warning on June 5), which constituted the same termination violation. Therefore, he would not have been fired had the May 16 and June 2 reprimands not been administered.

B.     The Three-Year Statute of Limitations Applies

The three-year statute of limitations applies because several of Defendant's FMLA violations were willful. *See* 29 U.S.C. § 2617(c)(2). The evidence shows that Defendant's local

human resources representative, Ms. Knupp, advised Plaintiff's supervisor to disguise negative comments about his FMLA leave, and include it in his performance appraisals. Additionally, the evidence shows that Plaintiff's supervisor, in preparing to issue a warning about Plaintiff's absences, deliberately violated 29 C.F.R. 825.300(c)(5), which explains "[e]mployers are also expected to responsively answer questions from employees concerning their rights..." June 1, per Deere's Human Resources personnel's instructions to "...not offer answers to [Plaintiff's] questions," Matter complied (*supra* AMF ¶ 51f.) Plaintiff was so shocked by the blatant disregard of his rights, that he, literally, protested, "[t]his is a violation of my right." Even worse, the undisputed evidence shows that the Defendant's department responsible for managing FMLA leave requests refused to participate in a meeting that was created by Plaintiff with the intent to clarify his healthcare certifications, rectify alleged violations, and prevent future deficiencies.

C.    Plaintiff Was Denied FMLA Benefits to Which He Was Entitled Under the Certifications Approved on December 2015 and May 2016

Deere's recertification request was improper so the original certification, per the FMLA, permitted Mr. Applewhite to take leave to help his mother any day from December 23, 2015 to December 22, 2016, until his 60 days of entitlement were fully depleted.

According to the originally approved health certification, none of Mr. Applewhite's leave requests that occurred between December 23, 2015 and December 22, 2016 should have been prohibited because it is undisputed that it permitted Applewhite to take a leave every day until he exhausted the sixty days for which he was entitled. [ECF 63-4 Page 7 ¶ 20.] The health certification that was, undisputedly, issued by McNamara on December 23, 2015 and approved by Deere on January 4, 2016 indicated the duration of Ms. Applewhite's condition was "indefinite," and estimated Ms. Applewhite's need for care to be everyday for at least one year. As a result, per 29 C.F.R. § 825.308(b), Deere was only "… permitted to request recertification every six months in connection with an absence." Consequently, June 22, 2016 was the earliest date that Deere could request a recertification. Deere intentionally confounds McNamara's estimated frequency, sixty times per two months, as a minimum duration of sixty

days in order to legitimize the recertification request that it sent before legally allowed. Because the undisputed the material facts demonstrate that: 1. McNamara estimated the duration of condition to be "indefinite" [ECF 63-4 ¶ 19.]; 2. Deere's decision makers admitted they believed Applewhite to be a truthful person [*supra* AMF ¶ 8, Applewhite ¶ 25; ECF 63-4 ¶ 38]; and 3. approved the original certification, its basis for recertification was, undeniably, unreasonable and a violation.

On May 5, 2016 Ciha admitted Deere based its decision to require a health recertification before six months on their unfounded belief that Mr. Applewhite's leave should be changed from intermittent to continuous leave, *supra* ¶ DMF 38. However, per Deere's policy (*supra* AMF ¶ 37l) and the FMLA, Ciha did not have authority to request that Plaintiff modify his leave from intermittent to continuous when caring for a parent, *supra* AMF ¶ 37l. *See* 29 U.S.C. § 2612(b)(1), FMLA "leave [to care for the parent of the employee]...may be taken intermittently..." For this reason, Deere's basis for recertification was (again) unreasonable and a violation. In the FMLA, for intermittent leave needs in excess of six (6) months, there are only three (3) conditions that permit an employer to request a recertification, before six (6) months after the original certification was issued: 1. "the employee requests an extension of leave..."; 2. "[c]ircumstances described by the previous certification have changed significantly (e.g., the duration or frequency...)"; or 3. "[t]he employer receives information that casts doubt upon the employee's stated reason for the absence or the continuing validity of the certification." *See* 29 C.F.R. § 825.308(a-c). Deere, wisely, does not attempt to argue the first or second.

