E-FILED
Saturday, 25 January, 2020  12:38:01 AM
Clerk, U.S. District Court, ILCD

# Exhibit



1            MR. SCHOTT:  I'm going to object.  This

2    is -- you don't get to define what the contours of

3    the attorney/client privilege is or the legal work

4    product doctrine is.

5            My objection to the question about what

6    documents she is reviewing and witness preparation

7    in consultation with counsel, I'm instructing her

8    not to answer.

9            MR. APPLEWHITE:  Repeat that.

10            MR. SCHOTT:  You can read it back,

11    please.

12            (Requested portion of the record read

13    back.)

14    BY MR. APPLEWHITE:

15        Q.     Who made the orders to terminate my

16    employment?

17            MR. SCHOTT:  Objection; vague.

18    Objection; lacks foundation.

19        A.     The decision was made by our HR leader

20    at the time of the hierarchy that I was in.  It was

21    a decision between myself, Heidi, and Dan Allen had

22    ultimate decision on that.

23    BY MR. APPLEWHITE:

24        Q.     Did Mark make a decision in that?

1        A.      No.

2        Q.      Are you familiar with Deere's policy

3   regarding retaliation?

4        A.      Yes.

5        Q.      What is Deere's policy regarding

6   retaliation?

7        A.      We have --

8               MR. SCHOTT:  Objection; vague.  Go

9   ahead.

10       A.      We have a retaliation policy that is

11   out on our website for employees to reference in

12   terms of kind of outlines kind of a variety of

13   topics related to what that means to the employees.

14              I don't have it memorized, so I can't

15   really cite it for you, but we do have a policy

16   regarding retaliation.

17   BY MR. APPLEWHITE:

18       Q.      Can you explain what's in the policy at

19   all?

20       A.      Let me think for a second.  Like I

21   said, I don't have it memorized.  I mean, we don't

22   stand for retaliation at John Deere, so our

23   employees are -- when they are in an investigation,

24   they understand that we have a policy against

1   retaliation so that while they are in the

2   investigative process, they can feel comfortable

3   that if retaliation does occur, that we would take

4   swift action for that.

5        Q.      Per Deere's policy, what is your

6   obligation that someone reports retaliation to you?

7               MR. SCHOTT:  Objection; vague, but you

8   can answer.

9        A.      Can you repeat the question again?

10              MR. APPLEWHITE:  Can you read back the

11  question, please.

12              (Requested portion of the record read

13  back.)

14       A.      If an employee were to come to me and

15  report that, then we would obviously look into that

16  and possibly start an investigation to better

17  understand the facts.

18  BY MR. APPLEWHITE:

19       Q.      I'm trying to get specifically your

20  obligation.  You answered as we.

21       A.      So when I say we, HR, a manager, even a

22  fellow employee or co-worker.  I think it's not

23  just on the shoulders of HR, but is for other

24  people as well, but HR obviously has a, you know,

1    we are a common group that employees come to if

2    they feel they are being retaliated against.

3        Q.      So if an employee comes to you and

4    shares that he believes he's been retaliated

5    against, what is your obligation?

6        A.      To look into the matter.

7        Q.      Are you familiar with Deere's policy on

8    disciplinary procedures for salaried employees?

9            MR. SCHOTT:  Objection; lacks

10   foundation.  You can answer.

11       A.      Yes.

12   BY MR. APPLEWHITE:

13       Q.      Are you aware, per Deere's policy, on

14   disciplinary procedures on salaried employees in

15   the United States in regards to performance or

16   behavior that the employee should first be advised

17   in detail of the shortcomings, they should be

18   counseled, and also given reasonable time to do so?

19           MR. SCHOTT:  Objection; vague.

20   Objection; compound.  Objection; lacks foundation.

21   You can try to answer.

22       A.      So I am aware of our policy, and I am

23   aware of the coaching that we provide managers in

24   working with our employees when there is a

1      A.      Possibly.  Yeah.

2              MR. APPLEWHITE:  May I show it?

3              MR. SCHOTT:  Yes.

4              MR. APPLEWHITE:  This is from something

5      that you all produced.

