E-FILED
Saturday, 25 January, 2020 12:38:01 AM
Clerk, U.S. District Court, ILCD

# Exhibit

A. I really don't know. If I had to -- I mean, usually they are resolved within a day.

BY MR. APPLEWHITE:

Q. But I'm asking for the maximum amount of time.

MR. SCHOTT: Objection; vague.

BY MR. APPLEWHITE:

Q. Have you ever had to wait more than one day to have a computer-related issue resolved?

A. Yes.

Q. While working under Mark Matter, how would you describe team meeting timeliness?

MR. SCHOTT: Objection; vague. Objection; foundation. You can answer.

A. I guess what do you mean by timeliness?

BY MR. APPLEWHITE:

Q. As far as the meeting starting on time?

A. I would say the meetings always started on time.

Q. Always?

A. I would say the intent was starting on time. Did they always start on time, I can't say they always did or always didn't, I guess.

Q. Let me ask it a different way. Have

you ever been a part of a meeting while working for Mark Matter where a meeting started late?

A. Yes.

Q. How about meetings that ended late?

MR. SCHOTT: Objection; vague. Go ahead.

A. Yes.

BY MR. APPLEWHITE:

Q. In regards to meetings that started late, what are some of the reasons that you can remember?

MR. SCHOTT: Objection; vague. Answer, if you can.

A. The one that comes to mind was the previous meeting ran late, so it didn't start on time.

BY MR. APPLEWHITE:

Q. Any else?

A. I don't know of any other specific reasons why.

Q. Any technical difficulties that might have been a cause?

MR. SCHOTT: Objection; vague.

A. I mean, yeah, there were technical

difficulties from time to time as well.

BY MR. APPLEWHITE:

Q. What were those technical difficulties?

A. The one that I remember would be VC rooms not connecting.

BY MR. APPLEWHITE:

Q. Any others?

MR. SCHOTT: Objection; vague.

A. I don't recall.

BY MR. APPLEWHITE:

Q. Have you ever had issues with any instant message software, for example, Skype or Lync?

MR. SCHOTT: Objection; vague. Objection; lacks foundation.

MR. APPLEWHITE: May I finish?

MR. SCHOTT: Yeah, go ahead.

BY MR. APPLEWHITE:

Q. In regards to meetings beginning late, have you ever experienced technical issues with any instant message softwares like Lync, Skype, or any other software that you can think of which caused a meeting to begin late?

A. I have.

Q. Have you ever witnessed Mark Matter attending such meetings late?

MR. SCHOTT: Objection; lacks foundation. Objection; vague.

A. I can't recall any. I don't know.

BY MR. APPLEWHITE:

Q. In regards to the CART meetings that I held, how would you describe the effectiveness of them?

MR. SCHOTT: Objection; lacks foundation. Objection; vague.

A. I don't recall. I don't believe I was very involved at that point with CART, so I wasn't attending those meetings. I don't recall.

BY MR. APPLEWHITE:

Q. Have you ever been to a meeting late?

MR. SCHOTT: Objection; vague. Objection; foundation.

BY MR. APPLEWHITE:

Q. Have you ever been to a meeting while working for Mark Matter late?

A. I have.

Q. Approximately, how many times have you been late to a meeting while working for Mark

Q. So would you say that you've been late to a meeting 20 or more times?

MR. SCHOTT: Objection; vague. Objection; calls for speculation. You can try to answer.

A. I don't know. I don't know how to put a number to it, I guess.

BY MR. APPLEWHITE:

Q. Would you say while working for Mark Matter, you've been late to meetings more than five times?

MR. SCHOTT: Objection; calls for speculation, lacks foundation.

A. I don't want to guess, I guess.

MR. SCHOTT: You should not guess.

A. I don't know.

By MR. APPLEWHITE:

Q. You don't have to guess. You can estimate and know that you're approximating.

A. I don't know.

Q. Have you been late to a meeting more than once?

A. Yes.

Q. More than twice?

A. Yes.

Q. Have you ever been reprimanded by Mark while working for Mark for being late for meetings?

A. I have not.

Q. Have you ever been late to work?

MR. SCHOTT: Objection; vague.

