E-FILED
Monday, 30 November, 2020  02:24:43 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| JAMAAL APPLEWHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-cv-04106-SLD-JEH |
| | ) | |
| DEERE & COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court are Defendant Deere & Company, Inc.'s ("Deere") Motion for

Summary Judgment, ECF No. 53, and Plaintiff Jamaal Applewhite's Motion for Summary

Judgment,[1] ECF No. 56; Supplement Attachments, ECF No. 57, filed as a motion to supplement;

Motion to Supplement, ECF No. 67; Motion for Discovery Sanctions, ECF No. 80; and

unopposed Motion for Oral Argument, ECF No. 83.  For the reasons that follow, Deere's Motion

for Summary Judgment is GRANTED IN PART AND DENIED IN PART, and Applewhite's

Motion for Summary Judgment is DENIED, Supplement Attachments is MOOT, Motion to

Supplement is GRANTED, Motion for Discovery Sanctions is DENIED, and Motion for Oral

Argument is DENIED.

---

[1] Applewhite spells judgment with an extra "e" in the title of his motion, but the Court will refer to the motion as Motion for Summary Judgment in accordance with the spelling in Federal Rule of Civil Procedure 56.  Additionally, Applewhite submitted one continuously paginated document including his memorandum of law in support.  The Court refers to the whole document as his Motion for Summary Judgment.

# BACKGROUND[2]

## I.   Factual Background[3]

### a.   Applewhite's Role at Deere

Applewhite was initially hired by Deere in 2006.  He held various engineering and supply management positions until March 2014.  He performed these jobs satisfactorily.  From approximately March 2014 to March 2015, he took an unpaid leave of absence from Deere.  He was rehired by Deere as a Cost Management Specialist in March 2015.  He worked primarily out of Deere's Southwest Office Building ("the SWOB") in Moline, Illinois.  In this role, Applewhite was responsible, among other duties, for cost analysis projects.  He was also responsible for leading a software deployment project called "CART," which required close collaboration with the information technology lead on the project, Christine Sivertsen, who worked in Moline, as well as team members from India, Europe, North Carolina, and Iowa.  He reported to Mark Matter.

Matter oversaw a customer service organization that, among other functions, supported Deere business segments in India.  United States based team members began work as early as

---

[2] At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true."  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  The facts related here are, unless otherwise noted, taken from Deere's statement of undisputed material facts, Def.'s Mot. Summ. J. 2–14; Applewhite's statement of undisputed material facts, Pl.'s Mot. Summ. J. 9–25; Deere's statement of disputed material and immaterial facts and additional material facts, Def.'s Resp. 10–32, ECF No. 63; Applewhite's statement of disputed material and immaterial facts and additional material facts, Pl.'s Resp. 7–42, ECF No. 65; Deere's reply to Applewhite's additional material facts, Def.'s Reply 3–33, ECF No. 73; Applewhite's reply to Deere's additional material facts, Pl.'s Reply 3–6, ECF No. 75; and from the exhibits to the filings.

[3] The Court disregards alleged facts from both parties that are not supported by the evidence cited, alleged facts where no evidence is cited, and alleged facts where the cited evidence was not provided.  In addition, in many instances Applewhite's dispute of an alleged fact fails to reference any evidence that actually disputes the asserted fact, instead, alleging additional facts that merely relate to the fact.  That is not a permissible way to dispute a fact and contravenes the purpose of the statement of material facts.  *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("A litigant who denies a material fact is required to provide the admissible evidence that supports his denial in a clear, concise, and obvious fashion, for quick reference of the court.").  The Court also disregards such disputes.

5:00 AM to accommodate for international time-zone differences.  Applewhite's "physical presence in Moline, where other team members worked, was important for collaboration and to ensure alignment with other SWOB-based employees and the Deere business segments they serviced."  Matter Decl. ¶ 4, ECF No. 53-7.[4]

### b.  Applewhite's Request to Telework

Matter discussed the schedule and attendance requirements for the position with Applewhite before he started.  Applewhite "requested permission to work remotely from Chicago, where he resided" prior to starting in the role.  *Id.* ¶ 5.  Matter "advised [Applewhite] that [he] specifically did not include a telework option in the Cost Management Specialist job posting, but that [he] would evaluate [the] request over the coming months."  *Id.*  While considering the request, Matter granted "a number of [Applewhite's] ad hoc requests to telework from Chicago . . . for various personal reasons, . . . includ[ing] [Applewhite's] desire to spend time with friends and to make personal air travel more convenient."  *Id.* ¶ 6.  A telework agreement allowing Applewhite to work remotely on Mondays was finalized in October 2015. Matter continued to consider additional requests on a case-by-case basis.  For example, Matter allowed Applewhite to telework for approximately six days in a row in December 2015.

### c.  Applewhite Misses or is Late to Meetings

Matter "start[ed] . . . get[ting] feedback from [the] Information Technology Group that" Applewhite was "late and missing meetings that [he had] scheduled, or . . . rescheduling them very, very early in the morning for early morning meetings" sometime between summer 2015 and November 2015.  Matter Dep. Excerpts 25:14–21, Def.'s Mot. Summ. J. Ex. B, ECF No. 53-4.  Matter discussed Applewhite's attendance issues with Human Resources Manager Claya

---

[4] Both parties submit declarations without identifying them with exhibit letters.  The Court cites to them by title and docket number only.

3

Knupp.  Knupp advised Matter to document the issues so he could address them with

Applewhite.  Matter "started documenting [Applewhite's tardiness] probably in November of

2015."  *Id.* at 25:11–12.  He documented at least four[5] instances where Applewhite failed to

attend or arrived late to meetings in November and December 2015: November 20, 2015 (arrived

fifty minutes late); November 23, 2015 (missed a meeting because he failed to wake up);

December 11, 2015 (missed a meeting because he overslept); and December 17, 2015 (missed a

team meeting).

    Applewhite attests that "[t]ardiness to meetings, and starting and ending meetings late

were common practice within Matter's team and Deere as a whole."  Applewhite Decl. ¶ 11,

ECF No. 65-7.  There is no mention of tardiness or absenteeism in Applewhite's 2015

performance review.  But Matter testified that he did not include comments regarding tardiness

or absenteeism in the 2015 performance review because it "close[d] at the end of October" and

he "felt it was something [they] needed to have a discussion about before [he] would have [it]

impact [Applewhite's] rating."  Matter Dep. Excerpts 47:20–48:6, Def.'s Resp. Ex. A, ECF No.

63-2.  Matter also testified that he and Applewhite talked about Applewhite's timeliness "in the

year-end review for 2015" which occurred at the end of October or beginning of November.  *Id.*

at 26:4–27:5.

### d.  Applewhite Requests FMLA Leave

    Sometime on or before December 18, 2015, Applewhite asked Knupp for information on

using FMLA leave to care for his mother, Zinda, who lived near Chicago.  Knupp gave him the

---

[5] Deere also argues that Applewhite overslept and missed a meeting on November 6, 2015.  *See* Def.'s Mot. Summ. J. 4.  It cites to Matter's declaration, in which Matter states that on that date, Applewhite "informed [him] in a text message that he missed a meeting because he overslept."  Matter Decl. ¶ 9.  But the text message attached to Matter's declaration does not say anything about missing a meeting.  It reads: "Hey Mark.  I overslept!  I'm headed in now."  Nov. 6, 2015 Text Message, Matter Decl. Ex. A, ECF No. 53-7 at 9.

contact information for Amber Davis, a member of Deere Disability Services ("DDS").  Davis

sent Applewhite a notice of eligibility and information on what he needed to provide to qualify

his leave as FMLA leave: an employee's request for FMLA and a Department of Labor

Certification form.

On December 23, 2015, Applewhite submitted the required paperwork.  He indicated that

he planned to use approximately sixty days of unpaid leave.  A medical certification completed

by Jolanta McNamara, Zinda's psychotherapist, indicated that Zinda suffered from depressive

symptoms and that her condition had an indefinite probable duration.  It stated that her condition

caused episodic flare-ups and that she would require care during such flare-ups.  It estimated that

Zinda would have sixty flare-ups per two months, each with a one-day duration.  The

certification form specifically asks for an "estimate [of] the frequency of flare-ups and the

duration of related incapacity that the patient may have over the next 6 months."  Dec. 23, 2015

Certification of Health Care Provider 4, Pl.'s Dep. Ex. 15, Def.'s Mot. Summ. J. Ex. A, ECF No.

53-3 at 68–71.

On January 5, 2016, Deere approved Applewhite's leave with an effective date of

December 23, 2015, the date of submission.  Davis instructed Applewhite to report his FMLA

hours to DDS and Matter, "not to work while using the FMLA benefit[,] and that FMLA leave

was to be used only for FMLA-qualifying need."  Davis Decl. ¶ 4, ECF No. 53-9.  Davis

provided Applewhite with a statement of employee responsibilities, which stated that Applewhite

was responsible for "follow[ing] [his] unit's normal procedures for reporting absences" and

"report[ing] [his] FMLA time to [DDS] by e-mail . . . within three business days of returning from leave."  FMLA Employee Responsibilities, ECF No. 57-2 at 40.[6]

On January 6, 2016, Applewhite informed Matter that his FMLA-need required him to be in Chicago on January 7 and 8 and over the next few months.  Knupp and her supervisor, Heidi Ciha, worked with Matter to establish telework privileges to support Applewhite's FMLA needs. On January 8, Matter sent Applewhite an email proposing an expanded telework schedule: for the next thirty days, Applewhite could telework from Chicago as much as needed; afterward, he could telework two days per week.  Applewhite accepted the proposal.

### e.  Applewhite is Late to Meetings

Applewhite was late to at least three meetings in January and February.  After Applewhite arrived an hour late to a CART planning meeting, Matter informed him that his "presence for the[] very detailed discussions [wa]s very important" and that Matter "expect[ed] [him] to be part of the[] meetings."  Feb. 8, 2016 2:09 PM Matter Email, Pl.'s Dep. Ex. 20, ECF No. 53-3 at 76.  Applewhite responded saying that his "tardiness wasn't planned, but [he] joined as soon as [he] could."  Feb. 8, 2016 9:36 PM Applewhite Email, Pl.'s Dep. Ex. 20, ECF No. 53-3 at 76.  Applewhite states that he was not informed he was "expected . . . to attend the CART requirements meetings" until Matter's February 8 email.  Applewhite Decl. ¶ 9.

Applewhite and Matter had at least two phone calls to discuss Applewhite's tardiness to meetings.  In the later call, Matter explained that, because most of the meetings Applewhite was tardy to were the first meetings of the day, there did not appear to be any valid business justification for his tardiness.  Applewhite summarized the call in an email.  He wrote that Matter

---

[6] Applewhite attached hundreds of pages of documents to his summary judgment motion as his Exhibit A.  *See* Pl.'s Ex. A, ECF Nos. 57-1 & 57-2.  Referring to these each as Exhibit A in citations provides no useful assistance in locating the documents, so the Court cites to them with an identifying title and the CM/ECF-generated page number.

had "noticed [his] tardiness over the last month for early morning meetings" and that others

working on the CART project were concerned about his commitment because of his tardiness to

CART meetings.  Feb. 23, 2016 3:47 PM Applewhite Email, Pl.'s Resp. Ex. D, ECF No. 65-5 at

46–47.  He wrote that he would work on it, but "[u]nfortunately, [his] personal situation ha[d]

[him] up very late often."  *Id.*  Matter responded, confirming that "he ha[d] noticed [Applewhite]

arriving late to meetings while teleworking since the start of the fiscal year" and that "[i]f it

appear[ed] the telework option cause[d] the[] issues, [he would] need to reevaluate."  Mar. 4,

2016 2:27 PM Matter Email, Pl.'s Resp. Ex. D, ECF No. 65-5 at 46.