Deere mischievously and desperately, after firing Applewhite, changes its rationale for requesting he complete a recertification before the June 22 permissibility date. It seeks refuge in the third exception by first, it shares that Applewhite's only support for his mother was to tend to her flare-ups, excluding many of the reasons for which it approved Plaintiff to support his mother, some of which were irrespective of her episodes/flare-ups (i.e., facilitating medical treatments, preventing self-inflicting injuries, and transporting her to appointments). *Supra* DMF

¶ 31. Secondly, it claims that Applewhite's pattern of FMLA use matched patterns that courts have found warranted employers seeking recertification. Specifically, it argues an "abrupt increase" in FMLA usage, as compared to the prior month, casted doubt on the continuing validity of Applewhite's certification. However, the patterns, which Deere relies on, originate from cases dissimilar in nature to that of Applewhite: 1. Applewhite took leave to take care of his parent who lived approximately 200 miles from his workplace; 2. the number of days Deere required Applewhite to work in the office varied each month; 3. Deere was aware that telework privileges enhanced Applewhite's ability to support his mother without missing work. Furthermore, the Court explained,

> ...it is plainly not reasonable to require an employee to recertify a condition more often than the period specified by the employee's healthcare provider if the employer is not challenging either the reasons for the employee's absence or the validity of the employee's certification.

See Harcourt at 958. Not only did Deere admit that they trusted Applewhite, the undisputed evidence demonstrates that Deere believed Mr. Applewhite wanted to be in Moline when he was required.[13] Additionally, Deere was in direct contact with Ms. Applewhite's healthcare provider, who declared that Mr. Applewhite's FMLA leave use was consistent with the need for care described in the original certification. (McNamara ¶ 8.) Considering the undisputed facts, it is not plausible that Deere requested recertification because it doubted the continuing validity of the original certification. Consequently, Deere's recertification request was in violation of the FMLA, and not should be voided on multiple, independent grounds, and the original certification should have remained controlling. It follows, that Deere was in violation of the FMLA for denying Applewhite's request to take leave as needed from May 7 to June 15 of 2016. As a result of Deere's prejudice, Applewhite was unable to support his mother in-person without receiving unexcused absences, had to hire a care provider to help in his absence (Applewhite ¶ 15), and was subjected to disciplinary actions that concluded in the termination of his employment.

---

[13] Knupp notes from March 4 read, "Mark thinks that Jamaal would want to be in Moline." (Ex. D at Bates 1367.)

<u>Even if the court determines the basis for Deere's early recertification request was legitimate,
Heidi Ciha did not provide an adequate deadline to complete the recertification, and was
prohibited from denying Mr. Applewhite FMLA leave until after June 8, 2016.</u>

The record demonstrates that Deere rigidly and unyieldingly enforced fifteen days as the
maximum time it allowed allowed Applewhite to provide medical certifications for unforeseen
absences. In regards to the FMLA paperwork that Deere's Disability Services department
shared in April 2016, Deere made five key points of contact with Applewhite:

1. April 21, Disability Services emailed the paperwork with Applewhite's eligibility
   entitlement hours grossly understated;

2. April 29, Disability Services clarified that it sent the paperwork *just in case* Applewhite
   wanted to take a continuous FMLA leave until June 3, 2016, instead of continuing
   with his current leave, which could take any day, intermittently, until December 2017;

3. May 3, unit Human Resources, Ciha, intervened and demanded Applewhite complete
   the paperwork in order to take protected leave after May 6;

4. May 6, Ciha voided Applewhite's originally approved certification; and

5. May 17, Disability Services corrected the FMLA paperwork by increasing Applewhite's
   entitlement hours from 8 to approximately 400 on its eligibility notice.

Per Disability Services' guideline and because Ciha voided Applewhite's certification on May 6,
beginning May 7, Defendant had until fifteen days after his "first day of missed work" to return
the certification, *supra* DMF ¶ 37. Applewhite's first absence from work after each of the five
key points of contact, excluding April 29 and May 3, was April 25, May 16, and May 23,
respectively, *supra* AMF ¶ 37a. Fifteen days after each date is: May 10, June 2, and June 8,
respectively. Deere's inaccurate eligibility notice was discouraging, so it was in violation of the
FMLA, and cannot be considered valid. *See* 29 C.F.R. § 825.300(b)(1),  "...the employer must
notify the employee of the employee's eligibility to take FMLA leave..."; *see also Arban v. West
Publ'g Corp.*, 345 F.3d 390 (6th Cir.2003), using 29 § 825.220(b) to explain that discouraging an
employee from taking leave constitutes "interfering with" FMLA rights. This is why June 8 was
the earliest date, which Deere could have used as a deadline.

Fifteen days from Applewhite's first day of missed work (his first absence since Ciha voided his original certification) was June 2. So if somehow it is determined that the inaccurate notification on April 21 was valid, June 2 was the earliest possible recertification deadline. Still, fifteen days from Applewhite's first absence that occurred after Disability Services emailed the FMLA paperwork, irrespective of when Ciha terminated his original leave, was May 10, but Applewhite shared with Deere that despite his diligent efforts, McNamara would not complete the certification until after she could evaluate his mother on May 13, during an appointment. Therefore, even when assuming that the paperwork emailed on April 21 was a valid recertification request, and ignoring the undisputed fact that Applewhite's absence on April 25 was protected and excused under the original certification, Deere should not have denied Applewhite from taking leave until May 13, at the earliest. *See* 29 CFR § 825.308(d), "[a]n employee must provide recertification...as soon as practicable under the particular facts and circumstances."