6              MR. SCHOTT:  This is the entire

7      production.  Which document do you want her to look

8      at, the one dated March 6?

9              MR. APPLEWHITE:  Yes.

10     A.      Okay.  I do remember you asking me

11     about that, Jamaal, about you not having to share

12     specifics.

13     BY MR. APPLEWHITE:

14     Q.      Okay.

15     A.      And I believe my response to you was

16     that you do not have to share specifics with

17     anyone.

18             MR. SCHOTT:  Just so the record's

19     clear, Mr. Applewhite, can you read the Bates

20     number at the bottom right-hand corner of that

21     document into the record, please.  That's Deere

22     underscore Applewhite, correct, and then read off

23     the sequence of numbers.

24             MR. APPLEWHITE:  001362.

1              MR. SCHOTT:  Thank you.

2    BY MR. APPLEWHITE:

3        Q.      So outside of responding to me via

4    email, what other actions did you take?

5              MR. SCHOTT:  Objection; vague.

6    Objection; lacks foundation.

7        A.      I don't recall additional actions that

8    I took outside of letting you know, and then

9    obviously, working with your manager at the time to

10   help your manager understand that as well.

11   BY MR. APPLEWHITE:

12       Q.      Did you do anything else?

13       A.      No.

14       Q.      Did you advise Mark Matter on the

15   conditions on my telework arrangements?

16             MR. SCHOTT:  Objection; vague.

17   Objection; lacks foundation.

18       A.      Mark and I spoke about your telework

19   arrangements and discussed how it was working, and

20   that's a common practice between an HR manager and

21   a manager when there is an employee in a telework

22   situation, which is consistent with how I used to

23   coach other managers who had employees in a

24   telework arrangement.  It's very common.

1      Q.      What was your recommendation to Mark?

2              MR. SCHOTT:  Objection; vague.

3      Objection; lacks foundation.  Go ahead.

4      BY MR. APPLEWHITE:

5      Q.      For the record, when I refer to Mark,

6      I'm referring to Mark Matter, my former supervisor.

7      A.      Okay.  I advised Mark that it was a

8      Moline base position from the very beginning.  That

9      was what the intention was at the start.  You were

10     aware of that on day one.  And if it's not working

11     at any time, then Mark has the right, as a manager,

12     to use his discretion to change the telework

13     arrangement.

14     Q.      Did you ever recommend or suggest to

15     Mark that he should end the telework arrangement?

16     A.      Yes.

17     Q.      Did you take this case, my FMLA case,

18     and approval personal?

19             MR. SCHOTT:  Objection; vague.

20     Objection; lacks foundation.  Go ahead.

21     A.      I'm not quite sure what you're asking.

22     BY MR. APPLEWHITE:

23     Q.      Did you ever get upset that I was

24     approved for FMLA?

```
 1        A.       No, that's your right.

 2        Q.       Were you ever upset with the way that I

 3   was taking FMLA?

 4        A.       No.

 5                 MR. SCHOTT:  Objection; vague.  Go

 6   ahead.  That's fine.

 7        A.       No.

 8   BY MR. APPLEWHITE:

 9        Q.       Were you ever frustrated by the way

10   that I was taking FMLA?

11                 MR. SCHOTT:  Vague, asked and answered.

12   Go ahead.

13        A.       Yeah, I wouldn't say frustrated.

14   Concerns were brought to HR's attention on usage,

15   but that's not something that I managed.  It was

16   management through the disability services team.

17   But not frustrated, just concerns were brought to

18   us that we were made aware of.

19   BY MR. APPLEWHITE:

20        Q.       So nothing related to my approval of

21   FMLA, the way that I used it, or communicated my

22   need for it frustrated you?

23        A.       No.

24        Q.       Why not?
```

1          MR. SCHOTT:  Objection; vague.

2     Relevance.  You can answer.

3     A.       Yeah, I mean, Deere has enough FMLA

4     policies that complies with the law, and your FMLA

5     case was reviewed and handled through a group of

6     professionals within HR.  They review all the

7     paperwork.  I don't have any knowledge of that.

8     They administer that and work with the employee

9     directly.