BY MR. APPLEWHITE:

Q. Have you ever been late to work while working for Mark Matter?

MR. SCHOTT: Objection; asked and answered.

A. Late to what? I don't know what to answer.

BY MR. APPLEWHITE:

Q. Late to work.

A. As a salaried employee, I don't know if I have a start or stop time. So I don't know what I'm late to or from. So I don't know how to answer the question.

Q. So you didn't have a -- you never while working for Mark had a start or stop time for work?

A. No.

MR. SCHOTT: Objection; vague. Objection; leading.

BY MR. APPLEWHITE:

Q. Have you ever had a start or stop working time while working for John Deere?

A. No -- depends how far we want to go back here. So when I was an hourly employee in 1997, I had a start or stop time. As a salaried employee, I've never had a start or stop time.

Q. Will you, please, explain what a ROCK document is.

MR. SCHOTT: Objection; lacks foundation. You can answer.

A. Stands for Retention Of Critical Knowledge. It's a document that describes the critical aspects of your job position.

BY MR. APPLEWHITE:

Q. How was it used?

MR. SCHOTT: Objection; vague.

A. It's used as a hand-off guide to the next person taking your position.

BY MR. APPLEWHITE:

Q. Did you have a ROCK document when you were an hourly employee?

A. I did not.

Q. If you did have a ROCK document when

the business which the programs I was managing affected. Key locations where documents are stored. Projects that were active. That's all that I recall.

Q. While working for Mark Matter, what was your understanding of his policies regarding unpaid time off?

MR. SCHOTT: Objection; lacks foundation. You can answer, if you can.

A. I don't know. I didn't have any conversations like that.

BY MR. APPLEWHITE:

Q. So you didn't have any conversations like that even for lunch?

MR. SCHOTT: Objection; leading. Objection; lacks foundation. You can answer.

A. I don't recall.

MR. APPLEWHITE: What were your two objections?

MR. SCHOTT: Leading and foundation.

BY MR. APPLEWHITE:

Q. What were Mark Matter's policies around taking breaks during the middle of the day outside of lunch or you could call it an extended lunch?

MR. SCHOTT: Objection; vague. Objection; lacks foundation.

A. I don't know.

BY MR. APPLEWHITE:

Q. You don't know because it was not shared with you or you don't know because you can't remember?

MR. SCHOTT: Objection; vague. Objection; calls for speculation.

A. Nothing was ever shared with me.

BY MR. APPLEWHITE:

Q. Going forward, I'm going to refer to Mark Matter as just Mark. Do you understand?

A. Yes.

Q. What was Mark's policies regarding paid time off?

MR. SCHOTT: Objection; lacks foundation.

BY MR. APPLEWHITE:

Q. What was Mark's policies while working -- while you worked for him regarding paid time off?

MR. SCHOTT: Objection; lacks foundation. You can answer.

A. You were always allowed to take time off just as long as you had your work covered. It was dependent on you as that person to make sure that you had what you needed covered.

BY MR. APPLEWHITE:

Q. In regards to these policies regarding time off, I've been speaking specifically about Mark. Now, I want to know your understanding of Deere's policy regarding taking lunch breaks that lasted more than 30 minutes.

MR. SCHOTT: Is that a question?

A. Was that a question?

BY MR. APPLEWHITE:

Q. I'll make it a question. What is your understanding regarding Deere's policy around taking lunch that lasts more than 30 minutes?

MR. SCHOTT: Objection; lacks foundation. Objection; calls for speculation. You can answer, if you can.

A. I guess I'm not aware of the policy. I don't know.

BY MR. APPLEWHITE:

Q. Are you aware -- are you familiar with any salaried employees that were terminated from

Deere for being late?

MR. SCHOTT: Can you repeat the question?

BY MR. APPLEWHITE:

Q. Are you familiar with any salaried employees that were terminated from Deere for being late?

MR. SCHOTT: Objection; vague. Objection; calls for speculation. You can answer.