### f.   Teleworking and FMLA Usage

During the period that Applewhite was allowed to telework as much as desired, he took

FMLA leave only three times: a full day on February 9; four and a half hours on February 10;

and two hours on February 16.[7]  *See* May 9, 2016 9:07 PM Applewhite Email, Pl.'s Dep. Ex. 19,

ECF No. 53-3 at 75 (listing all FMLA hours he had taken since January 7, 2016).  After that

period ended on February 19,[8] Applewhite requested that Matter allow him to telework more

than the allotted two days per week throughout February and March 2016.  Matter granted

Applewhite the ability to telework many times throughout this period and into April 2016.  For

example, Applewhite was permitted to telework the entire week of February 29, 2016.  And

"[t]he only days that [he] was[ not] allowed to telework [in March 2016] [we]re March 7th, 8th

and 9th."  Pl.'s Dep. 154:21–22, Def.'s Mot. Summ. J. Ex. A, ECF No. 53-3.  Applewhite

reported using FMLA leave on February 25 and 26 but then not again until March 23.

---

[7] He also claimed FMLA leave on January 7, but that was prior to the telework arrangement being formalized.
[8] Applewhite claims this fact is both disputed, *see* Pl.'s Reply 5, and undisputed, *see* Pl.'s Resp. 6 (listing Deere's fact 28 as undisputed); Def.'s Mot. Summ. J. 8 (listing as fact 28, "The thirty-business-day period during which [Applewhite] could telework exclusively from Chicago ended February 19, 2016.").  In his reply, he argues that "the period began on January 30 and ended on approximately February 8."  Pl.'s Reply 5.  He cites to no evidence that supports the assertion that the period began or ended on those dates.

On March 6, Applewhite emailed Knupp to ask whether "there [was] anything that protects [him] from having to shar[e] [his] family's personal information with Deere employees (other than [DDS])." Mar. 6, 2016 11:39 PM Applewhite Email, ECF No. 57-2 at 34. He explained that, "[a]fter telling [Matter] about [his] approved intermittent FMLA [leave] and how the situation is sporadic and unpredictable, [Matter] pressed [him] for additional details regarding [his] leave." *Id.* He wrote that Matter "seem[ed] to award [him] with more telework days as [he] share[d] specifics, but since [their] last meeting [he] told [Matter] that [he had] shared as much as [he was] comfortable sharing." *Id.* Knupp responded that Applewhite did not need to share the specifics of his case, but reiterated that it was his responsibility to inform his manager when he needed to take time off under his approved FMLA case.

On April 8, Matter notified Applewhite that he needed to adhere to the telework schedule he proposed in January: two days teleworking and three days in the office. On Monday April 11 or Tuesday April 12, 2016, Applewhite notified Matter that he "need[ed] to take FMLA the rest of the week and maybe all [the] next week." Apr. 12, 2016 12:33 AM Applewhite Conversation with Matter, Pl.'s Dep. Ex. 31, ECF No. 53-3 at 86 (listing instant messages from 3:51 PM through 4:10 PM presumably on April 11). On Friday April 15, Applewhite advised Matter and Knupp that "things at home [we]re getting much better," but that his plan was to telework from Chicago the following Monday and Tuesday and take FMLA leave Wednesday through Friday. Apr. 15, 2016 9:26 PM Applewhite Email, Pl.'s Dep. Ex. 32, ECF No. 53-3 at 87.

On Monday April 18, Knupp emailed Kevin Curran from DDS asking for guidance. She explained that since Applewhite had been told he needed to adhere to the two-day telework schedule, he "ha[d] not been in the Moline office" and had notified Matter for two weeks in a row "that he would be working from Chicago on Mon-Tues and taking FMLA the remainder of

the week," though he had actually called into a meeting on Thursday April 7.  Apr. 18, 2016 6:44

PM Knupp Email, Pl.'s Resp. Ex. D, ECF No. 65-5 at 43–44.  She wrote that "[e]ssentially he

[wa]s using his FMLA to stay up in Chicago; however, getting his work time in at off-business

hours and not claiming or taking FMLA time."  *Id.*  She asked for guidance because it was

"getting extremely challenging to manage on [their] end."  *Id.*

She also emailed Ciha telling her that she and Doug Rathburn, Matter's supervisor, "fe[lt]

[Applewhite] no longer deserve[d] a flex work schedule."  Apr. 18, 2016 6:49 PM Knupp Email,

ECF No. 57-2 at 32–33.  She wrote that after "discussing his performance gaps, his

communication style and overall the way he ha[d] handled things with [Matter], his team and his

stakeholders," they agreed he needed to be in Moline.  *Id.*  Ciha responded reminding Knupp to

ensure that in any follow up with Applewhite, they reminded him that "his choice of FMLA is

only for FMLA qualifying reasons."  Apr. 18, 2016 6:54 PM Ciha Email, ECF No. 57-2 at 32.

Knupp responded: "I asked [Curran] about that last week – he told me that [Applewhite] does not

have to give us any proof or reasoning when he asks to take FMLA – we as a company go off of

their 'word' since it's an unpaid benefit/approved FMLA case.  Seems so frustrating!"  Apr. 18,

2016 6:58 PM Knupp Email, ECF No. 57-2 at 32.

On Tuesday April 19, Matter, after consulting with Knupp and Ciha, informed

Applewhite that, as of April 25, his telework privileges were revoked.  He reminded Applewhite

that the position was Moline-based and unless he was using vacation or FMLA leave, he was

expected to be present at the SWOB in Moline.

To DDS, Applewhite reported using FMLA leave Tuesday April 12 through Friday April

15 and Wednesday April 20 and Thursday April 21.  He claimed FMLA leave for the entire

workweek of April 25.

### g. Recertification Request

On April 21, DDS requested that Applewhite submit a recertification of his FMLA leave from Zinda's healthcare provider.  Ciha explained in an email to Applewhite that "part of why disability services requested [a] recertification" was that "the pattern of usage indicate[d] [they] may need to look at something other than intermittent."  May 5, 2016 8:21 AM Ciha Email, ECF No. 57-2 at 68.  Davis sent Applewhite an email with a notice of eligibility and a statement of Applewhite's responsibilities for taking FMLA leave attached.  The statement of responsibilities informed Applewhite that he needed to return certain documents (a request for FMLA, a Department of Labor Certification form with sufficient certification to support the leave request, and sufficient documentation to establish the relationship between he and his family member) "within 15 days of receipt of this letter or first day of missed work[], whichever is most recent." FMLA Form 1, Pl.'s Dep. Ex. 35, ECF No. 53-3 at 90–91.  It informed him that "[f]ailure to return the required paperwork within the 15 day timeframe may delay the leave or even result in the leave being denied, resulting in an unprotected absence."  *Id.*  The notice of eligibility stated that he only had eight hours of FMLA leave available, *id.*, which was incorrect.  Applewhite emailed Davis for clarification on May 16, and she responded the next day stating that he had over 400 hours of FMLA leave remaining.

On May 3, Davis reminded Applewhite via email to submit the materials.  That same day, Ciha reiterated via email (following a meeting) that it was important for Applewhite to recertify because "without that recertification, his current approved leave [would] expire[]" on Friday May 6.  May 3, 2016 11:47 PM Ciha Email, Pl.'s Dep. Ex. 38, ECF No. 53-3 at 94–96.  On May 4, Applewhite requested an extension of time to submit the materials, explaining that McNamara, Zinda's healthcare provider, could not fill out the paperwork until after an appointment on May

10

13. Curran only granted an extension to May 10. Applewhite asked if he could take unpaid time off while the recertification was outstanding. Ciha offered him unpaid time to take his mother to her appointment on May 13, but stated that Deere was otherwise "not in a position to offer [him] further unpaid, non-FMLA time off." May 6, 2016 7:37 AM Ciha Email, ECF No. 57-2 at 25.

On May 17, Applewhite submitted the recertification materials via email. Davis responded the next day stating that she could not approve the request because "there [wa]s not enough sufficient information on frequency and duration of [the] need for FMLA." May 18, 2016 1:54 PM Davis Email, ECF No. 57-1 at 64. She stated that "[i]t is understandable that in some instances time off will be unknown due to flare ups . . . however, the answers provided were not sufficient enough to be reviewed." *Id.* The medical certification indicated that Zinda would have episodic flare-ups, but where it asked the provider to estimate the frequency of the flare-ups, McNamara wrote: "TBD." May 13, 2016 Certification of Health Care Provider 4, ECF No. 57-1 at 59–62. Applewhite asked McNamara to revise the form. She sent a revised form directly to Deere. In the revised certification, McNamara estimated that Zinda would have two flare-ups a week with each flare-up lasting one day. Davis informed Applewhite via email on May 20 that he had "been approved for 2x per week, lasting 1 day in duration to help care for [his] parent." May 20, 2016 5:54 PM Davis Email, Davis Decl. Ex. C, ECF No. 53-9 at 12. On May 24, Deere contacted McNamara to confirm that the certification was complete and signed by her.

While his recertification request was pending, Applewhite used FMLA leave on May 2, May 5, and May 6.

11

### h.  Start Time

Matter states that he instituted a flexible start time for Applewhite—allowing him to begin work between 6:00 AM and 8:00 AM—"[o]n or before May 9."  Matter Decl. ¶ 20.  Applewhite asserts that the start time was instituted on May 17, explaining that prior to May 17, he "and [Matter's] other direct reports[] began the workday when [they] decided."  Applewhite Decl. ¶ 7.[9]

On May 16, Applewhite sent Matter a text message at 9:06 AM stating that he would not be in until afternoon.  He arrived at 1:20 PM.  In an email sent on May 18, Applewhite indicated that he was late because he had an "[u]rgent personal/family matter c[o]me up last min[ute],"  May 18, 2016 7:56 AM Applewhite Email, ECF No. 57-2 at 17–18, but it is unclear whether Applewhite informed Matter that was the reason he was late prior to May 18.

On May 17, Matter sent Applewhite an email following an in-person meeting.  He wrote that in the meeting, he "conveyed the seriousness of the situation from Monday, 16 May."  May 17, 2016 9:46 PM Matter Email, ECF No. 57-2 at 18–19.  He wrote that the "fact that [Applewhite] came in late to work, especially as [he] did not arrive until near 1:20pm, and without sufficient prior notification [wa]s not acceptable and [wa]s considered an unexcused absence/tardy."  *Id.*  Further, he wrote that the team's "expected working hours are starting between 6am and 8am, though [they] on occasion start earlier to meet with team members in India."  *Id.*  Finally, he instructed Applewhite: "Going forward, I expect you to start your day in the office between 6 am – 8 am," but "[o]utside of a specific meeting that starts between 6am and 8am, I will allow you the freedom to flex your start time between 6am and 8am."  *Id.*

---

[9] The Court notes that at Matter's deposition, Applewhite asked Matter what time would have been acceptable for him to provide notice that he would be late on May 16.  Matter Dep. Excerpts 61:8–10, ECF No. 53-4.  Matter asked whether "that date [was] within the expected 6:00 a.m. to 8:00 a.m. start time" and Applewhite responded that it was.  *Id.* at 61:11–13.  This suggests Applewhite himself believes it started prior to May 17.