Whatever date the Court determines is the correct date to measure the recertification deadline from, it is obvious that Ciha interfered with Mr. Applewhite's FMLA rights when she enforced a deadline that was seven days earlier than Deere's policy and the FMLA permitted, and disallowed him excused absences that would permit him to provide support for his mother without adverse employment action.

<u>Plaintiff demonstrates Deere violated the FMLA when it secretly authenticated the recertification, and blocked him from taking leave on May 16, June 2, and June 15 of 2016 (even under the care described in the recertification).</u>

The recertification issued by McNamara on May 13 was sufficient, and established Mr. Applewhite's mother as having a serious health condition that required his support, *supra* DMF ¶ 16 and AMF ¶¶ 44,44a.[14] Deere did not require that Applewhite obtain a second opinion. Instead, on May 20, it granted him FMLA leave on the basis of the recertification and thus by its actions approved the recertification, beginning May 13, *supra* DMF 44, AMF 44d.

---

[14] Where it is explained that the law states a certification is sufficient if it complies with the following requirements: 1) issued by health care provider; 2) provides the date of onset, expected duration, and medical facts regarding the condition; and 3) includes a statement that the employee is needed to care for the family member. *See Harcourt v. Cincinnati Bell Telephone Co.*, 383 F. Supp. 2d 944 - Dist. Court, SD Ohio 2005 (citing 29 U.S.C. § 2613(b)).

Nevertheless, on June 2, Deere refused Applewhite's leave requests for May 16 and June 2, and issued him a written warning for the same. When Applewhite's June 2 and 15 absences supposedly exceeded the frequency of the flare-ups and/or duration of related incapacity estimated in the certification, Deere did not seek recertification, despite its authorization do so under the circumstances. *See* 29 C.F.R. § 825.308(c)(2); *see also Holder v. Ill. Dep't of Corrs.,* 751 F.3d at 494 (7th Cir. 2014). As part of the decision to process to request recertification, Deere could have asked McNamara whether Ms. Applewhite's condition and Applewhite absences were consistent with the expected need for care, *see* 29 C.F.R. § 825.308(e). Howver, it contacted McNamara to authenticate the recertification, without Applewhite's permission, *supra* AMF ¶ 45. *See Hancourt*, explaining an employer is to request permission to verify the authenticity of the certification with the health care provider. *See* 29 C.F.R. § 825.307(a). None of the authorities cited by Deere establish that the estimated frequency and duration of intermittent leave, act as absolute limits on the employee's entitlement to leave. Other courts have rejected arguments similar to Deere's "limitations argument." *See Fritz v. Phillips Serv. Indus., Inc.,* 842 555 F.Supp.2d 820 (E.D.Mich.2008); *see also Hansen v. Fincantieri Marine Group, LLC, 763 F. 3d 832 (7th Cir. 2014)*. Like the certification in *Fritz* and *Hansen*, McNamara's certification did not explicitly certify that Applewhite would not need leave beyond the estimated frequency or duration. Still, Deere based its decision to fire Applewhite for an unexcused absence on June 15, for which it refused his leave request. (Applewhite ¶ 26.) Similar to *Harcourt,* the undisputed record demonstrates that Deere's recertification, and fifteen-day deadline practices restricted Applewhite's FMLA rights in violation of 29 U.S.C. § 2615(a)(1). It maliciously confounded the estimates included in Ms. Applewhite's medical recertification as absolute predictions, relied on an unwarranted phenomena that each of Ms. Applewhite's flare-ups miraculously ended at midnight. *See also Miller v. Defiance Metal Prods.*, Inc., 989 F.Supp. 945, 946 (N.D.Ohio 1997) (noting that plaintiff's termination due to absenteeism caused by a medical condition constituted "an interference under FMLA").

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motion for Summary Judgment and enter summary judgment in favor of Mr. Applewhite on each of his claims.

24 January 2020

Respectfully Submitted,

By: s/ Jamaal Applewhite_____
*Pro se* Plaintiff
E-Mail: JamaalApplewhite@gmail.com

## **CERTIFICATE OF SERVICE AND COMPLIANCE**

I hereby certify that on January 24, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification to all parties of record. The argument section of this Response contains 6,999 words.

24 January 2020

Respectfully Submitted,

By: s/ Jamaal Applewhite
*Pro se* Plaintiff
E-Mail: JamaalApplewhite@gmail.com