10          Then when they need HR to get involved,

11     they bring us in to make sure that the employee is

12     doing what they need to do on their end.  There

13     were times where you weren't doing that, so then I

14     had to communicate that to you and to Mark and that

15     was my role in that.

16     BY MR. APPLEWHITE:

17     Q.       During those times when I was allegedly

18     not being compliant with the policy, did that

19     frustrate you at all?

20          MR. SCHOTT:  Objection; lacks

21     foundation.  Objection; vague.  Go ahead.

22     A.       I mean, I'm not normally a frustrated

23     type of person.  I don't get frustrated.  So that's

24     not a word that I would use to describe how I felt.

1          But there were multiple times that you

2    were coached by Amber on what was expected of you,

3    and if I recall correctly, there were multiple

4    times where you weren't, you know, sharing your

5    plan with her in a timely fashion, et cetera.

6          So then I would get brought into that,

7    and she would tell me about it, and I would just

8    make sure that I would insert and coach the manager

9    and you on making sure that things were being done

10   accordingly, but Amber really took the lead on

11   those things.

12   BY MR. APPLEWHITE:

13        Q.    So is it safe to say that you only got

14   involved with my FMLA case and how I communicated

15   it when it was brought to you from disability

16   services?

17        A.    Correct.  They would notify me when

18   there were perhaps gaps in reporting situations.

19        Q.    Did you share with me my FMLA rights

20   after I shared with you my needs to support my

21   mother?

22        A.    I did not, but Amber did.  That's her

23   role, not mine.

24        Q.    Then it is out of your responsibility

1    them?

2              MR. SCHOTT:  Objection; foundation,

3    vague.

4         A.    I don't recall that meeting.

5    BY MR. APPLEWHITE:

6         Q.    It was a meeting in which I shared my

7    concerns with retaliation and interference.  They

8    declined it, Kevin and Jeff declined it with this

9    response.  If I showed you any documents, would

10   that refresh your memory?

11        A.    Possibly.

12        Q.    For the record, I'm showing attorney

13   Schott and Claya a document with Bates No. Deere

14   underscore Applewhite underscore 000892.

15             MR. SCHOTT:  Okay.  Take your time.

16        A.    I was not aware that you sent that.

17   BY MR. APPLEWHITE:

18        Q.    Well, this meeting was declined -- the

19   document shows it as declined.

20             MR. SCHOTT:  Objection.

21   Mischaracterizes the exhibit.  Assumes facts not in

22   evidence.

23   BY MR. APPLEWHITE:

24        Q.    Are you surprised that Kevin Curran,

1    the supervisor of the disability department,

2    declined my meeting for clarification regarding my

3    FMLA concerns?

4              MR. SCHOTT:  Objection; vague.

5        A.    No.  I guess he -- I can't speak for

6    Kevin, so I don't know why he declined it.  He

7    probably assumed that matters were being talked

8    about between HR the manager and the employee.

9    BY MR. APPLEWHITE:

10       Q.    I'm not asking you to speak for him.

11   I'm asking if you are surprised that he declined

12   the meeting?

13             MR. SCHOTT:  Objection; vague.  Calls

14   for speculation, relevance.

15       A.    I'm not surprised.

16   BY MR. APPLEWHITE:

17       Q.    Why not?

18             MR. SCHOTT:  Same objections.

19       A.    Typically, the employee works with

20   their manager and HR, and if you referenced in your

21   letter that you just sent me a written warning,

22   Kevin was not a part of the written warning.  So if

23   you saw that in the body of the meeting notice,

24   it's an HR matter at that point.

1   BY MR. APPLEWHITE:

2        Q.      So if you were not the most familiar

3   with the FMLA policy and Kevin declined a meeting

4   for clarification, who do you recommend that I have

5   included in the meeting notes?

6             MR. SCHOTT:   Objection;

7   mischaracterizes the record.   Lacks foundation.

8   Relevance.

9        A.      I really can't answer that.

10  BY MR. APPLEWHITE:

11       Q.      Why not?

12       A.      I don't know at the time that you set

13  that meeting up with including Jeff Chiasm

14  (phonetic) and Kevin together, you know, we didn't

15  talk about it.   You didn't share that with me, so I

16  can't kind of go back and give you a name of who

17  you should have included.