A. I'm not.

BY MR. APPLEWHITE:

Q. When were you made aware of my separation from the company?

MR. SCHOTT: Objection; lacks foundation.

A. I don't know the exact date.

BY MR. APPLEWHITE:

Q. Approximately, how many days from when I was terminated?

A. I didn't even know when you were terminated.

Q. Then Mark never shared with you that I was terminated or separated from the company?

A. Mark did share that, but he didn't use

those words.

Q. What words did he use?

A. He just used Jamaal is no longer with the company -- any longer.

Q. How did he share this with you? And by how I mean, did he share with you in person or a meeting, via email?

A. I don't remember which method was used. I don't remember which method.

Q. Was it shared in a group setting with TCI, maybe?

MR. SCHOTT: Objection; lacks foundation. Objection; asked and answered. You can try to answer, if you can.

A. I don't recall if it was -- if it was a group setting.

BY MR. APPLEWHITE:

Q. Were you advised by anyone to not have contact with me?

A. I was not.

Q. While working under Mark, were you ever allowed to telework or work from home?

A. Yes.

Q. What were the conditions of that

Q. I could ask it in a better way.
A. Yes.
Q. Would you prefer to complete ship calls that were submitted through CART or would you prefer to work on projects?
MR. SCHOTT: Objection; relevance.
A. I would prefer projects.
BY MR. APPLEWHITE:
Q. Will you, please, describe and explain what GPM is.
MR. SCHOTT: Objection; relevance. Go ahead.
A. Global Performance Management. It's the system that tracks our goals and our -- tracks our base goals along with our manager's input and your input towards your goal.
BY MR. APPLEWHITE:
Q. Are all goals that are critical to your success in the position at Deere expected to be in GPM?
MR. SCHOTT: Same objection. Go ahead.
A. I would say yes.
BY MR. APPLEWHITE:
Q. When considering performance ratings,

promotions, demotions, how does GPM come into place?

MR. SCHOTT: Same objection.

A. I don't know.

MR. SCHOTT: Just so the record's clear, I'll keep objecting on any line of questioning under GPM or performance based. I'm just going to have a standing objection as to the relevance to the case, but go ahead and ask your questions.

BY MR. APPLEWHITE:

Q. While working under Mark, what is the earliest you began work?

MR. SCHOTT: Objection; asked and answered. Objection; vague. Go ahead.

A. 5:30 a.m.

BY MR. APPLEWHITE:

Q. What is the latest?

A. I don't -- I don't know.

Q. Have you ever started work after 8:00 a.m.?

A. I don't know.

Q. Have you ever started work in the evening, like maybe 10:00 p.m., when working with

India?

MR. SCHOTT: Objection; lacks foundation. You can answer.

A. I have.

MR. APPLEWHITE: I'd like to take a ten-minute break.

MR. SCHOTT: That's fine.

(Recess taken.)

BY MR. APPLEWHITE:

Q. Have you ever taken FMLA?

A. I have.

Q. Will you, please, tell me more about that.

A. I had an emergency back surgery in 2013.

Q. Were you working for Mark Matter at the time?

A. I was.

Q. Was it intermittent FMLA?

A. No.

Q. Were you on FMLA any other times?

A. Yes.

Q. Please explain.

A. I had two previous back surgeries to

Q. Were you ever disciplined by anyone within the human resources group that you reported to at that point?

A. No.

Q. Were you ever disciplined when you immediately returned from using FMLA?

A. No.

Q. And you testified earlier that you reported to Mark Matter for, approximately, eight years before you moved on to a new supervisor; is that right?

A. Correct.

Q. And during this eight-year period, how many meetings with Mark Matter in which Mark Matter was present, called the meeting, did you completely miss the meeting without business justification?

A. Very few.

Q. Was it one?

A. I can think of one off the top of my head where I completely missed, but there could have been another.

Q. And yes or no, did Mark Matter speak with you about the absence?

A. He did follow up and make sure that