On May 18, Applewhite was thirty minutes late to the SWOB and provided no prior communication or explanation to Matter.

### i.  Mid-Year Review

On May 24, Matter and Applewhite met in person for Applewhite's 2016 mid-year review.  During their meeting, Matter noted many instances of unexcused tardiness and absences throughout the course of the year, and that these instances had been observed by Applewhite's colleagues as well.  Matter reminded Applewhite that he needed to make every effort to be in the office on time.

In the written performance review, Matter reiterated that Applewhite had some performance gaps and had "been tardy to many meetings and ha[d] . . . unexcused absences and tardiness to work throughout the course of th[e] current . . . year" and that Applewhite's colleagues had observed his tardy arrivals and absences as well.  2016 Performance Management Appraisal 7, Matter Decl. Ex. F, ECF 53-7 at 21–29.  In his comments, Applewhite acknowledged that "[t]ardiness ha[d] been an issue," but wrote that it "ha[d] not impacted [his] ability to perform." *Id.* at 6.[10]  Applewhite received no raise in conjunction with this review.

### j.  June FMLA Leave and Written Warning

On May 31, Matter received a text from Applewhite at 6:20 AM indicating he had an FMLA situation and would not be able to make it in.  On June 1, he received another text message stating that Applewhite would need to take FMLA leave that day.  On June 2, he received a text message at 7:19 AM from Applewhite indicating that Applewhite needed to take

---

[10] Applewhite now vaguely claims "that FMLA-related tardiness was the issue as it impacted how he was perceived by others." Pl.'s Resp. 7.  He cites to a portion of the performance review where he asked for his review to be based on his performance and not the perceptions of others. *See* 2016 Performance Management Appraisal 6.  It is not a reasonable inference from his request that his performance not be judged on the perceptions of others that he was only acknowledging that FMLA-related tardiness was an issue for him.

FMLA leave that day too.  Applewhite arrived at the office at 1:30 PM on June 2.  Deere denied Applewhite FMLA leave for June 2 because "he had already used the two weekly occurrences of FMLA leave that [DDS] had approved."  Matter Decl. ¶ 24.  His tardy was considered unexcused.

Applewhite was issued a written warning on June 6 for excessive absenteeism.  Knupp, along with Deere security personnel Jeffrey Chisholm, met with Applewhite to discuss the warning and inform him that his ongoing deficiencies indicated a lack of dependability.  The warning stated that the concerns were outside of the certified time he was granted FMLA leave. It instructed him to take corrective action, including abiding by the start time Matter established, and warned that failure to comply would result in termination.  Applewhite refused to sign the warning.  Applewhite attests that during the meeting Knupp "refused to explain Deere's definition of 'excessive,'" and that she refused to respond to his questions about why his "FMLA-related travel was not being honored as being protected under the FMLA."  Applewhite Decl. ¶ 21.  He followed up with an email asserting that his tardiness on June 2 was "due to travel time from [his] approved FML" and that the warning was "a violation of [his] right."  June 9, 2016 4:42 PM Applewhite Email, ECF No. 57-1 at 95.

Applewhite also requested a meeting with Curran and Chisholm to discuss the warning and ask questions.  Specifically, he highlighted his concern that Knupp referenced his "late arrival" on June 2, which he stated "was protected under the" FMLA."  June 6, 2016 11:34 PM Applewhite Appointment Request, ECF No. 57-2 at 10.  He referenced the May 13 certification from McNamara which estimated that Zinda's episodes could last three days per week.  And he provided a summary of his FMLA usage and work history from May 31 through June 2

(including that he worked at the SWOB from 1:30 PM to 7:30 PM on June 2 and teleworked from 9:30 PM to 11 PM).

Curran declined the meeting, providing follow up in an email.  He explained that the certification DDS was working from was the corrected certification McNamara sent on May 20, which "state[d] a frequency of 2 times per week and not 3."  June 7, 2016 9:43 AM Curran Appointment Declination, ECF No. 57-2 at 4–5.  He then asked for clarification about the hours Applewhite provided in his meeting request because they conflicted with the hours he reported to DDS.  *Id.*  Finally, Curran stated that "[t]he other issues" Applewhite listed "with start times and working remote are HR issues and not" DDS issues.  *Id.*  Applewhite responded, indicating that "[t]he form [he] provided stated 3 times per week," but acknowledged "there was a secondary form that was sent directly to [Deere] from [his] mom's doctor."  June 7, 2016 9:57 AM Applewhite Email, ECF No. 57-2 at 4.  He asked for that to be forwarded to him.  He further noted that he "ha[d] no issues with either start times or working remote," explaining that instead, he was concerned that he was being denied his FMLA rights because he "as soon as [he] drove back from [his] approved FMLA duties, [he] attended work."  *Id.*  Curran forwarded him the May 20 corrected certification later that day.  He explained that the corrected form "came from the d[octo]r after the one that [Applewhite] sent in and was signed by [her] so [Deere was] using" it.  June 7, 2016 3:35 PM Curran Email, ECF No. 57-2 at 4.  Later in the day, Curran emailed Applewhite again, stating: "If you have any other questions, please let us know."  June 7, 2016 5:47 PM Curran Email, ECF No. 57-2 at 2.

On Friday June 10, Applewhite informed Matter that he was taking FMLA leave that day. He reported it to DDS the next day.  On Monday June 13, Applewhite informed Matter via email

that he needed to take FMLA that day as well.   Matter reported this to DDS the same day.
Applewhite reported taking a full day of FMLA leave on Tuesday June 14 as well.

On June 15, Applewhite was twelve minutes late to work.  He emailed Matter later in the
day explaining that he "came later than planned" because of "weather (it was raining so bad that
[he] couldn't see and was afraid to drive) and travel from Chicago."  June 15, 2016 3:28 PM
Applewhite Email, Pl.'s Dep. Ex. 44, ECF No. 53-3 at 100.  Applewhite attests that "[d]uring the
early morning[] of . . . June 15 of 2016, from approximately midnight to 5 AM, [he] was helping
[his] mother with her serious health condition at her home" and that he "notified Deere as soon
as feasible."  Applewhite 2nd Decl. ¶ 8, ECF No. 75-4.[11]  Applewhite asked Ciha and Knupp
what time he had clocked in that day so he could "accurately report [it] to" DDS, June 15, 2016
11:11 AM Applewhite Email, ECF No. 57-1 at 91, but his question was not answered.  Matter
had also emailed Applewhite on June 14 stating that he saw that Applewhite indicated on his
calendar that he was taking FMLA leave Tuesday June 14 and Wednesday June 15.  June 14,
2016 12:52 PM Matter Email, Matter 2nd Decl. Ex. A, ECF No. 73-8 at 5.  Matter wrote that
DDS informed him that Applewhite was only approved for two FMLA absences per week and
"[s]ince [Applewhite] took FML on both Monday and Tuesday, 13 and 14 June, 15 June is not
available for FML."  *Id.*  He suggested it "could be an oversight as [Applewhite] updated the
meeting notice, but [he] wanted to be sure [Applewhite] w[as] aware."  *Id.*  Applewhite
responded the afternoon of June 15: "It was an oversight . . ."  June 15, 2016 1:57 PM
Applewhite Email, Matter 2nd Decl. Ex. A, ECF No. 73-8 at 5.

---

[11] Applewhite asserts that he attached "copies of email exchange[s] between [him]self and Deere where it approved
[his] morning absences so that [he] could help [his] mother, in the morning, before traveling to work in Moline,"
Applewhite 2nd Decl. ¶ 8, but no such exhibits were attached to the declaration.

Later that day, Knupp scheduled a meeting with Applewhite and terminated him for excessive tardiness and absenteeism. Knupp testified that the decision to terminate Applewhite "was made by [the] HR leader at the time of the hierarchy that [she] was in. It was a decision between [herself], [Ciha], and Dan Allen had ultimate decision on that." Knupp Dep. Excerpts 10:19–22, Pl.'s Resp. Ex. A, ECF No. 65-2. Likewise, Ciha testified that terminating Applewhite "was a joint decision between [her]self, . . . Allen, and . . . Knupp," though she also testified that she and Allen were the ultimate decisionmakers. Ciha Dep. Excerpts 10:11–14, 23–24, Def.'s Mot. Summ. J. Ex. C, ECF No. 53-5.

## II.    Procedural Background

Applewhite brings suit against Deere pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–54. Am. Compl., ECF No. 30. He asserts two claims: first, he alleges that Deere retaliated against him for exercising his rights under the FMLA in violation of 29 U.S.C. § 2615(a)(2), *id.* ¶¶ 61–80; second, he alleges that Deere "discouraged [him] from fully using his FMLA leave" and interfered with his rights under the FMLA in violation of 29 U.S.C. § 2615(a)(1), *id.* ¶¶ 81–86.

Deere moves for summary judgment on both claims, arguing that the undisputed record shows Applewhite was terminated for excessive absenteeism and tardiness unrelated to his FMLA usage and that the claimed acts of interference are time-barred and fail as a matter of law because he cannot show he was denied FMLA benefits to which he was entitled. Def.'s Mot. Summ. J. 1–2. Applewhite also moves for summary judgment, arguing that there is no genuine dispute of any fact and that he is entitled to judgment as a matter of law because Deere interfered with his rights under the FMLA and "Deere retaliated against him for opposing acts made unlawful under [the] FMLA." Pl.'s Mot. Summ. J. 7. He filed his exhibits in a separate

document.  *See* Pl.'s Ex. A, ECF Nos. 57-1 & 57-2.  He later filed a motion to supplement his

summary judgment motion with a table clarifying the motion's citations.  Mot. Supplement 1;

Correlation Tbl., Mot. Supplement Ex. A, ECF No. 67-1.

Applewhite also filed a motion for sanctions, arguing that Deere failed to respond to

discovery requests.  Mot. Sanctions 1.  Finally, Applewhite filed an unopposed motion for oral

argument, arguing that "oral argument would allow the Court to come to a decision, knowing

that the [p]arties[]were given equal opportunity to argue."  Mot. Oral Argument 1.

## DISCUSSION

## I.      Motion for Sanctions

Applewhite asks the Court to impose sanctions on Deere for failure to respond to

discovery requests.  Mot. Sanctions 1.  He explains that Deere redacted discovery materials

claiming attorney-client privilege.  *Id.*  He argues that Judge Hawley granted his "motion seeking

. . . help obtaining non-redacted versions of the material," but that Deere continues to refuse to

produce non-redacted versions.  *Id.* (citing 2nd Motion Hearing Concerning Discovery Dispute,

ECF No. 41).  Deere argues that "Magistrate Judge Hawley held that [Applewhite] had waived

any challenges to Deere's privilege assertions by failing to raise the issue during [a] July 2019

hearing and denied [Applewhite's] requested relief."  Resp. Mot. Sanctions 2, ECF No. 82.

On August 21, 2019, Applewhite requested a hearing to discuss discovery disputes.  2nd

Mot. Hearing 1–2.  One dispute was over whether Deere had "produced redacted discovery with

inadequate privilege basis."  *Id.* at 2.  Judge Hawley granted the motion for a hearing and

scheduled a status conference to discuss the disputes.  *See* Aug. 22, 2019 Text Order; Aug. 27,

2019 Text Order (rescheduling the originally set conference at Applewhite's request); Aug. 29,

2019 Text Order (rescheduling the conference due to a conflict in Judge Hawley's calendar).

The conference was held on September 4, 2019.  Sept. 4, 2019 Minute Entry.  Applewhite

reiterated his argument that Deere improperly redacted documents.  Sept. 4, 2019 Hr'g Tr.