18       Q.      What advice do you provide employees

19  that seek clarification on Deere's FMLA policy?

20            MR. SCHOTT:   Objection; vague.   You can

21  answer.

22       A.      So Amber Davis at the time was managing

23  your case, and I know she was in frequent

24  conversations with you so that's who I would have

1    advised you to connect with.  And if you had to

2    escalate questions, then Kevin would step in.

3    BY MR. APPLEWHITE:

4        Q.      And Kevin is Amber's manager?

5        A.      He was at the time.  I don't know for

6    sure if that's still the case.

7        Q.      What date did you begin to consider

8    termination of my employment as an option?

9        A.      I can't pinpoint a date.  I know that

10   there was concerns starting in November 2015 of

11   your performance and those on going conversations

12   occurred throughout the course of 2016.

13            The expectations were shared with you

14   throughout the year.  You continued to not adhere

15   to those policies and procedures that were laid out

16   for you, and we moved forward with additional

17   discipline at the time in which we thought it was

18   appropriate.

19       Q.      So concerns as early as November 2015?

20       A.      Correct.

21       Q.      What were those concerns?

22       A.      Late to work, late to meetings, missing

23   meetings, things of that nature.

24       Q.      Were there any other concerns?

1      A.      There were times where you were not --
2 you did not treat your manager with respect in
3 terms of your kind of written and verbal tone.
4             There was also, as I mentioned earlier,
5 feedback from other Deere employees on your
6 interactions with them that were also considered
7 negative.
8      Q.      In regards to the disrespect to Mark,
9 when was that?
10     A.      That occurred throughout the year.
11     Q.      As early as November?
12     A.      I don't remember for sure when it
13 started, but I do believe there was some -- I'd say
14 elevated conversations on your GPM at the end of
15 the year that year.  So I would say, yes, the
16 disrespect towards Mark started in late 2015.
17     Q.      And did you or anyone else at Deere
18 bring that to my attention?
19     A.      I spoke with Mark about it as my role
20 as an HR manager is to do to talk to the
21 manager about their employee's performance gaps and
22 work with them on kind of providing coaching and
23 feedback back to the employee.
24     Q.      Did you speak with me about it?

1      A.      I know I spoke to you about how you

2   spoke to me in a meeting that I was trying to have

3   with you the day that I gave you the written

4   warning.  You wouldn't allow me to speak or talk,

5   and I actually had to stop the meeting because of

6   how that conversation was escalating and going.

7           And so I had stopped the meeting at

8   that point in time based off of how you were

9   treating me.  And during that time I told you that

10  we needed to take a pause so that you would

11  actually listen to what I had to say.  And then we

12  later regrouped, and I was able to deliver the

13  message.

14          So I did give you that feedback in that

15  session of how you were interacting with me.  I

16  recall that conversation.

17     Q.      Was the way that I spoke with you

18  during that situation part of the reason that I was

19  terminated?

20     A.      I think your collective behavior in

21  terms of how you, as I mentioned previously,

22  consistently late to work, missed work, late to

23  meetings, blew off meetings, how you treated Mark

24  at times, myself, and my other HR colleague, and

1    some of your colleagues, all of that wrapped

2    together is the kind of the culmination of the

3    performance gaps that led to your termination.

4        Q.    So in regards to how I spoke with you,

5    the answer -- is it safe to say the answer is yes

6    the way that I spoke and interacted with you during

7    the time that you were issuing me a warning had

8    something -- was in part the reason for my

9    termination?

10            MR. SCHOTT:  Objection; asked and

11   answered.

12       A.    Yeah, as I mentioned multiple times,

13   it's a collection of the performance, but that's

14   one -- I gave you one example of your tone in which

15   you spoke to me.  That was the one time that you

16   did that with me, but there were multiple times

17   that you spoke like that to Mark.

18   BY MR. APPLEWHITE:

19       Q.    Did you ever speak to me about how I

20   spoke to -- about my -- about the issue with regard

21   to how I spoke to Mark?