18:13–22, ECF No. 81.  Deere noted "that this was not the first time this issue ha[d] been raised

by" Applewhite, explaining that it was "raised . . . in filings before [a] July 25th hearing."  *Id.* at

21:5–8.  Deere argued that the issue was "resolved or waived because [Applewhite] did not

address it during . . . [the] first hearing."  *Id.* at 21:9–11.  Applewhite agreed that the documents

had been produced and that he raised the issue prior to the July 25, 2019 hearing, but argued that

he had not had a chance to address the argument at that hearing.  *See id.* at 21:19–22:11.  Judge

Hawley held that he would not "go back and revisit issues that could have been raised earlier."

*Id.* at 24:5–6.  He explained that "the time for raising that [issue] ha[d] passed" and he was "not

going to consider that issue."  *Id.* at 24:16–18.

Applewhite's motion does not identify any authority for imposing sanctions.  He cites to

Federal Rule of Civil Procedure 37(a)(4), which provides that "an evasive or incomplete

disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."  He

also does not identify what kind of sanctions he seeks.  Regardless, the Court finds Applewhite is

not entitled to sanctions because he has not shown that he filed a motion for disclosure that was

granted, *see id.* 37(a)(5); that Deere disobeyed a discovery order, *id.* 37(b)(2); or that he is

otherwise entitled to sanctions under any provision of Rule 37.  To the extent Applewhite is

seeking a court order requiring Deere to produce these documents, the time for him to object to

Judge Hawley's ruling has long passed.  *See id.* 72(a) (requiring a party to file an objection to a

magistrate judge's order within 14 days of the order).  The Motion for Sanctions is DENIED.

## II.     Miscellaneous Motions

### a.  Supplements

Supplement Attachments, filed as a motion to supplement, is MOOT because it is not a motion; instead, it is the attachments to Applewhite's summary judgment motion.  The Motion to Supplement is GRANTED as unopposed.  The Court used the table Applewhite provides to locate the materials he cites in his motion for summary judgment.

### b.  Oral Argument

Applewhite asks for oral argument so he can have an equal opportunity to argue his motion.  He argues that Deere filed a reply in support of its motion for summary judgment that exceeded the limit provided by the Local Rules.  Mot. Oral Argument 1.  The Court reserved ruling on the motion and granted Applewhite the opportunity to file a supplemental reply, allowing him additional pages so that he would have the same number of pages to argue his summary judgment motion that Deere used to argue its motion.  *See* July 20, 2020 Text Order. No supplemental reply was filed.  This suggests that the written materials already in the record adequately explain his argument.  The Court finds that oral argument is unnecessary and would not assist it in making its decision.  The motion for oral argument, therefore, is DENIED.  *See* CDIL-LR 7.1(D)(4) ("The Court may take the motion for summary judgment under advisement without oral argument or may schedule argument with appropriate notice to the parties.").

## III.    Motions for Summary Judgment

### a.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At the summary judgment stage, the court's function is not to weigh the evidence and

20

determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a factfinder to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)). "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment . . . ." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). The court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quotation marks omitted).

### b. Analysis

The Court considers the motions together, construing the facts in the light most favorable to each party in turn. The Court addresses interference first.

### i. Interference[12]

The FMLA makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of" a right created by the FMLA.  29 U.S.C. § 2615(a)(1).[13]  FMLA regulations "make clear that the ways in which an employer may interfere with FMLA benefits are not limited simply to the denial of leave.  Interference also encompasses 'us[ing] the taking of FMLA leave as a negative factor in employment actions' and 'discouraging an employee from using such leave.'"  *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 818 (7th Cir. 2015) (alteration in original) (quoting 29 C.F.R. § 825.220(c), (b)).

Applewhite argues that "Deere violated the FMLA by denying, discouraging and preventing him from invoking several of his entitled FMLA rights."  Pl.'s Mot. Summ. J. 29.[14] His briefing alleges wide-ranging violations and is not particularly focused or organized—he never clearly lays out what specific acts he believes constitute FMLA interference and his theory

---

[12] Throughout the briefing, Applewhite seems to conflate his interference and retaliation claims.  *See, e.g.*, Pl.'s Mot. Summ. J. 29 (arguing, right after stating that the law prohibits an employer from interfering with an employee's FMLA rights, that "Deere's most obvious and recent instance of retaliation occurred . . . when it terminated Applewhite's employment"); Pl.'s Resp. 48 (stating, in the retaliation section of his brief, "Deere now argues that an increase in FMLA use, connected to its truncated telework privileges, justifies its recertification request, which, it argues, legitimizes some [of] its FMLA interference behaviors that occurred after May 6").  The bounds between interference and retaliation claims are not entirely clear, particularly when it comes to alleged wrongful termination. *Cf. Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005) ("A claim under the FMLA for wrongful termination can be brought under either a discrimination/retaliation or interference/entitlement theory; the difference is that the first type of claim requires proof of discriminatory or retaliatory intent while the latter requires only proof that the employer denied the employee his or her entitlements under the Act."); *Carlson v. Sexton Ford Sales, Inc.*, No. 4:15-cv-04227, 2017 WL 4273618, at *6–7 (C.D. Ill. Sept. 26, 2017) (explaining that the Seventh Circuit has not always been clear about the bounds of interference and retaliation claims and under what statutory provisions such claims arise).  The Court has attempted to consider Applewhite's arguments in the most appropriate context.
[13] The parties do not dispute that Deere is a covered employer and Applewhite is an eligible employee.  *See* Def.'s Resp. 21–22.
[14] Somewhat confusingly, he then says: "Importantly, the law prohibits an employer from interfering [with] *any* right contained in the FMLA, and Deere interfered with *at least* one of the rights."  Pl.'s Mot. Summ. J. 29 (citation omitted); *see also* Pl.'s Resp. 54 ("Plaintiff only needs to prove that Defendant violated the FMLA or its regulations in one way.  However, Plaintiff . . . proves that Defendant actually committed over ten . . . violations, which prejudiced him.").  To get relief for an FMLA violation, Applewhite must prove it.  *See, e.g.*, 29 U.S.C. § 2617(a)(1)(A)(i)(I) ("Any employer who violates section 2615 . . . shall be liable to any eligible employee affected for damages equal to the amount of any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation.").  Proving one FMLA violation does not entitle him to relief stemming from all of his alleged acts of interference.

of interference for each act; he slips what might be alleged acts of interference into the middle of

paragraphs about other issues, *see* Pl.'s Resp. 55, ECF No. 65 (arguing that all acts related to his

termination are timely, including revocation of teleworking privileges, issuance of warnings, and

implementation of a start time); and he refers to retaliation in the sections which purport to be

about interference and vice versa, *see, e.g.*, Pl.'s Mot. Summ. J. 29; *supra* footnote 12.  But the

Court has gleaned the following alleged acts of interference from the briefing.  First, Applewhite

argues that he was terminated based on absences that should have been considered FMLA leave

on May 16, June 2, and June 15.  *E.g.,* Pl.'s Mot. Summ. J. 29 ("Deere wrongfully based . . . its

decision to terminate Applewhite's employment on outcomes that resulted from its earlier

violations of his FMLA rights."); Pl.'s Resp. 60–61.  Second, he argues that "Knupp instructed

Matter to disguise negative FMLA feedback comments in [his] performance reviews."  Pl.'s

Mot. Summ. J. 29.  Third, he argues that Deere's recertification request was invalid.  *Id.* at 30.

Relatedly, he argues that Deere held him to an improper deadline to submit the recertification

materials.  *Id.*  He also argues that the recertification completed by McNamara on May 13 was

sufficient and Deere should not have sought a revised recertification.  Pl.'s Resp. 60.  Fourth, he

argues that Deere "discouraged [him] from taking leave by refusing him privileges that similarly

situated employees enjoyed just one . . . day after returning from helping take care of his

mother," presumably referring to the requirement that he start work by 8:00 AM.  Pl.'s Mot.

Summ. J. 31.  Fifth, he argues that Deere failed to answer his questions about FMLA leave.  *Id.*

Sixth, he argues that Deere failed to provide him with an FMLA eligibility notice when he first

told Matter that he needed to care for his mother in February 2015, Pl.'s Resp. 54, and failed to

provide required notices when it denied him FMLA leave, *see, e.g.*, Pl.'s Reply 10, ECF No. 75

(arguing that Deere should have provided a notice of eligibility when it designated his May 16

tardiness unexcused).  Seventh, he argues that revoking his telework privileges violated the FMLA.  *See* Pl.'s Resp. 55.

### 1.  Statute of Limitations

Deere argues that all claims based on acts that occurred two years before Applewhite filed his complaint are barred by the statute of limitations.  Def.'s Mot. Summ. J. 22–24.  29 U.S.C. § 2617(c) provides that an action for a violation of § 2615, which includes the prohibition on interference, "may be brought . . . not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought."  29 U.S.C. § 2617(c)(1).  A three-year statute of limitations applies "[i]n the case of such action brought for a willful violation of [§] 2615."  *Id.* § 2617(c)(2).

Here, Applewhite's original complaint was filed on June 11, 2018.  Compl., ECF No. 1.[15] Most of the alleged acts of interference occurred prior to June 11, 2016.  In fact, the only acts Applewhite complains of that occurred after June 11, 2016 are his June 15 tardy and the resultant termination, and Deere's failure to provide a required notice after denying him leave on June 15. Applewhite argues that some of his alleged acts of interference—revocation of telework privileges, the warnings for the May 16 and June 2 absences, and the implementation of a work start time—constitute "progressive discipline" and thus are "the same termination violation." Pl.'s Resp. 55.  *But see* Pl.'s Mot. Summ. J. 29–30 ("Although these earlier impermissible activities may be inappropriate for the basis of this Action, they must be considered, at least, as relevant supplementary evidence.").

Unfortunately for Applewhite, in *Barrett v. Illinois Department of Corrections*, 803 F.3d 893, 898–99 (7th Cir. 2015), the Seventh Circuit rejected the argument that progressive

---

[15] Deere argues that the Complaint was filed on June 12, 2018, but the docket reflects that it was filed on June 11, 2018, but entered by the Clerk of Court on June 12, 2018.  The difference is immaterial.

discipline constitutes one continuing violation or that somehow the statute of limitations does not begin to run until the plaintiff is later terminated.  The court in *Barrett* considered "the FMLA's statute of limitations in the context of an absenteeism policy based on a system of progressive discipline."  *Id.* at 895.[16]  Under the defendant-employer's policy, an employee could be fired if she accumulated twelve unauthorized absences of work.  *Id.* at 894.  The plaintiff was fired in October 2010 because she had accumulated twelve absences over a period of seven years.  *Id.* She filed a lawsuit in January 2012, claiming for the first time that three of the absences (which occurred in 2003, 2004, and 2005) were protected by the FMLA.  *Id.* at 894–95.  The court held that at least "[w]hen an FMLA plaintiff alleges that his employer violated the Act by denying qualifying leave, the last event constituting the claim ordinarily will be the employer's rejection of the employee's request for leave."  *Id.* at 897.  In the case at hand, the employer rejected the plaintiff's claims that her absences should not have been considered unexcused shortly after the absences occurred, so her 2012 lawsuit was filed far too late.  *Id.*  The plaintiff argued that "although she *could have* filed suit at the moment she was denied leave, she wasn't *required* to file suit until several years later, when she was fired for accumulating too many unauthorized absences" and that "[t]he termination of her employment . . . was the last event constituting the FMLA violation."  *Id.* at 899.  The Seventh Circuit rejected this argument, explaining that the statutory text does not allow for there to be two "last" events (the denial of leave and a later termination), and that there is no tolling rule contained within the statute which would "hold the limitations period in abeyance indefinitely and revive a stale denial-of-leave claim years later, when the employee is fired based in part on the contested absence."  *Id.*

---

[16] The court was considering only an FMLA interference claim based on denial of leave, not a claim of retaliation. *Barrett*, 803 F.3d at 896, 897 n.6.