22            MR. SCHOTT:  Objection; vague.  Go

23   ahead.

24       A.    I don't recall that I personally spoke

1       Q.      What was Deere's reason for requesting

2  an FMLA recertification for me in 2016?

3       A.      I don't know.  I was out of the office

4  at that time.

5               MR. SCHOTT:  Same objection to that

6  question.

7  BY MR. APPLEWHITE:

8       Q.      Have you ever witnessed someone from

9  Deere require an employee to recertify before their

10  current FMLA approval expired?

11              MR. SCHOTT:  Vague.

12      A.      Not that I -- that's occurred with the

13  groups that I've supported that I'm aware of.  I do

14  know there are times where maybe a condition or a

15  situation changes, so it's modified.  I'm aware of

16  those types of things happening, and they adjust

17  things and get re-approval or re-documentation from

18  the physician.

19  BY MR. APPLEWHITE:

20      Q.      What changed in my situation that would

21  require recertification?

22              MR. SCHOTT:  Objection; lacks

23  foundation, asked and answered.

24      A.      Yeah, I was out during that time frame.

1    how they can be approved with FMLA.

2    BY MR. APPLEWHITE:

3        Q.      What was Deere's sick day policy?

4                MR. SCHOTT:   Objection; lacks

5    foundation.

6        A.      So we allow employees time off if they

7    are ill over the course of a work year, obviously,

8    that's when an employee is not well, and they can't

9    be in the office.   They notify their manager.   If

10   they are out of the office for, I believe, it's six

11   days in a row, then they are to work with

12   disability services on short-term disability so

13   that their time out is covered, if it's an approved

14   situation.

15   BY MR. APPLEWHITE:

16       Q.      Is there a maximum amount of days that

17   an employee can call off sick?

18       A.      We don't have a set day.

19       Q.      For sick days that last less than six

20   days in duration, what is the policy?

21       A.      Notify your manager, let your manager

22   know that you're out of the office.   That's the

23   general policy.

24       Q.      How was that policy shared with -- how

1    BY MR. APPLEWHITE:

2         Q.      In regards to the medical certification

3    form required when requesting FMLA leave, what is

4    one day understood to mean?

5              MR. SCHOTT:  Objection; vague.  Lacks

6    foundation.

7         A.      Can you -- I'm uncertain of what your

8    question is.

9    BY MR. APPLEWHITE:

10        Q.      So I'm trying to have a better

11   definition of what one day is.

12        A.      Okay.  I would --

13             MR. SCHOTT:  Is that a question?

14             MR. APPLEWHITE:  I asked my question,

15   but I was just trying to help her understand what I

16   was getting at.

17             MR. SCHOTT:  Your question was vague.

18   Can you re-ask it, please?

19   BY MR. APPLEWHITE:

20        Q.      In regards to the medical certification

21   form that is required to be completed when

22   requesting FMLA leave, what is one day defined as?

23        A.      A business day.  That's what I would

24   assume that to be.

1        A.      Yes.

2        Q.      Were they on FMLA?

3        A.      No.

4        Q.      Were they ever approved for FMLA?

5        A.      Not that I'm aware of.

6        Q.      What were the progressive steps taken

7   before termination of those employees?

8        A.      Coaching, feedback, written warning.

9        Q.      What was the proximity between the time

10  that they were coached and the time they were

11  fired?

12              MR. SCHOTT:  Objection; relevance.  Go

13  ahead.

14       A.      The employee that I'm referring to when

15  I became the HR manager had been an ongoing issue

16  prior to me taking the role, so then I stepped in

17  and picked up where my colleague had left off.  I

18  don't know the exact time frame that the issues

19  began to when the employee was terminated.

20  BY MR. APPLEWHITE:

21       Q.      How tardy was the employee?

22       A.      It ranged.  Anywhere from five minutes,

23  ten minutes, four hours, two hours, wide range.

24       Q.      What is considered excessive tardiness?

1      A.      Consistent repeated patterns after

2   multiple coaching sessions and the employee

3   understanding very clearly that this is when we

4   expect you to be in the office by, and they

5   repeatedly failed to comply.