Applewhite's claim is similar to the plaintiff's in *Barrett*, particularly to the extent he claims absences outside the statute of limitations contributed to his termination.  Essentially, he is arguing that he would not have been fired absent these earlier events which he claims violate the FMLA.  Certainly, *Barrett* applies to the absences for May 16 and June 2, for which Applewhite claims he should not have been reprimanded because the leave should have been protected as FMLA leave.  *See, e.g.*, Pl.'s Reply 7–8 ("[Deere's] unreasonable and confusing recertification request, and . . . failure to request recertification and provide any FMLA notices for [Applewhite's] absences on May 16, June, and June 15 prejudiced [Applewhite].").  Applewhite also claims that revocation of his teleworking privileges and implementation of the start time is part of the "progressive discipline" that is related to his termination.  *See* Pl.'s Resp. 55.  Presumably, he means that if not for being required to work at the SWOB and being required to arrive by 8:00 AM, he would not have been deemed absent or late, and therefore he would not have been terminated.  The Court sees no reason *Barrett*'s principles should not apply to these acts of interference too, and Applewhite does not address *Barrett*.  The last action of the alleged violations would be the date his privileges were revoked and the date the start time was implemented (both of which predate June 11, 2016).

Applewhite also argues that "[t]he three-year statute of limitations applies because several of [Deere's] FMLA violations were willful."  Pl.'s Resp. 55.  For instance, he argues, Knupp "advised [Matter] to disguise negative comments about his FMLA leave, and include it in his performance appraisals."  *Id.* at 56.  He also argues that Matter "deliberately violated 29 C.F.R. [§] 825.300(c)(5)" by refusing to answer any questions in a meeting where he issued a warning to Applewhite regarding his absences.  *Id.*  Finally, he argues that DDS "refused to

26

participate in a meeting" intended "to clarify his healthcare certifications, rectify alleged violations, and prevent future deficiencies." *Id.*

Applewhite offers no legal support for his apparent argument that if he can prove *some* willful violations, then the three-year statute of limitations applies to all alleged violations. In *Barrett*, 803 F.3d at 897, the Seventh Circuit explained that each time the employer found the plaintiff's absences unauthorized, "an actionable FMLA claim accrued and the limitations clock started to run." *Id.* The Court reads *Barrett* as standing for the proposition that each alleged act of interference or restraint is its own FMLA claim subject to its own statute of limitations. Applewhite therefore needs to show that the three-year statute of limitations applies to each alleged act. This understanding is consistent with the statutory language, which allows for a three-year statute of limitations "[i]n the case of [an] action brought for *a* willful violation of section 2615." 29 U.S.C. § 2617(c)(2) (emphasis added).

As for the alleged violations he has argued were willful, the Court finds that Applewhite has either failed to establish a genuine issue of fact as to whether there was a violation or whether it was willful (and certainly, then, he has failed to establish that he is entitled to judgment as a matter of law). "To benefit from the three-year statute of limitations in § 2617(c)(2), a plaintiff must show that h[is] employer either knew the FMLA prohibited its conduct or showed reckless disregard for whether it did." *Sampra v. U.S. Dep't of Transp.*, 888 F.3d 330, 334 (7th Cir. 2018).

With respect to the argument that Knupp instructed Matter to disguise negative comments about Applewhite's FMLA usage in his performance review, the Court finds that claim belied by the record. Applewhite is referring to an email exchange between Matter and Knupp. Matter forwarded Knupp "a comment from feedback [he] had requested." May 12, 2016 Matter Email,

ECF No. 57-2 at 23. The comment was: "[Applewhite] has told the CART team several times that he is on FMLA . . . but is also continuing to work. . . . [H]is issues seem to be negatively impacting his overall work performance. I would prefer he dedicate himself full time to his FMLA needs and return once he is able to be committed." *Id.* The parties seem to agree that Matter was seeking Knupp's advice on how to address the comment in Applewhite's review. Knupp forwarded him an email she sent to herself: "No reference to FMLA at all…. Talk about the quality of his work, quality of his communications – the things he was able to do - . . . . Paraphrase the feedback below to show that [Applewhite] was disengaged and not committed." May 13, 2016 3:52 PM Knupp Email, ECF No. 57-2 at 23. Certainly if Knupp was instructing Matter to include negative comments based on Applewhite's FMLA leave in his review, but hide it, that would suggest that she knew the FMLA prohibited that conduct. But it is not a reasonable inference from this email alone that Knupp was telling Matter to disguise negative FMLA-based comments; instead, she was telling him not to use the FMLA as a factor, and instead to focus on work-performance issues. In any case, the comment at issue was not included in the review. Applewhite selectively cites to a comment Matter included in his review that he was not engaged. *See* Pl.'s Resp. 37. The comment actually relates to Applewhite's engagement in meetings. *See* 2016 Performance Appraisal Review 8 (feedback from colleagues included that "[i]t appears [Applewhite] is not always engaged in discussions as on occassion [sic] he does not repond [sic] when asked a question in a meeting or on topics specific to his role as business lead"). Applewhite points to no other comments he alleges are based on his FMLA use.

The Court also finds the argument that Matter willfully refused to answer his questions unsupported by the evidence. 29 C.F.R. § 825.300(c)(5) provides that "[e]mployers are . . . expected to responsively answer questions from employees concerning their rights and

responsibilities under the FMLA."  Applewhite claims that Matter deliberately violated this provision, pointing to a June 1, 2016 email Matter sent to himself outlining talking points for a meeting he planned to have with Applewhite the next day which stated: "Do not offer any answers to his questions."  June 1, 2016 7:17 PM Matter Email, Pl.'s Resp. Ex. D, ECF No. 65-5 at 21.  The Court doubts that the mere statement that he was intending not to answer questions suggests he knew the FMLA required employers to answer questions or that he showed reckless disregard for whether refusing to answer questions would violate the FMLA.  Applewhite certainly makes no legal argument on this issue.  Regardless, Applewhite cites no evidence that he actually asked Matter any questions about his FMLA rights or responsibilities during that meeting that Matter did not answer.[17]  Applewhite similarly argues that Curran from DDS willfully declined a meeting with him that he scheduled to get answers to his questions.  But in the email declining his meeting request, Curran responded with information regarding Applewhite's entitlement to leave.  Applewhite points to no authority holding that he was entitled to a meeting.  The email and Curran's further responses addressed all of Applewhite's concerns that related to the FMLA.  Applewhite points to no questions that were not answered.  Curran even offered to answer any further questions Applewhite had.  And moreover, again, the Court doubts that the fact of denying the meeting is itself evidence of willfulness, as that is defined by *Sampra*.

In sum, all of Applewhite's interference claims based on actions that occurred prior to June 11, 2016 are either time-barred or meritless.  Deere is entitled to summary judgment on these claims.

---

[17] Applewhite writes in his response that he "was so shocked by the blatant disregard of his rights, that he, literally, protested, '[t]his is a violation of my right.'"  Pl.'s Resp. 56 (brackets in original).  There is no accompanying cite to the record which supports that he said that to Matter.  Instead, he appears to be quoting from the email he sent to Knupp after she met with him on June 6 regarding the written warning.

## 2.  June 15 Claims

The only claims that remain, then, relate to Applewhite's June 15 absence and subsequent termination.

### a.  Leave and Termination

Applewhite first argues that he was denied leave on June 15 and was terminated as a result.  "A claim under the FMLA for wrongful termination can be brought under either a discrimination/retaliation or interference/entitlement theory; the difference is that the first type of claim requires proof of discriminatory or retaliatory intent while the latter requires only proof that the employer denied the employee his . . . entitlements . . . ."  *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005).  In *Kauffman*, the plaintiff had incurred two disciplinary strikes by December 2001, and then was absent for three days due to illness.  *Id.* at 882.  He tried to claim FMLA leave, but the employer rejected his claim and thus he incurred a third strike and was fired.  *Id.*  The facts are at least similar here—Applewhite had previous unexcused tardies and absences, but then was late on a day he claims he should have been entitled to FMLA leave and was fired—though Applewhite also asserts a retaliation claim and argues he has evidence of retaliatory intent.  The Court will address both theories.  *See infra* Section III(b)(ii)(2)(e).

Deere does not dispute that the June 15 tardy factored into Applewhite's termination.  *See, e.g.*, Def.'s Mot Summ. J. 19 ("Th[e June 15 tardy] was the final straw that led to [Applewhite's] termination, and it had nothing to do with the FMLA.").  The parties do dispute, however, whether Applewhite was entitled to or even requested FMLA leave on that day.  Applewhite makes a number of arguments as to why he was entitled to FMLA leave on June 15, some of which rely on alleged FMLA violations that are time-barred (like arguing that the

recertification process was improper and his leave was proper under the original certification), so

the Court cannot consider them.  He also, however, argues that even under McNamara's last

certification, he was entitled to leave for two reasons:

> 1) his leave use was consistent [with] the need for care described in the
> controlling certification because his absences were not so far in excess of the
> estimated frequency and duration; and 2) [Deere] should have allowed him three
> . . . days to report his unforeseeable leave, and requested a recertification if it
> determined his FMLA leave was in excess of what he was entitled.

Pl.'s Reply 9–10 (footnotes and quotation marks omitted).

Deere makes two arguments as to why Applewhite was not entitled to leave on June 15.

One is that Applewhite did not request FMLA leave that day.  *See* Def.'s Reply 49, ECF No. 73.

There is evidence in the record that Applewhite was traveling from Chicago to Moline and that is

why he was late.  There is also the email in which Applewhite suggested it was an oversight that

he changed his calendar to indicate that he was taking FMLA leave on June 15.  But the Court

does not view this as dispositive in light of Matter's instruction (which Applewhite had been told

numerous times) that Applewhite could not take any FMLA leave over two times a week.  *See*

June 14, 2016 12:52 PM Matter Email.  If that is incorrect—as Applewhite argues it is—and

Applewhite had a qualifying need on June 15, then Deere interfered with or denied his attempt to

exercise his right to FMLA leave.  Moreover, Applewhite also sent an email to Ciha and Knupp

asking for the time he clocked in so he could report it to DDS, indicating he was intending to

assert FMLA leave.[18]  And Applewhite states that he was caring for his mother the morning of

---

[18] Indeed, a document titled "Talk sheet for communication to Jamaal Applewhite" for the June 15 termination, which Deere produced (though the Court has no information about the document's author), lists as a talking point that Applewhite came in late because of travel from FMLA duties, because he was tired, and because it was raining. *See* Talk sheet for communication to Jamaal Applewhite 1, ECF No. 57-1 at 89–90.  It states that Applewhite had exhausted his FMLA time for that week because he took leave on Monday and Tuesday, so his "tardy . . . [wa]s in violation of the expectations . . . clearly laid out for [him]."  *Id.*

June 15 and that he "notified Deere as soon as feasible."  Applewhite 2nd Decl. ¶ 8.   There is a

genuine issue of fact as to whether Applewhite requested FMLA leave.