6      Q.      On more than one occasion Amber

7   corrected you and clarified the FMLA policy.  In

8   hindsight, do you agree that at least one of your

9   warnings were inappropriate, invalid, or bogus?

10          MR. SCHOTT:  Objection; foundation,

11   compound, vague.  You can answer.

12      A.      No, I don't recall being inappropriate

13   or bogus.

14   BY MR. APPLEWHITE:

15      Q.      Do you believe that I was being too

16   strategic or crafty in how I use or preserve my

17   FMLA days?

18          MR. SCHOTT:  Objection; vague.

19      A.      One situation I recall was, you know,

20   early on when we give you the 30 days to stay in

21   Chicago and take care of your family and get things

22   settled.  At the end of that month, we were

23   notified that you had only -- or that you hadn't

24   recorded any FMLA at all.  I think that, you know,

1   BY MR. APPLEWHITE:

2        Q.     Did the department in which I reported

3   to have a formal improvement program, for example,

4   an employee performance improvement process?

5        A.     That process is not for just a

6   department.  It's something that any employee could

7   possibly go into in the U.S., so it's not specific

8   to a department, but yes your department has the

9   option to put an employee in that plan.

10       Q.     Why wasn't I put into that plan?

11              MR. SCHOTT:  Objection; relevance.

12       A.     There was discussion around putting you

13   in that plan, but we didn't get to that.

14   BY MR. APPLEWHITE:

15       Q.     Why not?

16       A.     Because we handled the discipline the

17   way that we did through coaching feedback, clear

18   expectations, the written warning, and then the

19   termination.

20       Q.     But why did you determine to handle it

21   that way and skip the EPI process?

22              MR. SCHOTT:  Objection; asked and

23   answered.

24       A.     The performance was being managed

1    through conversations that you were having with

2    your manager on an on going basis, verbal and

3    written.  So we did not chose at that time to put

4    you into the EPI.

5    BY MR. APPLEWHITE:

6        Q.    I just have maybe one more.  Did I ever

7    protest any warnings offered by Deere?  Let me

8    repeat that.  In regard to any warnings given to me

9    in 2015 or 2016, did I protest any of them?

10           MR. SCHOTT:  Objection; calls for

11   speculation.  You can answer.

12       A.    I just delivered the warning to you.

13   It took two meetings for me to be able to read you

14   the warning because in the first meeting you were

15   making it difficult for me to speak and the second

16   meeting I was able to share that with you.

17           If I recall, I think that you refused

18   to sign it, but I don't remember for sure.  So then

19   we make a note of that on the warning that employee

20   refused to sign.

21   BY MR. APPLEWHITE:

22       Q.    What was the basis of my protest or

23   what I was speaking so much about?

24       A.    I can't remember.  I really don't

1    week lasting one day in duration?

2          A.      That's what I remember, yes.

3          Q.      And did you understand that to mean

4    that an employee can utilize FMLA two days a week

5    on two separate days, but not to exceed two days?

6          A.      Correct.

7          Q.      And during those individual days, he's

8    allowed an entire workday, correct?

9          A.      Correct.

10              MR. SCHOTT:  I don't have any further

11   questions.

12

13                      EXAMINATION

14   BY MR. APPLEWHITE:

15         Q.      Do you understand the estimated time

16   and duration on the medical certification form to

17   be estimates or exact allowed time off?

18         A.      I believe --

19              MR. SCHOTT:  Objection; vague.

20         A.      I mean, I didn't write them, but I'm

21   assuming it's based off of the physician's

22   recommendation, so it's an estimate based off of

23   the doctor's recommendation would be my guess.

24   BY MR. APPLEWHITE:

1          Q.      I should say the time that I was

2    approved off per week, was that an estimate or was

3    that an exact number of days off?

4                  MR. SCHOTT:  Vague; lacks foundation.

5          A.      So the days off that were outlined for

6    you were based off of what they estimated it would

7    probably take for you to care for your mother.  And

8    then the kind of guidelines within there of the

9    twice a week, that was the guidelines within the

10   letter or within your policy.

11                 MR. SCHOTT:  Off the record.

12                 (Proceeding concluded at 2:06 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24