Deere's second argument is that it was justified in denying any leave over two times a

week because the medical certification stated that Applewhite "required two FMLA occurrences

weekly."  Def.'s Reply 50; *see* Def's Resp. 10 n.6 ("Deere does dispute any suggestion by

[Applewhite] that 'returning' from the FMLA leave he reported on June 14, 2016, was protected

leave on June 15.  It is undisputed [Applewhite] had utilized, on June 13 and June 14, the two

FMLA occurrences for which he was approved that week."); *id.* at 21 (disputing that Applewhite

returned from leave on June 15 and had intent to report FMLA leave for that morning and stating

that it is undisputed that Applewhite "had reported using two days' FMLA leave that week").

Applewhite argues that Deere could not use the certification as an absolute limit on his

entitlement to leave, citing to *Hansen v. Fincantieri Marine Group, LLC*, 763 F.3d 832, 841 (7th

Cir. 2014).  In *Hansen*, the plaintiff alleged that his employer interfered with his rights under the

FMLA and terminated his employment in retaliation for exercising FMLA rights.  *Id.* at 833.  In

May 2011, the plaintiff requested FMLA leave for depression and his physician provided a

certification stating that he would have episodic flare-ups with an estimated frequency of four

episodes every six months with two to five days of incapacity for each episode.  *Id.* at 834.  He

subsequently requested and was approved for FMLA leave based on eight flare-ups throughout

the beginning of the summer.  *Id.*  His employer denied his ninth and tenth requests for leave in

July because the frequency exceeded what was listed in the certification.  *Id.* at 834–35.  The

plaintiff was then fired because he had accumulated too many absences and violated the

employer's attendance policy.  *Id.* at 835.  In litigation, the employer argued that the plaintiff's

"entitlement to intermittent FMLA leave is limited to the precise frequency and duration stated in

32

the certification." *Id.* at 841.  But the Seventh Circuit "reject[ed] the argument that the *estimates* in the certification act as limitations on the frequency and duration of episodes for which an employee may be entitled to intermittent leave under the FMLA."  *Id.* at 843.  The court noted that the employer "should have sought recertification when the frequency of [the plaintiff's] absences exceeded what was estimated in his certification, rather than simply denying him leave."  *Id.* at 842.

Deere argues that it did just what *Hansen* requires because it requested a recertification. *See* Def.'s Reply 50.  But the Court finds that unsupported by the record.  Deere does not argue that it asked for recertification in April (prior to denying Applewhite leave in June) because Applewhite's absences *exceeded* the original certification; instead, it argues that his usage pattern and the frequency of his absences changed and that it had information casting doubt on the validity of the certification and Applewhite's need for leave.  Def.'s Resp. 36–39, ECF No. 63.  Deere did not seek a recertification to confirm that any more than two days was inconsistent with Zinda's medical needs.  Nevertheless, to the extent Applewhite argues that Deere *had* to request another recertification before denying him leave, the Court disagrees.  The regulations are permissive.  *See* 29 C.F.R. § 825.308(c).  And in *Hansen*, 763 F.3d at 843–45, the Seventh Circuit did not find that the employer could not prevail on the FMLA claim because it failed to seek recertification; instead, the court went on to address whether the plaintiff had established a genuine issue of fact as to whether he was entitled to leave on the days in question.

The Seventh Circuit found that the plaintiff had sufficient evidence to "raise[] a material issue of fact as to whether he was unable to perform the functions of his job because of his serious health condition on the days he was absent."  *Id.* at 845.  The court found that the medical certification, and other documents from the physician, "could raise an inference of a lack of

medical necessity for absences exceeding the estimated frequency, [but] another reasonable inference c[ould] be drawn: the documents simply do not address the medical necessity of the July absences." *Id.* at 843. The court found that "the certified need for intermittent leave could support a jury finding that [the plaintiff's] chronic serious health condition rendered him unable to work on the days in question." *Id.* Moreover, the plaintiff had testified "that his depression prevented him from working on the days in question." *Id.* at 845. The court also noted that the physician could testify at trial regarding the estimates in the certification. *Id.* at 843, 845.

The Court likewise finds that there is a genuine dispute of fact as to whether Applewhite had an FMLA-qualifying need for leave on June 15. This precludes summary judgment in either party's favor. The last certification provided by McNamara estimated that Zinda would have episodic flare-ups and would require care during those flare-ups. She estimated the frequency of the flare-ups as two times per week lasting one day each. That could support the inference that any claimed FMLA time past two days was not necessary to care for Zinda. But like in *Hansen*, the certification provides only an estimate, so the certification could support the opposite inference too. The Court cannot choose between competing inferences when ruling on either party's motion. *See id.* at 843 ("It appears that the district court chose between competing inferences, drawing adverse inferences against Hansen, which was improper at the summary judgment stage.").

Additionally, McNamara has declared that she used the word "day" in her certifications "to describe the period, initiated at the onset of [Zinda's] flare ups, ending twenty-four . . . hours later, not necessarily ending by midnight the same day or at the conclusion of . . . Applewhite's . . . workday." McNamara Decl. ¶ 6, ECF No. 65-8. She has also declared that Applewhite's use of intermittent leave on June 15 was "not inconsistent with [Zinda's] need for care for her serious

34

health condition." *Id.* ¶ 8.  And Applewhite has stated that he was caring for his mother the morning of June 15.  Deere does not dispute that travel time can be protected if it is for a reason related to the need to care for a family member.  *See* Def.'s Reply 48–49.  From all of this evidence, a jury could find that Applewhite was caring for his mother on the morning of June 15 and he therefore had a qualifying reason for leave.  Of course, as explained above, there is also evidence which suggests Applewhite was late because of rain and travel and that he disclaimed taking FMLA leave that day, so viewing the evidence in the light most favorable to Deere, a jury could find that Applewhite was not entitled to leave.

### b.  Notice

Applewhite also claims that Deere failed to provide a required notice when it denied him leave on June 15.  *See* Pl.'s Reply 7–9 & n.4.  Presumably, he is referring to the notice requirements set forth in 29 C.F.R. § 825.300.  An employer is required to notify an employee within five business days whether leave will be designated as FMLA-qualifying.  *Id.* § 825.300(d)(1).  "Only one notice of designation is required for each FMLA-qualifying reason per applicable 12-month period, regardless of whether the leave taken due to the qualifying reason will be a continuous block of leave or intermittent or reduced schedule leave."  *Id.*  But "[i]f the employer determines that the leave will not be designated as FMLA-qualifying (e.g., if the leave is not for a reason covered by FMLA or the FMLA leave entitlement has been exhausted), the employer must notify the employee of that determination."  *Id.*  "If the leave is not designated as FMLA leave because it does not meet the requirements of the Act, the notice to the employee that the leave is not designated as FMLA leave may be in the form of a simple written statement."  *Id.* § 825.300(d)(4).  As the Court has explained, there is a genuine issue of fact as to whether Applewhite requested FMLA leave for June 15.  If he did, then it appears that

Deere violated § 825.300(d)(1) and § 825.300(d)(2) by not notifying him in writing that it would not count the leave as FMLA leave—at least it has not pointed the Court to any written notice. Because a genuine issue of fact remains, neither party's summary judgment motion will be granted.

In sum, the Court grants summary judgment to Deere, and denies Applewhite's motion for summary judgment, on all interference claims except those related to the June 15 absence and termination and any required notice related to the June 15 absence.  It denies both motions as to those claims.

### ii.   Retaliation[19]

The FMLA prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice" prohibited by the FMLA.  29 U.S.C. § 2615(a)(2).  Similarly, the FMLA makes it unlawful for an employer to "discharge" or "discriminate" against an individual for taking part in proceedings or inquiries under the FMLA. *Id.* § 2615(b).  The Seventh Circuit analyzes these FMLA discrimination claims under the rubric of retaliation, *see Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 825 (7th Cir. 2012), and evaluates them in the same way that retaliation claims under other employment statutes are evaluated, *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).

In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), the Seventh Circuit explained that the only question on summary judgment for an employment discrimination claim is whether there is sufficient evidence in the record to permit a reasonable factfinder to conclude that a proscribed factor caused the complained of adverse action.  *See Mourning v. Ternes Packaging, Ind., Inc.*, 868 F.3d 568, 571–72 (7th Cir. 2017) (applying that standard to an

---

[19] The Court does not read any of Deere's filings to move for summary judgment on Applewhite's retaliation claims based on the statute of limitations.

FMLA retaliation claim).  Ultimately, then, to survive summary judgment on his FMLA

retaliation claim, Applewhite must show that he engaged in a protected activity, that he suffered

an adverse action, and that the adverse action was causally connected to the adverse action.  *King

v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017).[20]

### 1.  Protected Activity

Deere does not dispute that Applewhite engaged in protected activity, but seems to

suggest that his only protected activity was taking or requesting leave, either in the form of a

request for leave on a specific date or the recertification of his need for leave.  *See* Def.'s Mot.

Summ. J. 17–18 (suggesting the protected activity is the first day of Applewhite's leave and

arguing that even if "protected activity [is measured from the date of [his] recertification request

in May 2016 or his FMLA leave in June 2016, the undisputed record and Seventh Circuit

authority foreclose any reasonable inference" that the termination was because of those actions).

However, Applewhite also argues that he opposed what he believed to be unlawful practices a

number of times.  *See* Pl.'s Resp. 45.  For instance, he complained to Knupp that Matter was

---

[20] Applewhite suggests he is "using a variant of the McDonnell-Douglas method of proof" to prove his retaliation claim.  Pl.'s Resp. 42; Pl.'s Mot. Summ. J. 32 ("[A] claim such as Applewhite's FMLA retaliation claim is assessed under the burden-shifting framework established in McDonnell Douglas.").  He cites to out-of-circuit case law.  *See* Pl.'s Resp. 42 (citing *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002)); Pl.'s Mot. Summ. J. 32 (citing *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014)).  The *McDonnell Douglas* burden-shifting framework remains a viable way of presenting evidence in a discrimination or retaliation claim in the Seventh Circuit, but it is not the only way to prove such a case.  *Ortiz*, 834 F.3d at 766.  "The *McDonnell Douglas* framework is just a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence—evidence that similarly situated employees not in the plaintiff's protected class were treated better—would permit a jury to infer discriminatory intent."  *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499–500 (7th Cir. 2017) (quotation marks omitted).  To state a prima facie case under *McDonnell Douglas* for a retaliation claim, the plaintiff must show: "(1) []he engaged in a statutorily protected activity; (2) []he performed h[is] job according to h[is] employer's legitimate expectations; (3) despite h[is] satisfactory job performance, the employer took an adverse action against h[im]; and (4) []he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity."  *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 926 (7th Cir. 2019) (quotation marks omitted).  Applewhite does not clearly develop an argument that he has established these elements.  *See* Pl.'s Resp. 42 (not identifying these as the elements of the prima facie case); Pl.'s Mot. Summ. J. 32 (same).  Instead, he essentially argues that he has evidence that goes to whether he has established a causal connection between a protected activity and adverse actions, including timing evidence, evidence of pretext, evidence that Deere failed to follow its own policy, evidence of animus, and so forth.  All his evidence goes to the ultimate question and the Court will consider it together.  *See Ortiz*, 834 F.3d at 766 ([A]ll evidence belongs in a single pile and must be evaluated as a whole.").

asking him for too many specific details about his mother's health situation.  He also complained to Knupp that reprimanding him for being late on June 2 violated his FMLA rights and tried to schedule a meeting with Curran to discuss the same concern.  At this stage, what the protected activity is, specifically, seems relevant only to the question of timing, i.e., how long after a protected activity an adverse action took place.

## 2.   Adverse Action

There is also some confusion in the briefing over what Applewhite is claiming as an adverse action.  In his summary judgment motion, Applewhite focuses on his termination, *see* Pl.'s Mot. Summ. J. 32–33, though in his reply he appears to include revocation of his teleworking privileges and his required start time, *see* Pl.'s Reply 10–11.  All of these were alleged as adverse actions in the Amended Complaint.  Am. Compl. ¶ 77.  In his response to Deere's summary judgment motion, Applewhite appears to argue that there were additional adverse actions, including "shar[ing] unwarranted and inconsistent unfavorable comments in his work performance appraisals," Pl.'s Resp. 49; being "removed . . . from his leadership position on [Deere's] recruiting team for the National Society of Black Engineers," being denied a raise, being surveilled, *id.* at 50; being required to complete less desirable work, being denied vacation time and required to ask for vacation time with advance notice, and being required to provide a doctor's note for one sick day, *id.* at 52.

Deere argues that any adverse actions not mentioned in the Amended Complaint—therefore everything except the failure to receive a raise, Am. Compl. ¶ 57; negative comments in his performance review, *id.* ¶ 82; the start time, *id.* ¶ 77; the termination, *id.*; and the revocation of teleworking privileges, *id.*—are an impermissible attempt to amend Applewhite's Amended Complaint.  *See* Def.'s Reply 43–44 (arguing that various alleged acts of retaliation

"cannot form the basis for [Applewhite's] claim of retaliation, because they were not alleged in [his] Complaint, and he cannot amend his Complaint in response to a summary judgment motion."). The Court agrees. "An attempt to alter the factual basis of a claim at summary judgment may amount to an attempt to amend the complaint" and "the district court has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims." *Chessie Logistiscs Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859–60 (7th Cir. 2017).

In *Abuelyaman v. Illinois State University*, 667 F.3d 800, 813–14 (7th Cir. 2014), the Seventh Circuit upheld the district court's refusal to consider the plaintiff's argument at summary judgment that he was retaliated against for participating in an investigation of a discrimination complaint brought by a colleague when "up to the point of summary judgment [his] sole argument . . . was that [he] had complained to" the college president that the colleague was the victim of discrimination. *See also Whitaker v. Milwaukee Cty.*, 772 F.3d 802, 808 (7th Cir. 2014) (characterizing *Abuelyaman* as standing for the proposition that a district court may refuse to consider an "entirely new *factual* basis for retaliation not previously presented"). Here, to the extent Applewhite is basing his retaliation claim on allegations not raised in the Amended Complaint, he is presenting new factual bases for his retaliation claim that were not previously presented, and the Court will not consider them.

### a. Raise

Any claim that Deere retaliated against Applewhite by failing to give him a raise in 2016 is unsupported by the record. Applewhite claims that despite his generally good performance evaluation in 2016, he was offered no merit increase. Pl.'s Resp. 50. There is no evidence in the record to support that this was something Applewhite was entitled to or eligible for or that anyone else (particularly anyone who did not take intermittent FMLA leave) received a raise.

39

*See* Def.'s Reply 48.  In his briefing, Applewhite claims that this was the first time he was denied

a merit increase in ten-years, *see, e.g.*, Pl.'s Resp. 50, but no evidence to that effect was cited in

any of Applewhite's briefing, *id.* at 33; Pl.'s Mot. Summ. J. 13. Without such evidence, the Court

will not conclude that the failure to give Applewhite a raise was even an adverse action, let alone

that it was retaliatory.  *See Villaruel v. Gary Cmty. Sch. Corp.*, 28 F. App'x 564, 570 (7th Cir.

2002) (rejecting the plaintiff's claim that "she did not receive [a] standard salary increase" in

retaliation for a Title VII complaint where she "fail[ed] to present any evidence as to this claimed

standard salary increase, or evidence that others who did not complain, but who were similarly

qualified, received a higher raise"); *cf. Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir. 1996)

(holding that a "loss of a bonus is not an adverse employment action in a case such as this where

the employee is not automatically entitled to the bonus").  Deere is entitled to summary judgment

on this claim.

### b.  Negative Comments in Performance Review

Applewhite's retaliation claim based on negative comments in his performance review is

also denied.  Deere argues that the performance review is not an actionable adverse action.  *See*

Def.'s Reply 37.  Only materially adverse actions are actionable under the FMLA.  *See Freelain

v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018).  "To count an employer's action as

materially adverse, a plaintiff must show that the action would have dissuaded a reasonable

worker from engaging in protected activity."  *Id.* at 901–02 (quotation marks omitted) (noting

that "[t]he category of actions prohibited by . . . anti-retaliation provisions is broader than the

category of adverse employment actions prohibited by . . . anti-discrimination provisions").  The

Seventh Circuit has specifically found, in an FMLA case, that negative performance reviews and

performance improvement plans are not materially adverse actions.  *Langenbach v. Wal-Mart*

*Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014).  The Court will not disregard this Seventh Circuit case law.  Deere is entitled to summary judgment on this claim.

### c.  Start Time

Applewhite's claims that the imposition of a start time was a materially adverse action is also denied.  "Where there is no evidence the defendant sought to exploit a known vulnerability by altering a plaintiff's work schedule upon return from FMLA leave, a schedule change is not a materially adverse action."  *Id.* at 799 (quotation marks omitted).  Applewhite advances no argument that the start time was implemented to exploit a known vulnerability.  And the Court will not make such an argument and marshal the evidence required to support it for him.  Moreover, it is clear from the record that Applewhite was always expected to start working early in the morning, this simply formalized the arrangement after Applewhite had a pattern of being late to or missing meetings and arriving to the SWOB late.  Applewhite only offers a general statement that Matter's direct reports could start working later.[21]  In any case, Deere has provided Applewhite's gate access records, Knupp 2nd Decl. Ex. A, ECF No. 73-9 at 5–21, which show that throughout 2015 and 2016, he usually entered the building sometime between 6:00 AM and 8:00 AM.  Requiring Applewhite start work in the office by 8:00 AM does not appear to represent a material change in his work requirements such that it would dissuade a reasonable person from exercising FMLA rights.  Deere is entitled to summary judgment on this claim.

---

[21] Even in Applewhite's declaration, he implies that Matter had to "okay" his request to start work late.  Applewhite Decl. ¶ 7.  He attaches an instant message conversation with Matter in which he asks Matter for permission to start work late the following day because he was planning to meet with a foreign colleague around midnight.  *See* May 12, 2015 Conversation with Matter, Applewhite Decl. Ex. D, ECF No. 65-7 at 23.

### d.   Revocation of Telework Privileges

Applewhite also claims revoking his telework privileges in April 2016 itself is actionable retaliation.  *See* Pl.'s Reply 10; Pl.'s Resp. 50.  He argues that losing the ability to telework twice per week is a significant change of benefits.  Pl.'s Reply 10.  Deere argues that a "loss of discretionary benefits or conveniences cannot constitute adverse employment actions."  Def.'s Reply 38.  But Deere cites to cases decided before the Supreme Court clarified the standard for materiality.  *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67–68 (2006) (holding that the standard for measuring materiality for a retaliation claim is whether the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (quotation marks omitted)).  Moreover, it cites to cases which involved denial of a benefit, rather than having a benefit taken away, which is what Applewhite is alleging.  *See Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004) (alleging that the employer retaliated by failing to recommend the plaintiff for a journeyman's card); *Rabinovitz*, 89 F.3d at 488 (7th Cir. 1996) (alleging that a lower performance rating "prevented [the plaintiff] from receiving a $600 bonus").  Applewhite also invokes the "known vulnerability" line of cases with respect to the ability to telework, albeit in a section of his reply brief that discusses interference.  Pl.'s Reply 7. He argues that "without telework privileges [he] required more time away from work."  *Id.*  The Court finds that, at the least, a reasonable jury could find that revoking the ability to telework two times a week could dissuade a reasonable employee from exercising his rights.  *See Robinson v. Ergo Sols., LLC*, 257 F. Supp. 3d 47, 52–53 (D.D.C. 2017) (finding that "the question whether ending a telecommuting agreement after 15 years is sufficiently harmful to dissuade a reasonable employee from complaining of discrimination is a factual determination for a jury to make"); *Saunders v. Mills*, 172 F. Supp. 3d 74, 100–01 (D.D.C. 2016)

(distinguishing cases which hold that denial of a telework request is not an adverse action from the facts of the case at hand, where the plaintiff's telework privileges were suspended, and finding that there was at least a genuine issue of fact as to whether the suspension was materially adverse).

The remaining issue is whether Applewhite's protected activity caused Deere to revoke his teleworking privileges. Deere never offers a clear statement of why it revoked Applewhite's teleworking privileges. In its statement of undisputed facts, it writes that Matter revoked Applewhite's teleworking privileges in light of Knupp's "concern[] that [Applewhite] was using his telework privileges to circumvent the expectation that he work onsite." Def.'s Mot. Summ. J. 9. But Knupp's email indicates that she was concerned that Applewhite "[wa]s using his FMLA to stay up in Chicago." Apr. 18, 2016 6:44 PM Knupp Email. She also wrote in an email to Ciha that after "discussing [Applewhite's] performance gaps, his communication style and overall the way he ha[d] handled things with [Matter], his team and his stakeholders," she and Doug Rathburn, Matter's superior, agreed Applewhite needed to be in Moline. Apr. 18, 2016 6:49 PM Knupp Email.

Deere's only argument as to why Applewhite cannot prove the decision to revoke his teleworking privileges was not retaliation is that Applewhite was always expected to work in Moline, which "breaks any causal connection between th[at] expectation[] and [his] FMLA use." Def.'s Reply. 40. This is unpersuasive since Deere allowed Applewhite to telework once a week before he claimed FMLA leave. Applewhite argues that Deere reevoked his telework privileges because he was using too much FMLA leave. *See* Pl.'s Reply 10. A jury could certainly infer that from Knupp's email suggesting that he was using FMLA to stay in Chicago. A jury could also infer retaliation from the shifting explanations provided for the decision. *See Hitchcock v.*

*Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) (noting that shifting or inconsistent explanations for a decision can "create a reasonable inference that they do not reflect the real reason" for the decision).  Deere is therefore not entitled to summary judgment on this claim. But Applewhite is not entitled to summary judgment either.  He has no direct evidence of retaliation, only evidence from which a jury could infer retaliation.  Viewing the evidence in the light most favorable to Deere, a jury would not be required to draw that inference.

### e.   Termination

Applewhite's termination is undisputedly a materially adverse action.  At least one Seventh Circuit case suggests that if Applewhite was fired at least in part for absences that should have been classified as FMLA leave, then he has "establish[ed] a prima facie case of FMLA retaliation."  *Hansen*, 763 F.3d at 835 n.1 ("If Hansen was entitled to take leave under the FMLA for his July absences, he can establish a prima face case of FMLA retaliation: It is undisputed that he incurred attendance points for those absences, and those points led to the termination of his employment."); *see Burnett v. LFW Inc.*, 472 F.3d 471, 482 (7th Cir. 2006) (finding that the fact that the plaintiff engaged in protected activity by taking time off after he gave his employer sufficient notice of his serious medical condition and was "subsequently terminated for the allegedly insubordinate act of leaving work . . . . suggest[s] a direct, causal connection between the protected activity and adverse action").  Other Seventh Circuit cases, however, suggest that is insufficient, and that further proof of retaliatory animus or intent is required.  *See Kauffman*, 426 F.3d at 885–87 (finding that the plaintiff could not establish a retaliation/discrimination claim even though he had "enough evidence to press forward with his" theory that his employer had denied him FMLA leave to which he was entitled to and fired him because of it).

44

The Court will therefore address whether Applewhite has other evidence of retaliation. First, however, the Court notes that Applewhite's motion must be denied as it relates to this claim. There remains a genuine dispute of fact as to whether he was entitled to FMLA leave on June 15 and if he were not, the inference of causation discussed above disappears. The only other evidence Applewhite points to is circumstantial evidence which might allow an inference of retaliation but does not require the factfinder to infer retaliation. He has not established there is no genuine issue of fact and a reasonable factfinder could not find in Deere's favor on this claim.

Any evidence that tends to show an adverse action was taken because of the protected activity is relevant. *See Ortiz*, 834 F.3d at 765. Such evidence can include "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). Here, Applewhite has at least two types of evidence which, considered together, would "permit a reasonable factfinder to conclude that" his protected activity caused his termination. *See Ortiz*, 834 F.3d at 765.[22]

First, he has evidence that the timing of his termination was suspicious. Though "mere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a

---

[22] Deere argues that it terminated Applewhite for a legitimate, non-discriminatory reason: his excessive absenteeism and tardiness. *See, e.g.*, Def.'s Mot. Summ. J. 15. Applewhite may be able to show pretext (that his employer gave a dishonest justification for his termination) if he can show that he was entitled to take FMLA leave on June 15. *See Burnett*, 472 F.3d at 482 (concluding that "a question of fact remain[ed] as to whether [the plaintiff's alleged insubordination] was the true reason" he was terminated when the employer's "classification of [the plaintiff]'s conduct as insubordinate stem[med] in large measure from its mistaken belief that [the plaintiff] was not entitled to FMLA leave"). Perhaps Deere could show that, so long as it honestly believed he was not entitled to FMLA leave, its reason was not pretext. *See Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 533 (6th Cir. 2015). But it does not make that argument. In any case, so long as Applewhite is not relying "solely on *McDonnell Douglas*," which the Court has found he is not, *see supra* footnote 20, "[]he may survive summary judgment even without evidence that the employer's explanation is dishonest." *Joll*, 953 F.3d at 933.

triable issue," *Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012) (alterations in original) (quotation marks omitted), "together with other facts, [suspicious timing] can sometimes raise an inference of a causal connection," *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008).  Moreover, the Seventh Circuit has suggested "there may be an exception to this general rule when the adverse action occurs on the heels of protected activity."  *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) (quotation marks omitted).

The parties dispute the relevant measure of timing for Applewhite's suspicious timing arguments.  Deere argues that amount of time must be calculated from the first time he requested leave, Def.'s Mot. Summ. J. 17 ("[I]n FMLA retaliation cases involving intermittent leave, courts calculate the temporal proximity between alleged protected activity and any adverse action from the moment the plaintiff first requests intermittent leave."), but the authority it cites is not as conclusive as it suggests.  For example, Deere cites to *Evans v. Cooperative Response Center, Inc.*, No. 18-302 ADM/BRT, 2019 WL 2514717, at *6 (D. Minn. June 18, 2019), which involved a retaliation claim under the American with Disabilities Act ("ADA").  The court noted that "[r]equesting FMLA leave has been recognized as protected activity under the ADA," and then held that eight months between the request for intermittent leave and the adverse action was "too lengthy to establish a causal link."  *Id.*  The *Evans* court cited to *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012), in which the Eighth Circuit held that it would "look[] to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended" as the relevant date for causation.  But in that case, the plaintiff took nearly eleven weeks of continuous leave.  *Id.* at 898.  *Sisk* did not involve intermittent leave and *Evans* contains no analysis of whether the relevant date differs for intermittent leave.  Likewise Deere cites *Nolen v.*

*FedEx Services*, No. 13-6245, 2014 WL 12887530, at *3 (6th Cir. May 28, 2014), which is an unpublished Sixth Circuit opinion that states that the plaintiff "first engaged in protected activity when she requested intermittent FMLA leave in August 2009," and that because she was not terminated until approximately nine months later, she could not create a genuine issue of fact based on timing alone. There is no indication the relevant date for measuring timing was at issue. (Moreover, Applewhite has other evidence). Other courts measure temporal proximity from the last day of an employee's FMLA leave. *See Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1273 (11th Cir. 2017) (collecting cases).

Applewhite first engaged in protected activity when he requested FMLA leave in December 2015. He was fired around six months later. But he also engaged in protected activity (potentially) up to when he tried to take leave on June 15. He undisputedly took leave on June 14, the day before he was terminated. He also undisputedly protested that a written warning issued to him on June 6 relied on an absence that should have been protected by the FMLA. These protected activities took place quite close in time to his termination. Moreover, the jury may infer retaliation from other timing in the record. A suspicious sequence of events and a "sequence of protected activity and punitive action could lend some support to a reasonable juror's inference of retaliation." *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012). Applewhite was repeatedly late to or missed meetings prior to requesting FMLA leave (though he now asserts he did not know he was required to attend some of the meetings, that does not suffice to dispute his emails conceding that he was late for certain meetings). But despite repeated tardiness to and absences from meetings, Deere took no disciplinary action (other than informal feedback) until April or May 2016, which is the same time that Applewhite's FMLA usage significantly increased. Of course, there is nothing wrong with progressive discipline. But

47

a jury may find suspicious that as Applewhite took more FMLA leave, his telework privileges were revoked, a strict start time was implemented, and he was given a written warning. The written warning was issued after Applewhite missed half a day for which he attempted to take FMLA leave. The Court does not comment on whether the decision to deny him leave was correct or not (as it is a time-barred basis for Applewhite's interference claim and is not a basis for his retaliation claim), but it may be relevant that the written warning followed an attempt to use FMLA leave. Of course, a jury may also accept Deere's explanation that each of these was justified. But the Court must view the evidence in the light most favorable to Applewhite when considering Deere's summary judgment motion.

Second, Applewhite points to statements Knupp made which he argues reflect a retaliatory intent. Knupp, in emails to Ciha and Curran, said that it "[s]eem[ed] so frustrating" that Applewhite did not have to provide proof that he was using FMLA leave for a qualifying reason, Apr. 18, 2016 6:58 PM Knupp Email, and that it was challenging to manage Applewhite's use of FMLA leave. She also acknowledged that she thought Applewhite was using FMLA leave to stay in Chicago and that she felt he did not deserve a flexible work arrangement. Deere makes no real argument that these are not probative of retaliatory intent. Instead, it argues that these comments do not create a genuine issue of material fact regarding the reason for Applewhite's termination because Knupp was not a decisionmaker with respect to Applewhite's termination and "the comments did not reference termination and were not made in connection with the termination decision," so they were no more than "isolated or stray remarks." Def.'s Reply 36.

The Court finds that a reasonable factfinder could infer that Knupp was frustrated by Applewhite's use of FMLA leave, and therefore she harbored animus toward his FMLA use. *See*

*Chumbley v. Bd. of Educ. for Peoria Dist. 150*, 220 F. Supp. 3d 915, 920 (C.D. Ill. 2016) ("A reasonable factfinder could find [comments made by the superintendent that she found the plaintiff's FMLA leave request frustrating because he told the director of HR that he was experiencing job-related anxiety issues in May, but then he did not request leave until October] . . . indicate frustration with Plaintiff taking FMLA leave, which then caused Defendant to reassign him."). The Court need not find that the emails in fact show Knupp's intent to retaliate; the fact that they are ambiguous "is the very reason the jury must be called." *Joll*, 953 F.3d at 932.

The Court also finds that a genuine issue of fact exists as to whether Knupp was a decisionmaker. Both Knupp and Ciha testified that Knupp was a decisionmaker, though Knupp testified that Dan Allen made the ultimate decision and Ciha testified that she and Allen were the ultimate decisionmakers. Ultimate decision or ultimate decisionmaker is not explained by any of these witnesses, but the Court finds that based on Knupp and Ciha's testimony that Knupp was a decisionmaker, a jury could find that she was at least in part responsible for the decision to terminate Applewhite.[23] In any case, Seventh Circuit case law provides that statements made by those who provide input to the decision are relevant as well. *See Gorence v. Eagle Food Ctrs, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

And lastly, the Court disagrees that the comments are only relevant if they are made in reference to the decision to terminate Applewhite. The Seventh Circuit has cautioned courts against "overread[ing]" stray-remarks cases. *See Hunt v. City of Markham*, 219 F.3d 649, 652–53 (7th Cir. 2000). "A remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally." *Joll*, 953 F.3d at 935. And, regardless, here,

---

[23] In a July 2019 hearing, Deere took the position that Allen "was just really a . . . rubber stamp." July 24, 2019 Hr'g Tr. 24:6–7, ECF No. 72.

the emails were sent approximately two months before Applewhite was terminated, and were made in official emails discussing Applewhite's work performance, the requirement that he work in person rather than teleworking, and his use of FMLA leave, all of which a jury could find were relevant to the process leading up to Applewhite's termination. *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 710 (7th Cir. 2013) (holding that the jury "should be able to consider that [the plaintiff's supervisor] expressed bias against women and Hispanics in the workplace a year before he became a witness in the investigation into [the plaintiff's] conduct and provided information to [the decisionmaker] that led to her firing").

Having found Applewhite has some evidence from which a factfinder could infer retaliation, the Court need not address his other evidence about comparators and Deere's failure to follow its policy. The Court finds that genuine issues of fact prevent summary judgment for either party on Applewhite's claims that Deere retaliated against him by terminating him and revoking his teleworking privileges. Deere is entitled to summary judgment on all other retaliation claims.

## CONCLUSION

Accordingly, Defendant Deere & Company, Inc.'s Motion for Summary Judgment, ECF No. 53, is GRANTED IN PART AND DENIED IN PART. Plaintiff Jamaal Applewhite's Motion for Summary Judgment, ECF No. 56, is DENIED; Supplement Attachments, ECF No. 57, filed as a motion to supplement, is MOOT; Motion to Supplement, ECF No. 67, is GRANTED; Motion for Discovery Sanctions, ECF No. 80, is DENIED; and unopposed Motion for Oral Argument, ECF No. 83, is DENIED. The claims remaining for trial are Applewhite's interference claims that he was denied leave and terminated on June 15, 2016 and that Deere failed to provide notice of the denial and his retaliation claims based on revocation of his

teleworking privileges and his termination.  Pursuant to Local Rule 16.1(B), the parties are

DIRECTED to participate in a settlement conference with Magistrate Judge Jonathan Hawley.

The Court will set pretrial and trial dates, if necessary, after the settlement conference.

Entered this 30th day of November, 2020.

s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE
